1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5   UNITED STATES OF AMERICA,       )  CR-16-00519 LHK
                                     )
6              PLAINTIFF,            )  SAN JOSE, CALIFORNIA
                                     )
7          VS.                       )  JULY 12, 2019
                                     )
8   JOHNNY RAY WOLFENBARGER,         )  PAGES 247-414
                                     )
9              DEFENDANT.            )
    _____ )

10

11

12           TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
13           UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  MARISSA HARRIS
17                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA  95113
18

19   FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           BY:  GRAHAM ARCHER
20                              SEVERA KEITH
                           55 SOUTH MARKET STREET, SUITE 820
21                         SAN JOSE, CALIFORNIA  95113

22          APPEARANCES CONTINUED ON NEXT PAGE

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR NCMEC:              BRYAN CAVE LEIGHTON PAISNER LLP
                               BY:  ALEXANDRA WHITWORTH
5                              THREE EMBARCADERO CENTER, 7TH FLOOR
                               SAN FRANCISCO, CALIFORNIA  94111
6

7      ALSO PRESENT:           CHRIS MARCEAU
                               SCOTT SCHELBLE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF WITNESSES

3

4      GOVERNMENT'S

5      **SEAN ZADIG**
              DIRECT EXAM BY MS. HARRIS              P. 251
6             CROSS-EXAM BY MR. ARCHER              P. 296
              REDIRECT EXAM BY MS. HARRIS           P. 366
7             RECROSS-EXAM BY MR. ARCHER            P. 369

8

9      **SCOTT SCHELBLE**
              DIRECT EXAM BY MS. HARRIS             P. 372
10            CROSS-EXAM BY MR. ARCHER              P. 393

11

12     **CHRIS MARCEAU**
              DIRECT EXAM BY MS. HARRIS             P. 401
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    JULY 23, 2019

2                   P R O C E E D I N G S

3         (COURT CONVENED AT 10:00 A.M.)

4              THE COURT:  GOOD MORNING AND WELCOME.

5         OKAY.  WOULD MR. ZADIG PLEASE TAKE THE STAND?

6         SIR, YOU'RE STILL UNDER OATH.

7              THE REPORTER:  DO YOU WANT TO CALL THE CASE?

8              THE CLERK:  YES.  CALLING CASE 16-CR-519, THE

9    UNITED STATES VERSUS JOHNNY RAY WOLFENBARGER.

10             MS. HARRIS:  GOOD MORNING, YOUR HONOR.

11        MARISSA HARRIS FOR THE UNITED STATES.

12             THE COURT:  GOOD MORNING.

13             MR. ARCHER:  GOOD MORNING, YOUR HONOR.

14        GRAHAM ARCHER FOR MR. WOLFENBARGER.  HE APPEARS BEFORE THE

15   COURT OUT OF CUSTODY.

16             THE COURT:  GOOD MORNING.  WELCOME.

17             MS. KEITH:  SEVERA KEITH ALSO FOR MR. WOLFENBARGER.

18             THE COURT:  OKAY.  WELCOME.

19        GO AHEAD, PLEASE.

20             MS. HARRIS:  THANK YOU, YOUR HONOR.

21        MAY I APPROACH THE WITNESS?  I'M JUST PROVIDING A COPY OF

22   HIS DECLARATION.

23             THE COURT:  GO AHEAD, PLEASE.

24        **(GOVERNMENT'S WITNESS, SEAN ZADIG, WAS PREVIOUSLY SWORN.)**

25   ///
```

1              **DIRECT EXAMINATION (RESUMED)**

2    BY MS. HARRIS:

3    Q.   SO -- GOOD MORNING, MR. ZADIG.

4    A.   GOOD MORNING.

5              MS. HARRIS:  DID THE COURT REMIND HIM THAT HE'S STILL

6    UNDER OATH FROM THE PREVIOUS PROCEEDINGS?

7              THE COURT:  I DID.  I CAN HAVE THE OATH ADMINISTERED

8    AGAIN IF YOU WANT, BUT I DID REMIND HIM.

9              MS. HARRIS:  OKAY.

10             THE COURT:  I DON'T THINK IT'S NECESSARY.

11             MS. HARRIS:  IT'S NOT, YOUR HONOR.  THANK YOU FOR

12   CLARIFYING.

13   Q.   SO I BELIEVE WHEN WE BROKE ON THE 12TH OF JULY, WE HAD

14   LAST DISCUSSED THE LAST OF ECIT'S INVESTIGATION INTO THE

15   PHILIPPINE WEBCAM CONDUCT.

16        DO YOU RECALL THAT, SIR?

17   A.   I DO RECALL THAT, YES.

18   Q.   AND I BELIEVE YOU TESTIFIED THAT THE FINAL SET, OR AT

19   LEAST THE MOST RECENT SET OF CYBERTIPS WAS FILED IN 2018; IS

20   THAT CORRECT?  OR EARLIER THIS YEAR?

21   A.   I BELIEVE IT WAS EARLIER THIS YEAR.

22   Q.   EARLIER THIS YEAR.  OKAY.  OKAY.

23        SO I'M JUST GOING TO SORT OF REDIRECT AND FOLLOW UP ON

24   SPECIFICALLY WHAT HAPPENED AFTER REPORT 7405007 WAS FILED FOR

25   MR. WOLFENBARGER IN THIS MATTER.

1          SO AT SOME POINT AFTER THAT REPORT WAS FILED WITH NCMEC,

2     DID YAHOO RECEIVE LEGAL PROCESS RELATING TO MR. WOLFENBARGER?

3     A.   IT DID, YES.

4     Q.   DO YOU RECALL WHAT THAT PROCESS WAS?

5     A.   I BELIEVE IT WAS A SEARCH WARRANT.

6     Q.   OKAY.  AND WHEN APPROXIMATELY WAS THE SEARCH WARRANT

7     RECEIVED, IF YOU RECALL?

8     A.   I BELIEVE --

9               THE COURT:  IS MR. ZADIG'S MICROPHONE ON?

10              THE CLERK:  I'M WORKING -- I'M NOT SURE IF ANY OF

11    THEM ARE ON.  THEY WERE WORKING EARLIER.

12              THE COURT:  MS. HARRIS, DO YOU WANT TO MOVE YOURS

13    CLOSER TO YOU?

14         I DON'T THINK MR. ZADIG'S IS ON.

15              THE CLERK:  I'M NOT SURE ANY OF THEM ARE WORKING.

16              MS. HARRIS:  I DON'T THINK IT'S ON, YOUR HONOR.

17              THE COURT:  ALL RIGHT.  WELL, PLEASE JUST --

18              MS. HARRIS:  I'LL JUST TALK LOUD.

19              THE COURT:  PLEASE TALK LOUD.  THANK YOU.

20              THE WITNESS:  I WILL DO THE SAME.

21              THE COURT:  THANK YOU.

22              THE WITNESS:  SO REGARDING THE SEARCH WARRANT, I'M

23    NOT CERTAIN OFFHAND WHEN THAT WAS.

24    BY MS. HARRIS:

25    Q.   OKAY.  DO YOU RECALL WHICH YEAR IT WAS, OR --

1    A.   I BELIEVE IT WAS LIKELY PROBABLY 2016.

2    Q.   OKAY.  AND ONCE YAHOO RECEIVED THE WARRANT, HOW DID THEY

3    RESPOND?

4    A.   OUR --

5              THE COURT:  OH, THERE WE GO.

6              THE CLERK:  I JUST HAD TO RESET IT.

7              THE COURT:  THANK YOU.

8              THE WITNESS:  OUR LEGAL TEAM -- SO WE HAD A TEAM

9    WITHIN THE LEGAL DEPARTMENT CALLED THE LAW ENFORCEMENT RESPONSE

10   TEAM THAT RESPONDS TO LEGAL PROCESS, BOTH CIVIL AND CRIMINAL.

11   THE LAW ENFORCEMENT RESPONSE TEAM WOULD HAVE RESPONDED TO THAT

12   LEGAL PROCESS.

13   BY MS. HARRIS:

14   Q.   OKAY.  DO YOU RECALL HAVING ANY COMMUNICATIONS WITH THE

15   AGENT WHO WAS SERVING THE WARRANT ABOUT THE STATUS OF THE

16   PROSECUTION?

17   A.   I DO, YES.

18             MS. HARRIS:  YOUR HONOR, MAY I APPROACH?

19             THE COURT:  GO AHEAD, PLEASE.

20   BY MS. HARRIS:

21   Q.   SO I'M HANDING YOU WHAT'S BEEN FILED IN THIS LITIGATION AS

22   DEFENSE EXHIBIT N (HANDING).

23        WHY DON'T YOU JUST TAKE A QUICK LOOK THROUGH THOSE

24   DOCUMENTS, MR. ZADIG.

25             (PAUSE IN PROCEEDINGS.)

```
 1                    THE WITNESS:  OKAY.

 2        BY MS. HARRIS:

 3        Q.   DO YOU RECOGNIZE THOSE COMMUNICATIONS, SIR?

 4        A.   I DO, YES.

 5        Q.   OKAY.  ARE THOSE THE COMMUNICATIONS THAT YOU HAD WITH THE

 6        AGENT SERVING THE SEARCH WARRANT ON THIS CASE?

 7        A.   THEY ARE.

 8        Q.   SO I WANT TO DIRECT YOUR ATTENTION TO PAGE 1.

 9             THERE WE GO.

10             SO -- OKAY.  SO DIRECTING YOUR ATTENTION TO THE E-MAIL

11        SENT ON JANUARY 24TH.

12             DO YOU SEE THAT, SIR?

13        A.   I DO, YES.

14        Q.   OKAY.  IT APPEARS IN THE E-MAIL THAT YOU'RE ASKING FOR

15        UPDATES ON THE JRWOLFEN02 CASE; IS THAT CORRECT?

16        A.   THAT'S CORRECT.

17        Q.   AND WHY DID YOU REQUEST UPDATES ON THE CASE?

18        A.   IT'S THE PRACTICE OF THE ECIT TEAM TO FOLLOW UP ON ALL

19        PRIOR CHILD SAFETY SUPPLEMENTS TO OBTAIN FEEDBACK.

20        Q.   AND WHAT'S THE REASON FOR THAT?

21        A.   THERE'S A COUPLE REASONS.  PRIMARILY IT IS BECAUSE WE HAVE

22        FOUND THAT THE PRACTICE OF -- OUR EMPLOYEES WHO DEAL WITH THIS

23        CONTENT, THAT IS, CHILD EXPLOITATION AND SEXUAL ABUSE CONTENT,

24        IT'S VERY EMOTIONALLY DIFFICULT TO BE EXPOSED TO THAT TYPE OF

25        CONTENT.
```

1          IN FACT, IT ACTUALLY -- ESSENTIALLY THE BRAIN, ACCORDING

2     TO OUR WELLNESS SPECIALISTS THAT WE BRING IN, EXPERIENCES

3     TRAUMA WHEN EMPLOYEES OR PEOPLE ARE EXPOSED TO THAT TYPE OF

4     CONTENT.

5          AND WE BRING IN WELLNESS AND RESILIENCY COUNSELORS WHO --

6     WITH A SPECIALTY IN TRAUMA ON A QUARTERLY BASIS WHO WORK WITH

7     MY TEAM AND HELP THEM PROCESS THE IMAGES THEY SEE AND DEVELOP

8     COPING STRATEGIES FOR DEALING WITH THIS.

9          ONE OF THE RECOMMENDATIONS THAT THEY PROVIDE IS THAT WE

10    OBTAIN FEEDBACK TO PROVIDE BOTH CLOSURE TO THE PEOPLE WHO ARE

11    EXPOSED TO THIS CONTENT, SO THAT'S MY TEAM, THE ECIT TEAM, AS

12    WELL AS ENGINEERS WHO BUILD THE TOOLS ACROSS THE COMPANY, AND

13    THE FRONT-LINE REVIEWERS ON OUR MODERATION TEAM.

14         AND SO THESE -- THE WELLNESS AND RESILIENCY EXPERTS HAVE

15    RECOMMENDED WE OBTAIN THAT FEEDBACK FOR THE CLOSURE, AND ALSO

16    TO HELP ENSURE THAT PEOPLE WHO ARE EXPOSED TO THIS CONTENT KNOW

17    THAT THEY'RE DOING IT FOR A REASON, ESSENTIALLY.

18    Q.   OKAY.  YOU ALSO MENTIONED THAT YOU CONSULTED WITH

19    ENGINEERS IN THIS PROCESS.  WHAT IS THE NATURE OF THAT

20    CONSULTATION WITH THE COMPANY'S ENGINEERS REGARDING THIS

21    PARTICULAR CONDUCT?

22    A.   SURE.  SO THERE ARE ENGINEERS ACROSS THE COMPANY WHO BUILD

23    BOTH THE PRODUCTS THAT OUR USERS USE, LIKE YAHOO MESSENGER AND

24    YAHOO MAIL AND OTHERS, AS WELL AS ENGINEERS THAT SUPPORT

25    INTERNAL TOOLS, LIKE THE TOOLS THAT THE LEGAL TEAM USES TO

1    PRODUCE INFORMATION IN RESPONSE TO LEGAL PROCESS, AND THE TOOLS

2    THAT THE TEAM USES TO REPORT IMAGES TO NCMEC, FOR EXAMPLE.

3        THE -- THESE ENGINEERS -- SO THESE FUNCTIONS DON'T

4    GENERATE REVENUE FOR THE COMPANY.  THE CHILD SAFETY REPORTING

5    IS NOT A REVENUE GENERATING FUNCTION.

6        AND AS SUCH, WE NEED TO OBTAIN SUPPORT FOR DOING THIS TYPE

7    OF WORK WITHIN THE COMPANY TO ALLOW IT TO OCCUR AND FOR MORE OF

8    IT TO HAPPEN.  WE NEED THE LEADERS, THE VICE PRESIDENTS OF THE

9    VARIOUS ORGANIZATIONS AND THE VARIOUS PRODUCTS TO UNDERSTAND

10   THAT THIS WORK HAS VALUE AND IS IN OUR BUSINESS INTEREST TO DO,

11   EVEN THOUGH IT'S NOT IMMEDIATELY GENERATING ADVERTISING

12   REVENUE.

13       SO WE SHARE THE RESULTS, WHEN WE LEARN ABOUT OUTCOMES LIKE

14   CHILD RESCUES AND ARRESTS AND OTHER POSITIVE OUTCOMES, WITH A

15   LARGE GROUP OF PEOPLE IN THE COMPANY.  THIS INCLUDES THE ECIT

16   MEMBERS, OUR LEGAL AND POLICY INDIVIDUALS, AND THEN THE

17   ENGINEERS THAT I WAS DESCRIBING SO THEY KNOW THAT THE WORK THAT

18   THEY HAVE BEEN WORKING ON AND ENABLING THE REPORTING OF THIS

19   CONTENT ACTUALLY HAS SOME SORT OF VALUE BOTH TO THE COMPANY AND

20   TO SOCIETY AND TO THEMSELVES.

21   Q.   IS THERE ANY INTEREST IN IMPROVING THE PRODUCTS SO THAT

22   THEY CANNOT BE EXPLOITED IN THIS WAY AGAIN?

23   A.   YES, THAT'S ALSO A BIG PART OF WHAT ECIT DOES IS NOT ONLY

24   DO WE LOOK AT PRODUCTS THAT HAVE ALREADY SHIPPED AND

25   INVESTIGATIVE USE AND FRAUD AND OTHER ISSUES ON THEM, BUT WE

```
 1        ALSO WORK WITH PRODUCTS THAT ARE PREVIOUS TO LAUNCH.

 2             SO AS NEW PRODUCTS ARE BEING PLANNED, WE MEET WITH TEAMS

 3        AND TRY TO TELL THEM THAT THEY NEED TO BE CONSIDERATE OF

 4        CERTAIN CONTENT ISSUES.  FOR EXAMPLE, THEY NEED TO MAKE SURE

 5        THAT THEIR PLATFORMS ARE NOT GOING TO BECOME HAVENS FOR CHILD

 6        PORNOGRAPHY OR CHILD ABUSE MATERIAL OR OTHER ONLINE SCAMS OR

 7        FRAUD.

 8             AND WE USE THESE OUTCOMES WE GET FROM LAW ENFORCEMENT AS A

 9        WAY, ALMOST LIKE A CAUTIONARY TALE TO HELP EDUCATE ENGINEERS

10        WHO ARE CONSIDERING LAUNCHING NEW PRODUCTS AND WE DON'T WANT

11        THEM TO BE ABUSED IN THIS WAY.

12        Q.   OKAY.  SO IT HELPS THE ENGINEERS LEARN HOW TO MAKE -- HOW

13        TO FORTIFY THEIR PRODUCTS AGAINST THIS TYPE OF ABUSE?

14        A.   THAT'S CORRECT, YES.

15        Q.   AND AGAIN -- AND IT HELPS, I BELIEVE YOU TESTIFIED

16        PREVIOUSLY -- UPON THE RECOMMENDATION OF THE WELLNESS AND

17        RESILIENCY EXPERTS THAT YOU GOT, IT HELPS TO PROVIDE CLOSURE

18        FOR THE FRONT-OF-LINE CONTENT REVIEWERS WHO DEAL WITH THIS

19        MATERIAL?

20        A.   THAT'S CORRECT.

21             MR. ARCHER:  OBJECTION.  LEADING.

22             THE COURT:  SUSTAINED.

23        BY MS. HARRIS:

24        Q.   OKAY.  I BELIEVE YOU TESTIFIED PREVIOUSLY ABOUT THE

25        WELLNESS AND RESILIENCY EXPERTS THAT YOU GOT.  IS THAT CORRECT?
```

1    A.   YES.  WE HAVE THESE TEAMS, LIKE I MENTIONED EARLIER, OF

2    CONTENT MODERATORS WHO, DAY IN AND DAY OUT, ALL THEY DO IS LOOK

3    AT OBJECTIONABLE CONTENT, CHILD ABUSE MATERIAL, TERRORISM

4    CONTENT ON VARIOUS PROPERTIES, HATE SPEECH, HARASSMENT, KIND OF

5    THE WORST OF THE WORST OF THE INTERNET.  AND THAT JOB IS VERY,

6    VERY DIFFICULT.

7         THERE'S ACTUALLY BEEN A LOT OF PRESS RECENTLY ABOUT OTHER

8    COMPANIES AND THE TEAMS THAT THEY EMPLOY AND HOW THEY HAVE TO

9    DEAL WITH SORT OF THE CONTENT THEY SEE.

10        SO MAKING SURE THAT THESE EMPLOYEES IN OUR COMPANY HAVE,

11   YOU KNOW, PROPER MENTAL WELLBEING AS A RESULT OF THE CONTENT

12   THEY'RE EXPOSED TO IS REALLY IMPORTANT TO US.

13   Q.   I SEE.

14        DIRECTING YOUR ATTENTION TO ANOTHER E-MAIL THAT WAS FILED

15   AS PART OF THIS EXHIBIT, ON JANUARY 25TH, 2017, IN THIS E-MAIL,

16   YOU ARE INFORMED ABOUT CHARGES THAT WERE FILED IN THIS CASE; IS

17   THAT CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   OKAY.  DO YOU RECALL HOW YOU RESPONDED WHEN YOU LEARNED OF

20   THE CHARGES THAT WERE FILED?

21   A.   IF I RECALL, I RESPONDED TO THE AGENT AND THANKED HER FOR

22   THE INFORMATION AND INDICATED THAT WE WOULD RECORD IT OR NOTE

23   IT ON OUR SIDE.

24   Q.   OKAY.

25             THE COURT:  IS THIS STILL DEFENSE N?

1              MS. HARRIS:  IT IS, YOUR HONOR.

2              THE COURT:  OKAY.  GO AHEAD, PLEASE.

3      BY MS. HARRIS:

4      Q.  SO NOW I'M GOING TO SHOW YOU DEFENSE EXHIBIT M, AS IN

5      MARY.

6          DO YOU RECOGNIZE THIS E-MAIL, SIR?

7      A.  I DO, YES.

8      Q.  OKAY.  IT'S AN E-MAIL FROM YOU?

9      A.  THAT'S CORRECT.

10     Q.  GO AHEAD AND TAKE A MINUTE TO READ IT.

11         (PAUSE IN PROCEEDINGS.)

12             THE WITNESS:  OKAY.

13     BY MS. HARRIS:

14     Q.  OKAY.  SO IT APPEARS IN THIS E-MAIL THAT YOU'RE INFORMING

15     YOUR TEAM, OR OTHER INDIVIDUALS, OF WHAT YOU CLASSIFY --

16             MR. ARCHER:  OBJECTION.  LEADING.

17     BY MS. HARRIS:

18     Q.  -- AS A SUCCESSFUL OUTCOME; IS THAT CORRECT?

19             MR. ARCHER:  OBJECTION.  LEADING.

20             MS. HARRIS:  IT'S STATED IN THE DOCUMENT, YOUR HONOR.

21             THE COURT:  SUSTAINED.

22     BY MS. HARRIS:

23     Q.  OKAY.  HOW WOULD YOU CHARACTERIZE YOUR E-MAIL HERE?

24     A.  I WOULD SAY THIS IS A TYPICAL EXAMPLE OF AN E-MAIL THAT WE

25     WILL SEND TO THE GROUP OF INDIVIDUALS WITHIN THE COMPANY WHO

1       WORK ON CHILD SAFETY MATTERS.

2            SO IN THE "TO" LINE YOU SEE, IT SAYS CSE REPORTING

3       OUTCOMES.  THAT'S CHILD SEXUAL EXPLOITATION REPORTING OUTCOMES.

4       IT'S THE LIST THAT WE BUILT WITH THE LEGAL AND POLICY AND

5       ENGINEERING AND MODERATION TEAMS TO SORT OF SHARE OUTCOMES THAT

6       WE LEARNED THAT ARE POSITIVE FROM CHILD SAFETY WORK.

7            THIS IS A VERY TYPICAL EXAMPLE OF ONE OF THOSE OUTCOME

8       E-MAILS WE MIGHT SEND.  WE NOTED WHAT HAPPENED, THE DATE OF THE

9       ACTION.  IN MANY CASES, WE'LL ATTACH COURT TRANSCRIPTS, OR NOT

10      TRANSCRIPTS, BUT COURT DOCUMENTS, LIKE THE INDICTMENT OR ARREST

11      AFFIDAVITS.

12           AND WE WILL THEN RECOGNIZE INDIVIDUALS ACROSS THE COMPANY

13      WHO DIRECTLY CONTRIBUTED TO THIS GOOD OUTCOME.  FOR EXAMPLE, IN

14      THIS E-MAIL, I THANK THE MODERATION TEAM -- CE STANDS FOR

15      CUSTOMER EXPERIENCE, PART OF THE ORGANIZATION WHERE THE

16      MODERATION TEAM RESIDES -- I THANKED THEM FOR FILING DOZENS OF

17      CYBERTIPS FOR THE YAHOO MESSENGER PROFILE PICTURES I DESCRIBED

18      IN MY LAST TESTIMONY.

19           I THANKED THE INDIVIDUAL FROM THE LERT, LAW ENFORCEMENT

20      RESPONSE TEAM, IN LEGAL WHO RESPOND TO THE SEARCH WARRANT.

21           I ALSO THANKED THE ENGINEER -- HIS NAME WAS JORGE -- WHO

22      BUILT AND SUPPORTED THE LAT TOOL, LAT BEING THE TOOL THAT SENDS

23      THE REPORTS TO NCMEC, FOR HIS ASSISTANCE.

24           AND THEN I CONCLUDED WITH SAYING, "IT'S GREAT TO START OFF

25      THE YEAR WITH THESE WINS, WHICH WILL HELP GUIDE US THROUGH THIS

1    YEAR AND FOCUS OUR EFFORTS, TRYING TO MAKE SURE THAT EVERYBODY

2    UNDERSTANDS THAT THE DIFFICULT WORK THAT THESE TEAMS DO IS VERY

3    IMPORTANT."

4    Q.   SO YOU APPEAR TO ACKNOWLEDGE SEVERAL PEOPLE IN THE E-MAIL;

5    IS THAT CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   OKAY.  AND WHY WOULD YOU ACKNOWLEDGE SO MANY PEOPLE IN

8    THIS E-MAIL?

9    A.   WE FOUND THAT DIRECTLY RECOGNIZING THE INDIVIDUALS WHO

10   CONTRIBUTED TO A PARTICULAR OUTCOME, A CHILD RESCUE OR AN

11   ARREST OR SOME OTHER GOOD, POSITIVE OUTCOME, IS REALLY HELPFUL

12   TO THAT INDIVIDUAL.  IT HELPS THEM UNDERSTAND THAT ALL THE HARD

13   WORK AND THE CONTENT THEY'VE BEEN EXPOSED TO, THE CHILD

14   PORNOGRAPHY AND CHILD ABUSE IMAGES THEY'VE HAD TO EXPERIENCE,

15   HAD AN OUTCOME THAT RESULTED IN SOMETHING THAT, YOU KNOW, WAS

16   BEYOND THEMSELVES AND BEYOND THE COMPANY.

17        AND SO WE MADE A POINT, FOR ALMOST MY ENTIRE TIME AT

18   YAHOO, TO DIRECTLY CALL OUT PEOPLE WHO CONTRIBUTED TO CERTAIN

19   OUTCOMES.

20   Q.   NOW, THE PRIOR EXHIBIT DEALT WITH E-MAILS BETWEEN YOU AND

21   AGENT TROMBETTA; IS THAT CORRECT?  EXHIBIT N.

22   A.   THAT'S CORRECT.

23   Q.   DID AGENT TROMBETTA EVER REQUEST INFORMATION ABOUT

24   MR. WOLFENBARGER WITHOUT LEGAL PROCESS?

25   A.   SHE DID NOT.

1    Q.   DID YOU EVER PROVIDE ANY INFORMATION ABOUT

2    MR. WOLFENBARGER TO THE FBI WITHOUT LEGAL PROCESS?

3    A.   OUTSIDE OF OUR INITIAL REFERRALS TO NCMEC AND THE

4    SUPPLEMENT PROCESS THROUGH CYBERTIPS, NO.

5    Q.   SO WERE YOU THE PERSON IN CHARGE OF ECIT'S INTERNAL

6    INVESTIGATIONS?

7    A.   YES.

8    Q.   I BELIEVE YOU TESTIFIED THAT THERE WERE ROUGHLY FOUR OF

9    THEM.  IS THAT CORRECT?

10   A.   I BELIEVE SO, YES.

11   Q.   WHAT WAS MANAGEMENT'S ATTITUDE IN TERMS OF THE INVESTMENT

12   OF RESOURCES AND TIME INTO THESE INVESTIGATIONS?

13   A.   MANAGEMENT, COMPANY MANAGEMENT, TO INCLUDE THE CEO, THE

14   GENERAL COUNSEL, AND THE BOARD OF DIRECTORS OF YAHOO WHEN YAHOO

15   WAS AN INDEPENDENT COMPANY PRIOR TO ACQUISITION, HAD BEEN

16   INFORMED OF THESE INVESTIGATIONS AND WERE, FRANKLY, SHOCKED

17   THAT THIS TYPE OF CONDUCT WAS HAPPENING ON THE PLATFORMS THAT

18   THEY OPERATED.

19        AND SO THEY WERE VERY SUPPORTIVE OF THESE INVESTIGATIONS

20   BECAUSE THEY DIDN'T, IN MY -- MY UNDERSTANDING OF WHAT I WAS

21   TOLD IS THAT THEY DIDN'T WANT TO HAVE THIS BAD THING HAPPENING

22   ON THEIR PLATFORMS.

23   Q.   OKAY.  WERE THESE INVESTIGATIONS CONDUCTED SOLELY TO CURRY

24   GOOD FAVOR WITH INVESTIGATING AGENTS?

25   A.   NO.

1          MR. ARCHER:  OBJECTION.  LEADING.

2          MS. HARRIS:  IT'S A QUESTION.

3          THE COURT:  OVERRULED.

4       GO AHEAD.  YOU MAY ANSWER THE QUESTION.

5          THE WITNESS:  THEY WERE NOT.

6    BY MS. HARRIS:

7    Q.  AND WERE THESE INVESTIGATIONS CONDUCTED SOLELY TO GENERATE

8    PUBLICITY?

9    A.  THEY WERE NOT.

10   Q.  WERE YOU THE POINT OF CONTACT FOR ALL LAW ENFORCEMENT

11   INQUIRIES ABOUT THE USERS THAT ECIT REFERRED TO NCMEC IN ITS

12   VARIOUS REPORTS?

13   A.  I WAS.

14       AND I SHOULD TESTIFY, FOR YOUR PREVIOUS QUESTION, WE

15   ACTUALLY DON'T WANT ANY PUBLICITY, IF WE CAN.  WE HAVE -- WE

16   DON'T ISSUE ANY PRESS RELEASES, WE DON'T TALK TO REPORTERS,

17   WITH THE EXCEPTION OF AN NPR ARTICLE BACK IN 2017, ABOUT THIS

18   WORK.

19       WE REALLY TRY TO SORT OF REMAIN, YOU KNOW, IN THE SHADOWS

20   MORE OR LESS AND DON'T WANT TO DRAW ATTENTION TO THIS WORK.

21   Q.  OKAY.  AND I BELIEVE YOU JUST SAID THAT YOU WERE THE POINT

22   OF CONTACT FOR LAW ENFORCEMENT INQUIRIES ABOUT USERS THAT ECIT

23   REFERRED TO NCMEC?

24   A.  YES, I WAS.

25   Q.  AND WHAT DID THAT ROLE ENTAIL IN TERMS OF YOUR

1       INTERACTIONS WITH LAW ENFORCEMENT?

2       A.   SO MY UNDERSTANDING WAS AFTER WE HAD MADE OUR REFERRALS TO

3       NCMEC, WHICH WERE THEN SENT TO THE FBI AND HOMELAND SECURITY,

4       THE UNITS OF THOSE AGENCIES THAT RECEIVED THOSE WERE

5       HEADQUARTER UNITS AND -- IN WASHINGTON, D.C., AND THEY WOULD

6       SEND -- THEY WOULD ESSENTIALLY SEND PACKETS TO THE FIELD, FIELD

7       AGENCIES, OR FIELD, RATHER, OFFICES AROUND THE COUNTRY WHO

8       WOULD THEN DO INVESTIGATION ON THE VARIOUS USERS THAT WERE IN

9        THOSE REPORTS.

10           SO I WOULD OFTEN GET CALLS FROM VARIOUS FIELD OFFICES OF

11      THE FBI OR HOMELAND SECURITY WHEN THEY HAD QUESTIONS ABOUT

12      UNDERSTANDING THE CONTEXT OF WHY THEY WERE LOOKING AT THIS

13      PARTICULAR E-MAIL ADDRESS.

14           OFTENTIMES THEY WOULDN'T GET A WHOLE LOT OF INFORMATION

15      FROM, SAY, FBI HEADQUARTERS, AND SO THEY WOULDN'T UNDERSTAND

16      HOW DID THE INVESTIGATION COME ABOUT, HOW DOES -- HOW DO WE

17      FIND IT, WHAT WAS THE METHOD THAT WE CONDUCTED OUR

18      INVESTIGATION.  ALL THE THINGS THAT WE PROVIDE TO THE FBI

19      INITIALLY DIDN'T TRICKLE THEIR WAY DOWN TO THE FIELD OFFICE, SO

20      WE PROVIDED THAT CONTEXT.

21           WE ADDITIONALLY -- BECAUSE WE RECEIVED A LOT OF QUESTION S

22      ABOUT SERVING LEGAL PROCESS, WE WOULD PROVIDE INFORMATION ON

23      OUR POLICIES WITH RESPECT TO LEGAL PROCESS, HOW TO SERVE LEGAL

24      PROCESS, POINTS OF CONTACT FOR THE LEGAL TEAM, AND THINGS LIKE

25      THAT.

1    Q.   DID YOU EVER PROVIDE INFORMATION TO THE AGENTS THAT YOU

2    SPOKE WITH, THE FIELD AGENTS, THAT WAS NOT -- THAT HAD NOT

3    ALREADY BEEN PROVIDED TO NCMEC?

4    A.   I DID NOT.

5    Q.   DID YOU EVER GIVE THEM INFORMATION ABOUT AN INDIVIDUAL

6    USER OUTSIDE OF THE LEGAL PROCESS SERVED?

7    A.   NO, I DID NOT.

8    Q.   AND WAS IT YOUR JOB TO SEE THAT LEGAL PROCESS REQUESTS

9    WERE RESPONDED TO IN A TIMELY MANNER?

10   A.   IT WAS NOT.  HOWEVER, THE ECIT, E-CRIMES INVESTIGATES

11   TEAM, DEFINITELY HAD A VESTED INTEREST IN ENSURING THAT THE

12   CASES THAT THEY HAD SENT OUT WERE PROCESSED SO THE COMPANY

13   COULD RECEIVE THE BENEFIT OF, YOU KNOW, THE BAD ACTIVITY

14   HAPPENING, OR I SHOULD SAY BAD ACTIVITY STOPPING.

15        SO I WORKED WITH OUR LEGAL TEAM TO ENSURE THAT LEGAL

16   PROCESS THAT WAS RECEIVED, IF I BECAME -- IF I -- I'LL

17   PROJECT -- IF I BECAME AWARE OF IT, IT WAS PROCESSED CORRECTLY.

18   Q.   DO YOU RECALL EVER RECEIVING ANY REQUEST TO RETRIEVE

19   INFORMATION FROM PARTICULAR YAHOO ACCOUNTS WITHOUT PROPER LEGAL

20   PROCESS?

21   A.   NO, I DO NOT.

22   Q.   TO YOUR KNOWLEDGE, DID YOU OR OTHER ECIT MEMBERS EVER

23   DISCLOSE USER INFORMATION OR CONTENT WITHOUT PROPER LEGAL

24   PROCESS?

25   A.   NO, WE DID NOT.

1    Q.   TO YOUR KNOWLEDGE, DID YOU OR ECIT EVER DISCLOSE TIPS OR

2    LEADS ABOUT USERS IMPLICATED IN THESE INTERNAL INVESTIGATIONS

3    TO LAW ENFORCEMENT WHILE THESE INVESTIGATIONS WERE ONGOING?

4    A.   I DON'T BELIEVE SO, NO.

5    Q.   DID ANY LAW ENFORCEMENT AGENCY PROVIDE YOU OR ECIT WITH

6    INFORMATION TO AID ECIT'S INTERNAL INVESTIGATIONS?

7    A.   NO, THEY DID NOT.

8    Q.   DID YOU EVER FEEL COMPELLED BY NCMEC OR ANY OTHER LAW

9    ENFORCEMENT AGENCY TO CONDUCT THESE REVIEWS AND INVESTIGATIONS?

10   A.   NO.  AND IN FACT, AS PART OF OUR REFERRALS, WE

11   SPECIFICALLY STATE TO LAW ENFORCEMENT, BOTH IN THESE PHILIPPINE

12   WEBCAM CASES, AS WELL AS OTHER, SAY, WEST AFRICAN OR ACCOUNT

13   HIJACKING OR SPAM INVESTIGATIONS WE MIGHT REFER, THAT WE DO NOT

14   DO -- AFTER WE MAKE A REFERRAL, WE DO NOT DO INVESTIGATION

15   AFTER THAT POINT.  WE DON'T DO INVESTIGATION AFTER THE POINT OF

16   OUR REFERRAL, AND EVERYTHING ELSE AFTER THAT HAS TO GO THROUGH

17   LEGAL PROCESS.

18   Q.   WERE YOU EVER REWARDED BY NCMEC OR OTHER LAW ENFORCEMENT

19   AGENTS FOR CONDUCTING THESE INVESTIGATIONS OR FILING

20   CYBERTIPLINE REPORTS?

21   A.   NO, WE WERE NOT.

22   Q.   DID YOU OR ECIT CONDUCT THESE INVESTIGATIONS OR FILE

23   CYBERTIPLINE REPORTS WITH THE EXPECTATION THAT IT WOULD RESULT

24   IN ANY TYPE OF REWARD OR PAYMENT?

25   A.   NO, WE DID NOT.

1    Q.   DID YOU OR ECIT CONDUCT THESE INVESTIGATIONS OR FILE

2    CYBERTIPLINE REPORTS TO RECEIVE OR MAINTAIN THE GOODWILL OF

3    NCMEC, THE GOVERNMENT, OR ANY LAW ENFORCEMENT AGENCY?

4    A.   NO.

5              THE CLERK:  IT'LL TAKE A MOMENT TO GO BACK ON.

6    SORRY.

7              MS. HARRIS:  NO PROBLEM.

8              THE COURT:  YOU MAY NEED TO FOCUS THAT A LITTLE MORE.

9              MS. HARRIS:  IS IT -- THIS ONE ISN'T WORKING.

10             THE COURT:  DID IT TURN OFF?

11             MS. HARRIS:  YEAH.  AS LONG AS IT'S WORKING ON THE

12   OTHER ONES.

13             THE CLERK:  YEAH, IT'S ON THE OTHERS.

14             THE COURT:  SORRY.  IS THAT ONE NOT WORKING AGAIN?

15             THE CLERK:  LET'S SEE.

16             THE COURT:  WHAT IF WE TURNED AROUND THE MONITOR ON

17   COUNSEL TABLE?

18             MS. HARRIS:  YEAH, THAT'S ALSO FINE.  AS LONG AS YOU

19   ALL CAN JUST TELL ME WHEN YOU CAN'T --

20             THE COURT:  IT'S CLEAR NOW.  THANK YOU.

21   BY MS. HARRIS:

22   Q.   OKAY.  SO I'M SHOWING YOU BATES 1644, IT'S BEEN FILED IN

23   THIS LITIGATION AS DEFENSE EXHIBIT RR, SO THIS IS ONE OF THE

24   DOCUMENTS FILED IN RR.

25             CAN YOU PLEASE TAKE A LOOK AT THE E-MAIL?

1    A.   OKAY.

2    Q.   ALL RIGHT.  CAN YOU EXPLAIN WHAT, WHAT IT IS THAT YOU'RE

3    CONVEYING IN THIS E-MAIL?

4    A.   YES.  SO THIS IS ACTUALLY AN EXAMPLE, I SHOULD SAY, OF

5    NOTIFYING LAW ENFORCEMENT PRIOR TO OUR, OUR SUPPLEMENT, WHICH I

6    BELIEVE OCCURRED IN FEBRUARY OF 2016, THAT WE HAD IDENTIFIED AN

7    INDIVIDUAL THAT WE HAD ALREADY PROVIDED IN A CYBERTIP WHO WAS

8    APPARENTLY PLANNING TO TRAVEL OUTSIDE THE COUNTRY, IF I RECALL,

9    I BELIEVE TO THE PHILIPPINES, AND THAT WAS PRIOR TO OUR MEETING

10   IN WASHINGTON, D.C.

11        USUALLY WE WOULD NOT DO THIS.  HOWEVER, BECAUSE THERE WAS

12   THE LIKELIHOOD OF WHAT WE BELIEVED TO BE IMMINENT CHILD ABUSE

13   THAT WOULD HAPPEN WITHOUT -- IF WE DIDN'T NOTIFY LAW

14   ENFORCEMENT, THIS CHILD ABUSE WOULD OCCUR, SO WE ESSENTIALLY

15   WENT OUT OF BAND IN THIS INSTANCE AND NOTIFIED LAW ENFORCEMENT

16   AHEAD OF TIME THAT -- TO NOTE A CYBERTIP THAT HAD ALREADY

17   PREVIOUSLY BEEN FILED.

18   Q.   OKAY.  DO YOU RECALL IF THE INDIVIDUAL PLANNING TO TRAVEL

19   IN FEBRUARY INFORMATION WAS INCLUDED IN THE CYBERTIP?

20   A.   YES, I BELIEVE SO.  I ACTUALLY WOULD HAVE TO KNOW WHAT

21   CYBERTIP IT WAS.

22        AS I MENTIONED LAST TIME, WE HAD TWO TYPES OF CYBERTIPS.

23   WE WOULD HAVE THE IMAGE CYBERTIPS AND WE WOULD HAVE THE TEXT

24   CYBERTIPS, THE TEXT ONES BEING LIKE CHAT COMMUNICATIONS WHERE

25   OFTEN TRAVEL WAS DISCUSSED.

1          I BELIEVE, ALTHOUGH I DON'T KNOW FOR CERTAIN, THAT THIS

2    WAS ONE OF THE CHAT CYBERTIPS WHERE THE TEXT OF THE CYBERTIP

3    WAS VERY CLEAR THAT THE INDIVIDUAL WAS TRAVELING FOR THE

4    PURPOSE OF CHILD ABUSE.

5    Q.   OKAY.  AND, AGAIN, IT'S REDACTED HERE, BUT THIS E-MAIL

6    APPEARS TO REFER TO A SPECIFIC CYBERTIP THAT HAD ALREADY BEEN

7    FILED?

8    A.   CORRECT.  IT WAS A CYBERTIP THAT WE HAD FILED TO NCMEC.

9    IN THIS CASE IT WAS, I BELIEVE, CONNECTED TO THE PHILIPPINE

10   WEBCAM CASE.

11         BUT OUR CYBERTIP PROCESS WAS INDEPENDENT ESSENTIALLY OF

12   THE SUPPLEMENT PROCESS I FOLLOWED.

13   Q.   THANK YOU.

14         THIS IS 1645, ALSO OF DEFENSE EXHIBIT RR.  WHY DON'T YOU

15   TAKE A READ OF THAT?

16         (PAUSE IN PROCEEDINGS.)

17              THE WITNESS:  OKAY, YES.

18   BY MS. HARRIS:

19   Q.   OKAY.  WHY DON'T YOU EXPLAIN WHAT'S HAPPENING IN THIS

20   E-MAIL?

21   A.   SO THIS IS AN E-MAIL THAT I SENT TO AGENT YESENSKY.  THIS

22   IS ACTUALLY NOT CONNECTED TO THE PHILIPPINES WEBCAM

23   INVESTIGATION.

24         THIS IS -- THE BULK OF WHAT THE ECIT DOES WITH RESPECT TO

25   CHILD SEXUAL ABUSE INVESTIGATIONS RELATES NOT TO LARGE-SCALE

1    SUPPLEMENTS, OR LARGE-SCALE INVESTIGATIONS LIKE WEBCAM

2    INVESTIGATIONS, BUT TO INDIVIDUAL CYBERTIPS.

3         AS I MENTIONED LAST TIME, THE ECIT REVIEWS EACH CYBERTIP

4    THAT GETS SENT OUT AND DETERMINES IF THERE ARE SITUATIONS THAT

5    MIGHT INVOLVE IMMINENT HARM TO CHILDREN, INDIVIDUALS IN

6    POSITIONS OF AUTHORITY, OR WHO HAVE ACCESS TO CHILDREN, OR

7    SEXUAL OFFENDERS.

8         THIS IS ONE OF THOSE INDIVIDUAL CASES WHERE AN INDIVIDUAL,

9    I RECALL, WHO WAS USING OUR FLICKR PRODUCT AT THE TIME, WAS A,

10   I BELIEVE A BUDDHIST MONK, A UNITED STATES CITIZEN FROM OHIO,

11   BUT RESIDED IN THAILAND AND WORKED AS A BUDDHIST MONK, AND

12   OPERATED -- OR DID A LOT OF WORK WITH ORPHANS, AND BASED ON

13   OUR, ON THE INVESTIGATION, WE BELIEVED HE WAS ACTUALLY ABUSING

14   THE CHILDREN IN HIS CARE.

15        AND SO WE WANTED TO ESCALATE THIS TO LAW ENFORCEMENT, SO

16   WE MADE A CYBERTIP AND SUPPLEMENT.  BUT BECAUSE I KNEW THAT

17   AGENT YESENSKY HAD DONE A LOT OF WORK IN THAILAND UNRELATED TO

18   THE PHILIPPINES WEBCAM INVESTIGATION, I WANTED TO MAKE SURE HE

19   WAS AWARE SO HE COULD TRY TO GET THE PROPER RESOURCES DIRECTED

20   TO THIS.

21   Q.   WAS THE INFORMATION INCLUDED IN THIS E-MAIL REPORTED IN

22   THE CYBERTIPS THAT ARE REFERENCED UNDER REDACTION?

23   A.   YEAH.  YES, IT WAS.

24   Q.   AND YOU ALSO MENTION A SUPPLEMENT POTENTIALLY THAT -- OR

25   EXCUSE ME -- THAT WAS APPARENTLY FILED WITH NCMEC IN THE LAST

1    PARAGRAPH.  IS THAT CORRECT?

2    A.   THAT IS CORRECT.

3    Q.   OKAY.  SO, AGAIN, YOU FILED INDIVIDUAL CYBERTIPS AND A

4    SUPPLEMENT CONTAINING THIS INFORMATION?

5    A.   YES, THAT'S RIGHT.

6    Q.   THANK YOU.

7              THE COURT:  SO YOUR DISCOVERY PRODUCTION OF

8    COMMUNICATIONS BETWEEN YAHOO'S ECIT AND THE FBI WAS NOT LIMITED

9    TO THE PHILIPPINES WEBCAM CASE?  YOU INCLUDED OTHERS RELATING

10   TO OTHER CHILD PORNOGRAPHY OR OTHER CHILD SEXUAL ABUSE?

11             MS. HARRIS:  ALL COMMUNICATIONS.  WE ASKED THEM TO

12   LOOK FOR ANY COMMUNICATIONS BETWEEN -- THIS WAS PROVIDED BY

13   AGENT YESENSKY, YOUR HONOR.

14        SO WE ASKED AGENT YESENSKY TO LOOK FOR ANY COMMUNICATIONS

15   THAT HE HAD WITH MR. ZADIG OR OTHER YAHOO, AND THIS IS WHAT WAS

16   PROVIDED TO US.

17             THE COURT:  OKAY.  BUT THAT CERTAINLY INCLUDED

18   DISCOVERY BEYOND THE PHILIPPINES, THE STREAMING, THE WEBCAM OF

19   CHILD SEXUAL ABUSE?

20             MS. HARRIS:  YES, ACCORDING TO THE WITNESS'S

21   TESTIMONY.

22             THE COURT:  OKAY.  GO AHEAD, PLEASE.

23   BY MS. HARRIS:

24   Q.   THIS IS BATES 1647, ALSO OF DEFENSE EXHIBIT RR.

25        WHY DON'T YOU GO AHEAD AND READ THAT?

1    A.   OKAY.

2    Q.   WHAT'S HAPPENING IN THIS E-MAIL?

3    A.   SO THIS WAS AN E-MAIL I HAD SENT TO AGENT YESENSKY TO SET

4    UP A TIME TO HAVE A MEETING AT NCMEC TO DISCUSS -- WELL, TO

5    DISCUSS THE REFERRAL, THE SUPPLEMENT THAT WE HAD SENT TO NCMEC

6    PRIOR.

7    Q.   OKAY.  WE DISCUSSED THIS PREVIOUSLY DURING THE LAST DAY OF

8    TESTIMONY, IS THAT CORRECT, THAT MEETING?

9    A.   YES, WE DID.

10   Q.   THANK YOU.

11        THIS IS BATES 1649, ALSO OF DEFENSE EXHIBIT RR.

12        LET ME KNOW WHEN YOU'RE READY.

13   A.   OKAY, YES.

14   Q.   WHAT IS THE PURPOSE -- WHAT IS THIS E-MAIL COMMUNICATING?

15   A.   A NUMBER OF THINGS ACTUALLY.  SO AGENT YESENSKY HAD, I

16   BELIEVE, HAD PREVIOUSLY INQUIRED IF I COULD TRAVEL TO EUROPOL,

17   THE EUROPEAN POLICE CONSORTIUM, TO TALK ABOUT WHAT MY TEAM

18   DOES.

19        MY LEGAL DEPARTMENT WAS A LITTLE WARY OF THAT AND DIDN'T

20   WANT ME TO GO TO EUROPOL TO TALK ABOUT THIS, MOSTLY BECAUSE OF

21   THE FACT THAT YAHOO AT THE TIME WAS A U.S. COMPANY AND DEALING

22   WITH INTERNATIONAL LAW ENFORCEMENT WAS COMPLICATED DUE TO MLAT

23   ISSUES.  SO THEY WERE REQUESTING ME NOT TO DO THAT.

24        HOWEVER, I ALSO TALKED ABOUT -- AGENT YESENSKY AND I HAD

25   TALKED ABOUT A TRIP TO THE PHILIPPINES TO TALK TO THE

1    PHILIPPINE NATIONAL POLICE AS PART OF AN INDUSTRY -- FACEBOOK

2    AND OTHER COMPANIES WERE GOING AS WELL -- TO TALK ABOUT CHILD

3    SEXUAL ABUSE INVESTIGATIONS.  SO THAT WAS OKAY.

4         I ALSO GAVE AGENT YESENSKY A HEADS-UP THAT WE WERE

5    BEGINNING AN INVESTIGATION OF A NEW PHILIPPINES WEBCAM CASE AND

6    NOTIFIED HIM THAT WE WOULDN'T BE ABLE TO SHARE ANYTHING UNTIL

7    WE'D FINISHED, BUT WANTED HIM TO BE AWARE OF THAT.

8         FINALLY, I ENDED WITH A REQUEST FOR CONTACTS WITH THE

9    UNITED KINGDOM'S NATIONAL CRIME AGENCY SO I COULD OBTAIN

10   FEEDBACK FOR PRIOR REFERRALS, SIMILAR TO WHAT WE HAD DONE WITH

11   U.S. AGENCIES.

12   Q.   OKAY.  SO I'M GOING TO ASK YOU ABOUT THE SECOND PARAGRAPH.

13        DID YOU DISCLOSE ANY SPECIFIC INFORMATION ABOUT YAHOO

14   USERS IN THAT PARAGRAPH?

15   A.   NO, JUST THE FACT THAT WE HAD BEGUN A NEW INVESTIGATION.

16   Q.   OKAY.

17             THE COURT:  CAN I ASK, THE NEW PHILIPPINES CASE, IS

18   THAT A TOTALLY SEPARATE PHILIPPINES WEBCAM INVESTIGATION?  OR

19   IS THAT JUST ANOTHER INDIVIDUAL WHO WAS BEING INVESTIGATED AS

20   PART OF THE PHILIPPINES WEBCAM CASE IN THIS CRIMINAL CASE?

21             THE WITNESS:  YEAH.  SO THIS -- I WAS REFERRING TO IN

22   THIS CASE A, ANOTHER SORT OF LARGE-SCALE INVESTIGATION.  THIS

23   WAS EVENTUALLY GOING TO BECOME THE THIRD REFERRAL WE DID IN

24   JANUARY OF 2016.

25             BUT IT WASN'T AN INDIVIDUAL PERSON.  IT WAS A SORT OF NEXT

1        COLLECTION OF BUYERS AND SELLERS IN THAT SORT OF ACTIVITY.

2              THE COURT:  OKAY.  SO THIS IS PART OF OPERATION

3        SWIFT TRAVELER?

4              MS. HARRIS:  NO, YOUR HONOR.  IT WAS PART OF THE

5        ECIT'S INTERNAL INVESTIGATION.

6           OPERATION SWIFT TRAVELER WAS AN FBI INVESTIGATION THAT WAS

7        CONDUCTED BY THE FBI.  THEY WERE NOT COLLABORATING.

8              THE COURT:  OKAY.  I'M NOT BEING PRECISE.

9           BUT THE PHILIPPINES WEBCAM INVESTIGATION THAT STARTED WITH

10       THE FIRST REPORTING, OR FIRST CYBERTIPS BEING FILED IN

11       SEPTEMBER OF 2014, I GUESS THIS IS JUST THE -- THIS IS PERHAPS

12       A THIRD TRANCHE THAT GETS FILED IN JANUARY OF 2016.  IS THAT

13       WHAT THIS IS PERHAPS REFERRING TO?

14             THE WITNESS:  THAT'S CORRECT.

15             THE COURT:  ALL RIGHT.  THANK YOU.

16          GO AHEAD.

17       BY MS. HARRIS:

18       Q.  SO THIS IS BATES 1650.  GO AHEAD AND TAKE A READ OF THAT,

19       ALSO DEFENSE EXHIBIT RR.

20          (PAUSE IN PROCEEDINGS.)

21             THE WITNESS:  OKAY.

22       BY MS. HARRIS:

23       Q.  SO I WANTED TO ASK YOU, YOU SAY HERE -- TOWARDS THE BOTTOM

24       OF THE FIRST PARAGRAPH, YOU REFERENCE A COMMON GOAL.  WHAT DID

25       YOU MEAN BY THAT?

1    A.   SO THIS WAS AN E-MAIL THAT I HAD SENT TO AGENT YESENSKY,

2    AS WELL AS MY COUNTERPART AT WESTERN UNION, WESTERN UNION BEING

3    THE MONEY REMITTING SERVICE.

4        SO I WAS INTRODUCING THEM BECAUSE I HAD TALKED TO MY

5    COUNTERPART THERE AND HE HAD INDICATED THAT THEY WERE ALSO

6    SEEING THEIR PLATFORM BEING ABUSED FOR THE PURPOSES OF

7    REMITTANCES AND PAYMENTS AROUND CHILD SEXUAL ABUSE WEBCAM

8    STREAMING.

9        SO I WANTED TO INTRODUCE THE TWO JEFFS.

10       AND THE COMMON GOAL I REFER TO IS THE ESSENTIAL --

11   ESSENTIALLY THE REMOVAL OR THE STOPPING OF ONLINE PLATFORMS

12   BEING USED FOR THE SALE OF CHILD SEXUAL ABUSE MATERIAL.

13   Q.   OKAY.  WESTERN UNION IS ANOTHER PAYMENT PROCESSING

14   SERVICE; IS THAT CORRECT?

15   A.   THAT'S CORRECT.  THEY'RE SIMILAR TO XOOM.

16   Q.   I SEE.  THANK YOU.

17       SO THIS IS BATES 1652 THROUGH 1653, ALSO DEFENSE

18   EXHIBIT RR.

19       TAKE A LOOK AT THAT.  LET ME KNOW IF YOU NEED ME TO FLIP

20   THE PAGE.

21   A.   YOU CAN FLIP THE PAGE, PLEASE.

22   Q.   (INDICATING.)

23   A.   OKAY.

24   Q.   SO WHAT'S HAPPENING IN THIS E-MAIL?

25   A.   SO I WAS SENDING AN E-MAIL TO GUILLERMO GALARZA, WHO WAS

1     THE, I BELIEVE THE TRAINING COORDINATOR FOR ICMEC, ICMEC

2     MEANING INTERNATIONAL CENTER FOR MISSING AND EXPLOITED

3     CHILDREN, KIND OF AN INTERNATIONAL ANALOG TO NCMEC IN SOME

4     WAYS, AS WELL AS AGENT YESENSKY.

5         THIS WAS IN RELATION TO THE PHILIPPINES TRIP WE HAD

6     DISCUSSED PREVIOUSLY WHERE WE WERE GOING TO BE PARTICIPATING IN

7     A CONFERENCE AROUND CHILD SEXUAL EXPLOITATION, PROVIDING

8     INDUSTRY PRESENTATIONS TO MEMBERS OF THE PHILIPPINE NATIONAL

9     POLICE.

10        AND AS I MENTION IN THE SECOND PARAGRAPH HERE, WHAT I WAS

11    GOING TO BE DISCUSSING WAS AN OVERVIEW OF OUR PRODUCTS, SO HOW

12    OUR PRODUCTS WORKED, AND SPECIFICALLY WHICH PRODUCTS WERE

13    RELEVANT FOR CHILD SAFETY AND CHILD EXPLOITATION, OUR PROCESS

14    OF REPORTING CHILD SAFETY CYBERTIPS, QUESTIONS AROUND LEGAL

15    DISCLOSURE, ESPECIALLY INTERNATIONAL ISSUES, AND THEN A CASE

16    STUDY OF THE PHILIPPINES WEBCAM INVESTIGATION.

17    Q.   SO WHEN YOU SAY "CASE STUDY OF THE PHILIPPINES WEBCAM

18     INVESTIGATION," WHAT DOES THAT MEAN?

19    A.   SO BECAUSE WE WERE PRESENTING IN FRONT OF A FILIPINO

20     AUDIENCE, PHILIPPINE NATIONAL POLICE, THAT WAS A VERY TIMELY

21     AND RELEVANT CASE STUDY FOR THE AUDIENCE THAT ENCOMPASSED ALL

22     OF THE AREAS I DISCUSSED, SO THE PRODUCT OVERVIEW, THE CHILD

23     SAFETY REPORTING, LEGAL DISCLOSURE.  IT SORT OF END-TO-END

24     DESCRIBED THE PROCESS OF WHAT PRIVATE INDUSTRY DOES IN RESPONSE

25     TO CHILD SEXUAL ABUSE REPORTING.

1          SO THAT'S WHY.

2     Q.   DID YOU DISCLOSE ANY USER DATA OR CONDUCT DURING THAT CASE

3     STUDY?

4     A.   NO, WE DID NOT.

5     Q.   DID YOU DISCLOSE ANY OTHER NON-PUBLIC INFORMATION ABOUT

6     YAHOO USERS DURING THE CASE STUDY PRESENTATION?

7     A.   NO, WE DID NOT.

8     Q.   AND WHY -- WHY WOULD THE COMPANY SEND YOU TO THIS TYPE OF

9     A CONFERENCE?

10    A.   A COUPLE REASONS.  ONE, SOME OF OUR PEER COMPANIES WERE

11    GOING AND -- LIKE FACEBOOK WAS THERE, XOOM WAS THERE.

12         THE COMPANY KIND OF PREFERS TO BE IN THE MIDDLE OF THE

13    PACK WHEN IT COMES TO THESE TYPE OF INITIATIVES.  WE DON'T WANT

14    TO BE THE FIRST THERE, BUT WE ALSO DON'T WANT TO BE THE LAST

15    THERE.

16         ADDITIONALLY, THE COMPANY, AS I MENTIONED BEFORE, WAS

17    UPSET BY THE FACT THAT THIS AWFUL CHILD ABUSE STREAMING AND

18    SORT OF LIVE STREAMED ABUSE WAS HAPPENING ON THE PLATFORMS THAT

19    WE WERE OFFERING TO OUR USERS, AND THEY WERE SUPPORTIVE OF

20    EFFORTS THAT WOULD TRY TO REDUCE THAT AND STOP IT.

21    Q.   OKAY.  AND THE DATE OF THIS E-MAIL IS AUGUST 24TH, 2015.

22    A.   THAT'S CORRECT.

23    Q.   DO YOU RECALL WHEN THE CONFERENCE WAS?

24    A.   I -- IT WAS EITHER LATE -- OH, IT'S RIGHT THERE.  IT WOULD

25    HAVE BEEN IN EARLY SEPTEMBER OF 2015.

1    Q.   OKAY.  SO THIS WAS AFTER YOU HAD ALREADY FILED TWO -- THE

2    RESULTS OF TWO OF YOUR INTERNAL INVESTIGATIONS; IS THAT

3    CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   DO YOU RECALL -- WELL, EXCUSE ME.

6         DID YOU MEET WITH ANY LAW ENFORCEMENT PERSONNEL IN

7    RELATION TO ECIT'S INVESTIGATIONS AT THIS CONFERENCE?

8    A.   SO WE -- JEFF YESENSKY WAS THERE.  THERE WERE MEMBERS OF

9    THE PNP, THE PHILIPPINE NATIONAL POLICE, AS WELL WHERE WE

10   DISCUSSED, IN BROAD TERMS, HOW THE INVESTIGATION WORKED AND

11   WHAT THE MOTIVATION OF OUR COMPANY WAS AND WHY WE WERE DOING

12   IT.

13        I DON'T BELIEVE WE TALKED ABOUT SPECIFICS.

14        BUT ONE OF THE PURPOSES OF OUR GOING TO THIS CONFERENCE

15   WAS TO EDUCATE THE PNP ON OUR OVERALL PROCESS, BECAUSE WE SAW

16   THIS AS AN AREA THAT WASN'T GOING TO GO AWAY ANY TIME SOON AND

17   WE WANTED TO MAKE SURE THAT THEY UNDERSTOOD, IF THEY DID GET

18   CYBERTIPS FROM NCMEC -- WHICH WE KNEW THEY WERE DOING BECAUSE

19   SOME OF THEM WERE BEING AUTO FORWARDED THERE -- WHAT THOSE

20   MEANT AND WHAT THE SORT OF CONTEXT WAS.

21   Q.   DO YOU RECALL PROVIDING ANY NON-PUBLIC INFORMATION ABOUT

22   YAHOO USERS TO THE LAW ENFORCEMENT AGENTS THAT YOU MET WITH AT

23   THE CONFERENCE?

24   A.   NO, I DO NOT.

25   Q.   THIS IS BATES 1680, ALSO OF DEFENSE EXHIBIT RR.

1          GO AHEAD AND TAKE A LOOK AT THAT AND LET ME KNOW WHEN

2     YOU'RE READY.

3          (PAUSE IN PROCEEDINGS.)

4          THE WITNESS:  OKAY.  I'M READY.

5     BY MS. HARRIS:

6     Q.   WHAT'S HAPPENING IN THIS E-MAIL?

7     A.   THIS IS AN E-MAIL THAT I SENT TO AGENT YESENSKY.  WE HAD,

8     IN OUR PRIOR REFERRAL -- ACTUALLY, THIS WAS THE JANUARY, OR

9     FEBRUARY RATHER OF 2016, THE THIRD SUPPLEMENT, PHILIPPINE

10    WEBCAM SUPPLEMENT.

11         WE INCLUDED A -- ONE OF THE BUYERS WE HAD INCLUDED IN THAT

12    CASE WAS A GERMAN CITIZEN RESIDING IN THE PHILIPPINES WHO

13    OPERATED AN ORPHANAGE.  THIS INDIVIDUAL -- I BELIEVE THE FBI

14    SENT THE INFORMATION ON THAT INDIVIDUAL THAT WE PROVIDED TO THE

15    GERMAN BKA, WHICH IS THE GERMAN FEDERAL POLICE, AND THE GERMAN

16    FEDERAL POLICE REACHED OUT TO MYSELF AND OUR LEGAL DEPARTMENT

17    AND WERE ASKING QUESTIONS ABOUT HOW TO OBTAIN CONTENTS OF

18    ACCOUNTS VIA THEIR OWN LEGAL PROCESS.

19         BECAUSE OF THE WAY THAT YAHOO AT THE TIME WAS A U.S.

20    COMPANY -- IT HAD AN IRELAND AFFILIATE SUBSIDIARY, BUT WE

21    DIDN'T RESPOND DIRECTLY TO GERMAN LEGAL PROCESS FOR CONTENT

22    BECAUSE IT WASN'T ALLOWED UNDER OUR POLICIES.

23         SO I WAS INDICATING THAT -- TO AGENT YESENSKY THAT THEY

24    WOULD HAVE TO SERVE IRELAND WITH AN MLAT, AND INSTEAD WAS

25    ASKING, BECAUSE THE FBI WAS AWARE OF THESE -- OF THIS

1    INDIVIDUAL AND THESE ACCOUNTS, IF THE FBI COULD OBTAIN -- GET A

2    SEARCH WARRANT, A U.S. SEARCH WARRANT, U.S. LEGAL PROCESS

3    INSTEAD OF THE MLAT PROCESS.

4    Q.   OKAY.  AND WHY WOULD YOU SUGGEST THAT?

5    A.   MY UNDERSTANDING -- WELL, A COUPLE REASONS.

6         MY UNDERSTANDING WAS THAT, AGAIN, LIKE I MENTIONED

7    EARLIER, I THINK THE MLAT PROCESS IS VERY TIME INTENSIVE.  IT

8    CAN TAKE UP TO A YEAR OR SO TO GET A RESPONSE.  IT'S VERY

9    FRUSTRATING FOR, FOR FOREIGN LAW ENFORCEMENT AND THEY TAKE

10   THEIR FRUSTRATIONS OUT ON US AS A COMPANY EVEN THOUGH IT'S NOT

11   OUR FAULT THAT THE MLAT PROCESS EXISTS.

12        AND WE ALSO WERE CONCERNED THAT THIS INDIVIDUAL, AS I

13   MENTIONED, WAS OPERATING AN ORPHANAGE AND WAS BELIEVED TO BE

14   ABUSING MANY CHILDREN IN HIS CARE, AND WE THOUGHT THAT

15   EXPEDIENCY WOULD BE HELPFUL HERE.

16   Q.   OKAY.  AND AS PART OF THAT EXPEDIENT PROCESS, YOU TOLD

17   THEM TO GET A SEARCH WARRANT; IS THAT RIGHT?

18   A.   I ASKED IF THEY COULD OBTAIN A SEARCH WARRANT, CORRECT,

19   YES.

20   Q.   OKAY.  AND THEN POSSIBLY SEND THE MATERIALS TO THE GERMANS

21   ON AN LE-TO-LE BASIS.  WHAT DOES THAT MEAN?

22   A.   BASED ON MY UNDERSTANDING, IF -- WELL, THIS IS PARTLY ON

23   MY UNDERSTANDING AND PARTLY WHAT OCCURRED.

24        IF LAW ENFORCEMENT IN THE UNITED STATES IS WORKING JOINTLY

25   WITH LAW ENFORCEMENT IN ANOTHER COUNTRY, THEY HAVE THE ABILITY

1    TO SHARE INFORMATION SORT OF AGENT-TO-AGENT, SO TO SPEAK,

2    WITHOUT USING MLATS OR OTHER ROGATORIES OR OTHER PROCESS.

3    Q.   DID YOU KNOW WHETHER OR NOT THAT WAS ACTUALLY A WORKAROUND

4    FOR AN MLAT?

5    A.   NOT DIRECTLY, NO, I DID NOT.

6    Q.   OKAY.  AND I THINK YOU ACTUALLY SAID THAT IN YOUR THIRD

7    PARAGRAPH.  IS THAT CORRECT?

8    A.   THAT'S CORRECT, YES.

9    Q.   OKAY.  AND ARE YOU FAMILIAR WITH HOW THIS ISSUE WAS

10   ACTUALLY RESOLVED?

11   A.   I BELIEVE -- I BELIEVE THAT THE BKA ACTUALLY DID GET THE

12   MLAT TO IRELAND AND THEN WAITED THE AMOUNT OF TIME NECESSARY TO

13   RECEIVE THE RESPONSE AND GOT THE INFORMATION THAT WAY.

14   Q.   OKAY.  THIS IS BATES 1684, ALSO OF DEFENSE EXHIBIT RR.

15        GO AHEAD AND READ IT, PLEASE.

16        (PAUSE IN PROCEEDINGS.)

17             THE WITNESS:  OKAY, YES.

18   BY MS. HARRIS:

19   Q.   WHAT'S HAPPENING IN THIS E-MAIL?

20   A.   SO I WAS INTRODUCING AGENT YESENSKY TO AN AGENT FROM THE

21   DCIS, DCIS BEING THE DEFENSE CRIMINAL INVESTIGATIVE SERVICE.

22   HE IS SOMEBODY WHO I HAD KNOWN FROM MY PRIOR GOVERNMENT

23   SERVICE, AND HE INDEPENDENTLY REACHED OUT TO ME AND WAS TALKING

24   ABOUT -- HE HAD MOVED INTO A CYBER ROLE WITHIN DCIS AND WAS

25   ASKING ABOUT DIFFERENT WAYS THAT DCIS CAN START TO GET MORE

1      ACTIVE IN CYBER INVESTIGATIONS, AND SPECIFICALLY CALLED OUT

2      HUMAN TRAFFICKING WORK THAT HE WAS HOPING TO DO.

3          I HAD MENTIONED TO HIM THAT WE HAD UNCOVERED A NUMBER OF

4      DOD SERVICE MEMBERS AND CIVILIANS WHO WERE BUYERS IN OUR WEBCAM

5      INVESTIGATIONS.  HOWEVER, I WASN'T ABLE TO -- I TOLD HIM I

6      COULDN'T SHARE INFORMATION WITH HIM BECAUSE WE HAVE TO GO

7      THROUGH THE NCMEC PROCESS.

8          SO THIS, THIS INTRODUCTION WAS TO -- SO JEFF COULD TALK TO

9      THE AGENT FROM DCIS AND POTENTIALLY SHARE THAT INFORMATION OF

10     THEIR OWN ACCORD.

11     Q.   OKAY.  I BELIEVE YOU SAID, THOUGH, THAT YOU WERE NOT

12     ALLOWED TO SHARE CASE REFERRALS WITH ANYONE OUTSIDE OF NCMEC?

13     A.   THAT'S CORRECT, YES.

14     Q.   AND THAT'S WRITTEN IN THE E-MAIL?

15     A.   YES.

16     Q.   AND WHY WOULD YOU MAKE A, AN INTRODUCTION BETWEEN

17     AGENT YESENSKY AND THIS ADDITIONAL INDIVIDUAL?

18     A.   SO THIS INDIVIDUAL HAD COME TO ME AND ASKED AND

19     SPECIFICALLY SAID THAT HE WANTED HIS AGENCY TO GET INVOLVED IN

20     HUMAN TRAFFICKING WORK.

21         SO THIS IS -- THIS WAS -- IN MY OPINION, THIS WAS AN AGENT

22     WHO MIGHT BE IN A POSITION TO TAKE ACTION ON SOME OF THE

23     INFORMATION THAT WE HAD PROVIDED IN OUR REFERRALS, AND AS I

24     MENTIONED EARLIER, THAT FEEDBACK IS VERY IMPORTANT TO US.

25         SO I WANTED TO MAKE THAT INTRODUCTION SO, YOU KNOW, THEY

1    COULD ESSENTIALLY WORK IT OUT WITHOUT HAVING TO -- YOU KNOW, WE

2    WOULDN'T BE ABLE TO DO ANY DISCLOSURES TO HIM, BUT THEY COULD

3    MAKE THE INTRODUCTION THEMSELVES.

4         Q.   I SEE.   THANK YOU.

5              THIS IS BATES 1685, ALSO OF DEFENSE EXHIBIT RR.

6              GO AHEAD AND HAVE A READ OF THAT.

7              (PAUSE IN PROCEEDINGS.)

8                   THE WITNESS:   OKAY.

9    BY MS. HARRIS:

10        Q.   THIS E-MAIL WAS NOT WRITTEN BY YOU; CORRECT?

11        A.   THAT'S CORRECT.

12        Q.   BUT YOU'RE CC'D ON IT?   OR YOU WERE A RECIPIENT OF IT?

13        A.   YES, I WAS.

14        Q.   OKAY.   WHAT'S YOUR UNDERSTANDING OF THE INFORMATION

15   COMMUNICATED HERE?

16        A.   THIS WAS AN E-MAIL TO MYSELF AND MY COUNTERPART AT XOOM

17   FROM AGENT YESENSKY, AND AGENT YESENSKY WAS PROVIDING THE

18   FEEDBACK ON SOME OF THE PRIOR REFERRALS THAT WE HAD MADE.   AS I

19   DISCUSSED EARLIER, THAT'S SOMETHING THAT WE HAD OFTEN

20   REQUESTED.

21        Q.   OKAY.   HE MENTIONS, IN THE SECOND LINE, THAT HE COULDN'T

22   RELEASE MUCH SINCE IT'S AN ONGOING INVESTIGATION; RIGHT?

23        A.   THAT'S RIGHT, YEAH.

24        Q.   AND YOU -- WE HAD DISCUSSED PREVIOUSLY THE REASONS WHY YOU

25   SOUGHT -- WHY YOU SOUGHT FEEDBACK FOR THESE TYPES OF

ZADIG DIRECT BY MS. HARRIS (RES.)

1    INVESTIGATIONS; IS THAT RIGHT?

2    A.   THAT'S CORRECT, FOR THE SORT OF RESILIENCY AND WELLNESS

3    ASPECTS, AS WELL AS THE INTERNAL SUPPORT FOR THIS TYPE OF WORK.

4    Q.   THIS IS BATES 1690, ALSO OF DEFENSE EXHIBIT RR.

5         GO AHEAD AND READ IT.

6    A.   OKAY.

7    Q.   WHY ARE YOU REQUESTING A MUGSHOT?

8    A.   AGAIN, THIS IS -- IN THE E-MAIL THAT WE HAD SEEN

9    PREVIOUSLY WHEN I WAS SENDING THE E-MAIL TO THE CSE REPORTING

10   OUTCOME OF THE MAILING LISTS -- SO THE LIST OF ALL THE POLICY

11   AND LEGAL AND ENGINEERING AND MODERATION PEOPLE -- ONE OF THE

12   THINGS THAT WE FIND SORT OF HELPS CONTEXTUALIZE THE WORK THAT

13   THEY DO IS THAT THERE'S ACTUALLY A REAL PERSON BEHIND THE

14   CYBERTIPS THAT GET FILED EVERY DAY, DAY IN AND DAY OUT.

15        AND MUGSHOTS ARE SOMETHING THAT, WHEN THEY ARE AVAILABLE,

16   WE DO PROVIDE THEM IN THE E-MAILS AS AN ATTACHMENT SO

17   INDIVIDUALS KNOW THAT THERE'S A REAL PERSON BEHIND THE ACCOUNTS

18   THAT THEY'RE INTERACTING WITH, WHICH IS KIND OF SOBERING, I

19   THINK, AND IT REALLY -- IT REMINDS THE STAFF THAT WORKS ON THIS

20   THAT THERE'S REAL WORLD CONSEQUENCES TO THIS WORK AND IT'S NOT

21   JUST, YOU KNOW, AN E-MAIL ADDRESS THAT HAS UPLOADED STUFF.

22   IT'S A PERSON THAT UPLOADED STUFF.

23   Q.   SO IT HELPS TO PUT A FACE TO THE NAME?

24   A.   THAT'S EXACTLY RIGHT.

25   Q.   THIS IS BATES 1693, ALSO OF DEFENSE EXHIBIT RR.

1    A.   OKAY.

2    Q.   OKAY.  WHAT'S HAPPENING IN THIS E-MAIL?

3    A.   SO THIS IS BACK IN 2014.  THIS IS THE SECOND PHILIPPINES

4    WEBCAM CASE.  I WAS A LITTLE OPTIMISTIC, HOPING THAT IT WAS THE

5    LAST PHILIPPINES WEBCAM CASE THAT WE HAD TO DO.

6         AND IT, SIMILAR TO THE E-MAIL WE REVIEWED A FEW TIMES AGO,

7    WAS LOOKING FOR A TIME THAT WOULD BE -- THAT WOULD WORK WITH

8    AGENT YESENSKY TO COME OUT AND DISCUSS THE REFERRAL THAT WE HAD

9    SENT TO NCMEC.

10   Q.   I SEE.  SO WE HAD ALREADY DISCUSSED THIS MEETING

11   PREVIOUSLY; IS THAT CORRECT?

12   A.   THAT'S CORRECT, YES.

13   Q.   THIS IS BATES 1699, ALSO OF DEFENSE EXHIBIT RR.

14   A.   YES, OKAY.

15   Q.   SO IN THIS E-MAIL, YOU'RE REFERRING AGENT YESENSKY AND

16   AGENT O'CALLAGHAN TO A TOOL; CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   WHAT TOOL WAS THAT?

19   A.   IT WAS A TOOL, OPEN SOURCE TOOL CALLED

20   DETECTINVISIBLE.COM.

21   Q.   AND WHY ARE YOU REFERRING THEM TO THIS TOOL?

22   A.   THIS WAS A THIRD PARTY TOOL THAT ACTUALLY XOOM HAD

23   NOTIFIED US ABOUT, WE WEREN'T AWARE OF IT, THAT LETS THE USER

24   OF THE TOOL VIEW THE PUBLICLY AVAILABLE PROFILE PICTURE OF A

25   YAHOO MESSENGER USER.

ZADIG DIRECT BY MS. HARRIS (RES.)

1      SO YAHOO MESSENGER -- I MAY HAVE MENTIONED IN THE LAST

2   SESSION, BUT YAHOO MESSENGER OPERATES IN SUCH A WAY THAT

3   THERE'S A PROFILE PICTURE FOR EACH USER, AND IF YOU ARE LOOKING

4   FOR SOMEBODY TO ADD AS A BUDDY ON THE CHAT SYSTEM, THE PROFILE

5   PICTURE IS PROVIDED SO THE PERSON WHO IS CONSIDERING ADDING

6   THAT INDIVIDUAL CAN DECIDE WHETHER OR NOT TO ADD THEM BASED ON

7   A PICTURE.

8      WE HAD FOUND THAT MANY OF THE SELLER ACCOUNTS IN THE

9   PHILIPPINES HAD ACTUALLY UTILIZED CHILD SEXUAL ABUSE IMAGERY,

10  LIKE SPECIFICALLY CHILDREN IN THE PHILIPPINES WHO WERE BEING

11  ABUSED, AS THEIR PROFILE PICTURE.  OUR THOUGHT WAS THAT THIS

12  WAS A MEANS FOR SOLICITING OR BASICALLY OFFERING FOR SALE THE

13  CHILDREN.

14     SO I WAS DIRECTING THESE TWO AGENTS TO THIS TOOL WHICH

15  COULD BE USED TO VIEW THESE PUBLICLY AVAILABLE PICTURES WHICH

16  ARE OFFERED DURING THE YAHOO MESSENGER PROTOCOL.

17  Q.   I SEE.  SO LET ME MAKE SURE THAT I UNDERSTOOD THIS

18  CORRECTLY.  YOU SAID THAT THEY WERE USING THE PROFILE PICTURES

19  TO ADVERTISE IN; IS THAT CORRECT?

20  A.   WELL, SO WE DON'T KNOW BECAUSE WE DIDN'T ASK THE SELLERS.

21     BUT WE NOTICED THAT A LARGE NUMBER OF THE ACCOUNTS IN THE

22  PHILIPPINES WHO WERE OFFERING THE CHILD ABUSE, EITHER THE

23  PICTURES OR THE VIDEO OR THE LIVE STREAMED ABUSE FOR SALE, HAD

24  PROFILE PICTURES OF CHILD PORNOGRAPHY, OR IN SOME CASES THEY

25  MAY BE SCANTILY CLAD PICTURES OF CHILDREN THAT WERE NOT THE

1    DEFINITION OF CHILD PORNOGRAPHY, BUT WERE STILL, YOU KNOW,

2    DEMONSTRATING ACCESS TO CHILDREN ESSENTIALLY.

3        WE THINK THIS WAS A WAY TO SIGNAL TO POTENTIAL BUYERS THAT

4    THEY ESSENTIALLY HAD THIS MATERIAL AVAILABLE, AND WHEN THE

5    BUYER WAS CONSIDERING ADDING THIS SELLER TO THEIR BUDDY LIST ON

6    YAHOO MESSENGER, THIS, WE THINK, WAS A POTENTIAL WAY FOR THEM

7    TO DECIDE, DO THEY WANT TO MAKE THAT KIND OF SHARE OR NOT?

8    Q.   I SEE.  SO THIS IS A PUBLICLY AVAILABLE TOOL?

9    A.   IT WAS.  I'M NOT SURE IF IT'S STILL AROUND.

10   Q.   DID YAHOO CREATE THIS TOOL?

11   A.   NO, WE DID NOT.

12   Q.   AND IS THAT WHAT YOU MEANT BY OPEN SOURCE TOOL?

13   A.   YES.  THE ECIT TEAM, AS PART OF THEIR INVESTIGATIONS, USES

14   NOT ONLY YAHOO DATA, LIKE I DESCRIBED EARLIER, ACCOUNTS AND

15   PHONE NUMBERS AND E-MAIL ADDRESSES AND THINGS LIKE THAT, BUT WE

16   ALSO UTILIZE OPEN, WHAT WE CALL OPEN SOURCE INFORMATION.  SO,

17   FOR EXAMPLE, FACEBOOK PROFILES, LINKEDIN PROFILES, PERSONAL

18   WEBSITES, BLOGS, INFORMATION LIKE THAT THAT HELPS US

19   CONTEXTUALIZE WHAT WE SEE ON OUR PLATFORMS.

20       SO THESE ARE -- THESE ARE TOOLS, THEY'RE SERVICES THAT ARE

21   NOT OPERATED BY US, BUT WE UTILIZE THEM BECAUSE THEY ARE

22   PUBLICLY AVAILABLE AND PROVIDE CONTEXT FOR INVESTIGATIONS.

23   Q.   I SEE.  THIS IS BATES 1700, ALSO OF DEFENSE EXHIBIT RR.

24       GO AHEAD AND READ IT.

25   A.   OKAY, YES.

1    Q.   SO IT LOOKS LIKE THIS E-MAIL ALSO REFERS TO THE MLAT

2    PROCESS.

3    A.   IT DOES, YES.

4    Q.   OKAY.  AND WHAT IS IT THAT YOU'RE CONVEYING IN THIS

5    E-MAIL?

6    A.   IF I RECALL, AGENT YESENSKY HAD CALLED ME AND ASKED ABOUT

7    OUR POLICIES FOR SHARING E-MAIL CONTENT WITH THE

8    UNITED KINGDOM.  I DON'T RECALL EXACTLY WHY HE WAS ASKING, BUT

9    IT WAS LIKELY IN RELATION TO ONE OF THE BUYERS LOCATED IN THE

10   U.K.

11        THE COMPANY POLICY WAS TO ONLY PROVIDE E-MAIL CONTENT IN

12   RESPONSE TO MLATS.  SO BECAUSE HE WAS ASKING FOR THE POLICY AND

13   OUR PROCESS, I INDICATED THAT AN MLAT WAS THE WAY TO -- WAS

14   WHAT THE U.K. WOULD NEED, SO AN ALTERNATIVE MIGHT BE TO GET A

15   U.S. SEARCH WARRANT SERVED BY THE FBI INSTEAD OF THE MLAT

16   PROCESS.

17   Q.   AND WAS THAT FOR THE SAME REASONS THAT WE HAD DISCUSSED

18   BEFORE WITH THE OTHER E-MAIL REFERRING TO THE MLAT?

19   A.   THAT'S CORRECT, YES.

20   Q.   DO YOU RECALL THE ACTUAL OUTCOME OF THIS MLAT REQUEST?

21   A.   I DON'T EVEN ACTUALLY RECALL WHAT -- THE ACCOUNT IN

22   QUESTION.

23   Q.   OKAY.  SO THIS IS BATES 1702 THROUGH 1712.  THIS IS AN

24   E-MAIL CHAIN OF SEVERAL E-MAILS.

25        SO I'M GOING TO -- IF I CAN APPROACH, YOUR HONOR?

1        THE COURT:  GO AHEAD, PLEASE.

2    BY MS. HARRIS:

3    Q.   I'LL HAND THIS TO YOU.  GO AHEAD AND TAKE A QUICK READ OF

4    IT AND THEN I'LL DIRECT YOU TO SPECIFIC PORTIONS OF THE E-MAIL

5    (HANDING).

6        (PAUSE IN PROCEEDINGS.)

7        THE WITNESS:  OKAY, YES (HANDING).

8    BY MS. HARRIS:

9    Q.   SO I'M GOING TO DIRECT YOUR ATTENTION TO BATES 1708 AND

10   1709.  THIS APPEARS TO BE AN E-MAIL FROM YOU SENT WEDNESDAY,

11   THE 6TH OF JULY, 2016; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   OKAY.  WHY DON'T YOU EXPLAIN WHAT'S HAPPENING IN THIS

14   E-MAIL?

15   A.   YEAH.  THIS IS IN RESPONSE TO AN E-MAIL THAT ACTUALLY I

16   RECEIVED FROM THE AFP, THE AUSTRALIAN FEDERAL POLICE, A FEW

17   PAGES BACK, I THINK.  THE AFP HAD REACHED OUT AND HAD TOLD --

18   THIS AGENT, AGENT SEIP, HAD BEEN INTRODUCED I THINK TO

19   AGENT YESENSKY FROM THE FBI AND HAD REACHED OUT TO ME AND

20   STATED THAT HE HAD HEARD ABOUT THE OPERATION SWIFT TRAVELER

21   INVESTIGATIONS AND WANTED TO KNOW HOW THE AFP COULD DEVELOP A

22   RELATIONSHIP WITH YAHOO FOR SIMILAR TYPES OF REFERRALS.

23   Q.   OKAY.  SO ON THE SECOND PARAGRAPH, YOU MENTIONED THE

24   BENEFIT WITH JEFF AND THE FBI OF FEEDBACK.

25        HAVE WE DISCUSSED THIS BENEFIT PREVIOUSLY DURING YOUR

1    TESTIMONY?

2    A.   WE HAVE, AND I ACTUALLY SPECIFICALLY SAY, "IT JUSTIFIES

3    OUR EFFORTS TO OUR MANAGEMENT, AND THE NEWS IS A HUGE MORALE

4    BOOST FOR OUR FRONT-LINE REVIEWERS WHO SPEND DAY IN AND DAY OUT

5    LOOKING AT CHILD ABUSE IMAGES TO REPORT THEM.  WE DO NOT TALK

6    ABOUT THESE SUCCESSES OUTSIDE OF YAHOO AS WE TRY TO AVOID

7    PUBLICITY AT ALL COSTS."

8         SO, YES, THAT WAS CONSISTENT WITH WHAT WE HAD DISCUSSED.

9    Q.   AND THEN YOU GO ON TO JUST ASK HIM FOR FEEDBACK AS TO WHAT

10   HAPPENS WITH REFERRALS; IS THAT CORRECT?

11   A.   THAT'S CORRECT, YES.

12   Q.   AND, AGAIN, WHY DID YOU ASK FOR THAT FEEDBACK?

13   A.   AGAIN, BECAUSE THAT -- THAT SORT OF GOOD NEWS, THE REAL

14   WORLD OUTCOMES OF THE DIFFICULT WORK THAT THESE TEAMS ENGAGE IN

15   IS HELPFUL FOR BOTH RAISING AWARENESS IN THE COMPANY OF CHILD

16   ABUSE IMAGES AND ISSUES ASSOCIATED WITH THOSE, AS WELL AS THE

17   SORT OF THE MORALE BOOST AND THE WELLNESS AND RESILIENCY

18   ASPECTS FOR OUR REVIEWERS.

19   Q.   IF YOU HAD NOT RECEIVED THE FEEDBACK THAT YOU REQUESTED,

20   WOULD YOU HAVE REFUSED TO WORK WITH HIM?

21   A.   NO.

22   Q.   THIS IS BATES 1794, ALSO OF DEFENSE EXHIBIT RR.

23   A.   OKAY.

24   Q.   SO CAN YOU EXPLAIN WHAT'S HAPPENING IN THIS E-MAIL?

25   A.   THIS IS AN E-MAIL FROM AGENT YESENSKY AND HE WAS ASKING

1    FOR A, A WORD DOCUMENT VERSION OF THE PDF REPORT THAT WE

2    PROVIDED TO NCMEC.  MY UNDERSTANDING WAS THAT HE WANTED THIS SO

3    THAT HE COULD, ESSENTIALLY, COPY THE E-MAIL ADDRESSES OUT AND

4    PROVIDE THEM BACK TO US IN LEGAL PROCESS.

5    Q.   OKAY.  SO JUST TO CLARIFY, THIS WAS INFORMATION THAT YOU

6    HAD ALREADY FILED WITH NCMEC?

7    A.   THAT'S RIGHT, YES.

8    Q.   HE JUST ASKED FOR IT IN A DIFFERENT FORMAT?

9    A.   THAT'S CORRECT.

10   Q.   THIS IS BATES 2029 THROUGH 2032, ALSO OF DEFENSE

11   EXHIBIT RR.

12   A.   OKAY.

13   Q.   HERE'S THE REST OF IT (INDICATING).

14   A.   OKAY, YEAH.

15   Q.   SO DIRECTING YOUR ATTENTION TO THE FIRST E-MAIL IN BATES

16   2029, WHAT'S HAPPENING IN THAT E-MAIL?

17   A.   SO THIS WAS BACK IN DECEMBER OF 2014.  THIS IS IN REGARDS

18   TO THE SECOND PHILIPPINE WEBCAM INVESTIGATION THAT WE HAD SENT

19   TO NCMEC.  I WAS TRYING TO -- I MAY HAVE -- WE MAY HAVE

20   ACTUALLY SCHEDULED THE DATE OF THE MEETING, AND I WAS NOTIFYING

21   THEM THAT EVEN THOUGH I WOULD BE BRINGING COURTESY HARD COPIES

22   OF THE REPORT AND CHART, THAT THEY NEEDED TO GET FROM NCMEC THE

23   SUPPLEMENTAL DATA THAT WE PROVIDED IN RELATION TO THE CYBERTIPS

24   BECAUSE THAT WAS OUR OFFICIAL DATA DISCLOSURE MECHANISM.

25   Q.   SO YOU'RE REFERRING THEM TO NCMEC FOR BOTH THE CYBERTIPS

ZADIG DIRECT BY MS. HARRIS (RES.)

1    AND THE SUPPLEMENTAL REPORT WHICH WAS ALREADY FILED?

2    A.   THAT'S CORRECT.

3    Q.   THANK YOU.

4         THIS IS BATES 2063, ALSO OF DEFENSE EXHIBIT RR.

5    A.   YES.

6    Q.   WHAT'S HAPPENING IN THIS E-MAIL?

7    A.   THIS WAS IN RELATION TO THE THIRD INVESTIGATION, SO IN

8    JANUARY OF 2016, PROBABLY I THINK A WEEK BEFORE, OR TWO WEEKS

9    BEFORE THE ACTUAL PHYSICAL IN-PERSON MEETING WE HAD.

10        I WAS NOTIFYING AGENT YESENSKY THAT WE HAD SENT THE LATEST

11   CASE TO NCMEC, INCLUDING THE REPORT, THE CHARTS, AND THE

12   ACCOUNTS, AND WAS ASKING IF HE WAS ABLE TO OBTAIN THEM FROM

13   NCMEC.

14   Q.   OKAY.  SO, AGAIN, REFERRING AGENT YESENSKY TO NCMEC FOR

15   INFORMATION THAT YOU HAD FILED?

16   A.   THAT'S RIGHT.

17   Q.   THIS IS DEFENSE EXHIBIT SS, BATES 2071 THROUGH 2073.

18   A.   OKAY.

19   Q.   (INDICATING.)

20   A.   OKAY.

21   Q.   (INDICATING.)

22   A.   OKAY.

23   Q.   WHAT IS YOUR UNDERSTANDING OF WHAT'S HAPPENING IN THIS

24   E-MAIL?

25   A.   I RECEIVED AN E-MAIL IN MARCH OF 2015 FROM AN FBI AGENT,

1    AGENT BLETSIS.  THEY HAD SERVED LEGAL PROCESS, SEARCH WARRANTS,

2    ON YAHOO, AND SHE RECEIVED A RESPONSE REGARDING OUR USER NOTICE

3    POLICY.

4         SO WE HAVE A POLICY WHERE WE WILL VOLUNTARILY PROVIDE USER

5    NOTICE, UNLESS ORDERED BY REGULATION OR NON-DISCLOSURE ORDER

6    FROM A COURT, TO OUR USERS TO NOTIFY THEM THAT THEY WERE THE

7    TARGET OF A GOVERNMENT REQUEST.

8         WE HAVE EXCEPTIONS, ONE OF THOSE BEING AN EXCEPTION FOR

9    CHILD ABUSE INVESTIGATIONS, THAT WE PROVIDE A VOLUNTARY DELAY

10   OF NOTIFICATION.

11        AND SO THE AGENT WAS -- HAD SENT THE SEARCH WARRANT AND --

12   OR WARRANTS IN AND WAS CONFUSED WHY THEY GOT THIS RESPONSE BACK

13   BECAUSE IT WAS A CHILD ABUSE INVESTIGATION.

14        SO IN MY RESPONSE TO HER, I WAS INDICATING THAT -- I WAS

15   DIRECTING HER TO THE LANGUAGE OF THE POLICY REGARDING CALLING

16   OUT THAT THIS NEEDED TO BE -- THE AGENT NEEDED TO SPECIFY THIS

17   WAS A CHILD ABUSE INVESTIGATION IN ORDER FOR US TO, TO WAIVE

18   OUR NOTICE REQUIREMENT, ESSENTIALLY.

19        I ALSO SUGGESTED THAT THE BEST BET IN ANY EVENT IS TO

20   ALWAYS GET A NON-DISCLOSURE ORDER AND THAT WAY WE DON'T HAVE

21   THE ABILITY TO NOTIFY, AND THAT'S SORT OF THE PREFERRED METHOD

22   FROM OUR LEGAL TEAM.

23   Q.   AND WHAT IS YOUR UNDERSTANDING OF WHO ISSUES

24   NON-DISCLOSURE ORDERS?

25   A.   A JUDGE.

1    Q.   OKAY.  SO THAT WOULD BE JUST ANOTHER TYPE OF LEGAL PROCESS

2    THAT THEY COULD GET?

3    A.   THAT'S CORRECT, YES.

4    Q.   SO THIS IS BATES 2095 THROUGH 2101, ALSO OF DEFENSE

5    EXHIBIT SS, AND I'M JUST GOING TO DIRECT YOUR ATTENTION TO

6    BATES 2096, OKAY, AND 2097.

7    A.   OKAY.

8    Q.   OKAY.  SO IN THE E-MAIL DATED FEBRUARY 14TH, 2017, YOU

9    ASKED PETER KAUPP FOR A MUGSHOT; IS THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   AND WHAT WAS HIS RESPONSE TO YOU?

12   A.   HE STATED THAT HIS OFFICE DIDN'T -- HAD A POLICY ABOUT NOT

13   RELEASING INFORMATION TO THE PUBLIC, BUT HE WOULD NOTIFY ME ON

14   ANY SORT OF COURT ACTIVITY.

15   Q.   AND WHAT WAS YOUR RESPONSE TO THAT?

16   A.   I SAID NO PROBLEM AND THANKED HIM.

17   Q.   AND THEN THERE'S AN E-MAIL ABOVE THAT.  WHAT'S THAT?

18   A.   SO THAT WAS THE -- ABOUT SEVEN MONTHS LATER, THE AGENT HAD

19   SENT AND LET US KNOW OF AN OUTCOME, SO FEEDBACK FROM THE PRIOR

20   REFERRAL.  HE DIRECTED US TO A PUBLIC -- A PRESS RELEASE FROM

21   THE VIRGINIA FEDERAL COURT.

22   Q.   OKAY.  SO IT WAS YOUR UNDERSTANDING THAT THIS WAS PUBLICLY

23   AVAILABLE INFORMATION?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND IN YOUR E-MAIL RESPONDING, HOW DO YOU RESPOND TO THAT?

1      A.   SO I THANKED HIM FOR THE UPDATE AND I WAS ENTHUSIASTIC

2      ABOUT THE OUTCOME AND SENT CONGRATULATIONS.

3      Q.   OKAY.  MY QUESTIONS TODAY, HAVE THEY COVERED EVERY DETAIL

4      THAT YOU KNOW ABOUT YAHOO'S INVESTIGATIONS INTO THIS CONDUCT?

5      A.   THEY HAVE NOT.

6      Q.   DID YOUR TESTIMONY TODAY EXPLAIN EVERYTHING THAT YOU KNOW

7      ABOUT THIS MATTER, OR HAVE YOU MERELY ANSWERED THE QUESTIONS

8      THAT I'VE ASKED YOU?

9      A.   I'VE ANSWERED YOUR QUESTIONS.

10     Q.   WHEN YOU TESTIFIED ABOUT CONVERSATIONS THAT YOU HAD WITH

11     OTHERS OR DOCUMENTS THAT YOU REVIEWED, OTHER THAN THOSE THAT

12     WE'VE REVIEWED TODAY, DID YOU TESTIFY TO THE EXACT WORDS USED,

13     OR JUST TO THE SUBSTANCE OF THE CONVERSATIONS IN THE DOCUMENTS?

14     A.   TO THE SUBSTANCE.

15          MS. HARRIS:  OKAY.  DOES THE COURT HAVE ANY

16     ADDITIONAL QUESTIONS FOR MR. ZADIG?

17          THE COURT:  I DO NOT.

18          MS. HARRIS:  OKAY.  THANK YOU.

19          THE COURT:  ALL RIGHT.

20        MR. ARCHER, GO AHEAD, PLEASE.

21          MR. ARCHER:  CAN WE TAKE A VERY QUICK RESTROOM BREAK,

22     A FEW MINUTES?

23          THE COURT:  OKAY.  THAT'S FINE.

24          MR. ARCHER:  THANKS.

25          THE COURT:  YOU CAN STEP DOWN DURING THE BREAK.

1          THE WITNESS:  THANK YOU.

2          (RECESS FROM 11:20 A.M. UNTIL 11:25 A.M.)

3          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

4          MR. ARCHER:  THANK YOU, YOUR HONOR.

5                      **CROSS-EXAMINATION**

6     BY MR. ARCHER:

7     Q.   GOOD MORNING, MR. ZADIG.

8          MR. ZADIG, ARE YOU FAMILIAR WITH THE CASE OF UNITED STATES

9     VERSUS DERRICK LEE DRIVDAHL, D-R-I-V-D-A-H-L?

10    A.   I AM, YES.

11    Q.   AND YOU SUBMITTED A DECLARATION IN THAT CASE; IS THAT

12    CORRECT?

13    A.   I DID, YES.

14    Q.   AND THAT WAS PART OF A MOTION TO SUPPRESS ON THE, ON

15    BEHALF OF THE DEFENSE, YOUR DECLARATION WAS IN RESPONSE TO

16    THAT; IS THAT CORRECT?

17    A.   THAT'S CORRECT.

18    Q.   OKAY.  AND THE JUDGE IN THAT CASE RULED IN FAVOR OF THE

19    PROSECUTION IN THAT MOTION; IS THAT CORRECT?

20    A.   I BELIEVE SO, YES.

21    Q.   OKAY.  AND THAT WAS BECAUSE THE JUDGE THERE HELD THAT THE,

22    THE GOVERNMENT WAS UNAWARE OF YOUR SEARCH WHEN IT OCCURRED.

23         DO YOU RECALL THAT?

24    A.   I ACTUALLY DON'T SPECIFICALLY RECALL.

25    Q.   OKAY.  SO I'D LIKE TO SHOW YOU, THIS IS EXHIBIT -- OUT OF

1        DEFENSE EXHIBIT RR, THIS IS BATES 2040.  THE GOVERNMENT SHOWED

2        YOU THIS AS WELL.

3            SO DO YOU RECOGNIZE THIS AS AN E-MAIL COMMUNICATION

4        BETWEEN -- WELL, BETWEEN A HOMELAND SECURITY AGENT AND YAHOO

5        LEGAL COUNSEL AND YOU?

6        A.   I DO, YES.

7        Q.   OKAY.  SO HOMELAND SECURITY APPEARS TO BE RAISING AN ISSUE

8        ABOUT SOME REPORTS IN -- SORRY -- SOME NAMES IN THE OCTOBER

9        REPORT, OCTOBER 2014 REPORT THAT DID NOT HAVE ASSOCIATED

10       CYBERTIPS WITH THEM.  IS THAT YOUR UNDERSTANDING OF THE CONCERN

11       THERE?

12       A.   THAT'S MY UNDERSTANDING OF THIS QUESTION, YES.

13       Q.   OKAY.  AND SO IS IT FAIR TO SAY THEN THAT THERE WERE USERS

14       THAT WERE IDENTIFIED IN THE OCTOBER 2014 REPORTS SUBMITTED FOR

15       WHICH THERE HAD NOT BEEN INDIVIDUAL CYBERTIPS?

16       A.   THAT'S CORRECT.

17       Q.   OKAY.  WAS IT -- IS IT ALSO CORRECT TO SAY THAT THERE WERE

18       USERS IN THE DECEMBER 2014 SUPPLEMENTAL REPORT WHO HAD BEEN

19       IDENTIFIED, BUT FOR WHOM THERE HAD NOT BEEN CYBERTIP REPORTS?

20       A.   IF YOU MEAN IDENTIFIED BY E-MAIL ADDRESS, THEN YES, THAT'S

21       RIGHT.

22       Q.   RIGHT.  SO IDENTIFIED -- SO LET'S SAY FOR THE DECEMBER

23       2014 REPORT, HAD BEEN IDENTIFIED AS TARGETS OF THE

24       INVESTIGATION, BUT FOR WHOM THERE HAD NOT BEEN CYBERTIPS,

25       SEPARATE CYBERTIPS SUBMITTED; CORRECT?

1    A.   YES.  SO WE HAD PROVIDED BUYERS AND SELLERS IN THESE

2    INVESTIGATIONS, SOME OF WHOM WE REPORTED IN CYBERTIPS AND

3    OTHERS WHICH WE DID NOT.

4    Q.   OKAY.  SO MR. WOLFENBARGER -- SORRY.

5         THE JRWOLFEN02 ACCOUNT WHICH WAS IDENTIFIED IN THE

6    DECEMBER 2014 REPORT, THAT HAD NOT HAD A SEPARATE CYBERTIP

7    REPORT SUBMITTED AT THAT POINT; CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   OKAY.  SO THAT CYBERTIP REPORT WAS SUBMITTED IN NOVEMBER

10   OF 2015?

11   A.   I BELIEVE SO, YES.

12   Q.   OKAY.  BUT MR. WOLFENBARGER HAD BEEN IDENTIFIED AS A

13   TARGET OF YAHOO'S INVESTIGATION BASED ON CHAT SNIPPETS AND

14   E-MAIL HEADERS IN OCTOBER -- SORRY -- IN DECEMBER OF 2014?

15   A.   YES.  IN THE INITIAL INVESTIGATION THAT MR. WOLFENBARGER'S

16   ACCOUNT WAS DISCOVERED, HE WAS IDENTIFIED AS BEING SOMEBODY WHO

17   WAS ENGAGED IN COMMUNICATIONS WITH THE SELLER ACCOUNTS IN THE

18   PHILIPPINES, AND OUR BELIEF WAS FOR THE PURPOSE OF OBTAINING

19   CHILD SEXUAL ABUSE MATERIAL.

20        BUT WE DID NOT OBSERVE ANY REPORTABLE CONDUCT AT THAT

21   TIME.

22   Q.   OKAY.  BUT YOU OBSERVED ENOUGH THAT YOU FELT IT

23   APPROPRIATE TO IDENTIFY HIM AS A TARGET IN THE DECEMBER 2014

24   REPORT; CORRECT?

25   A.   THAT'S CORRECT, YES.

1     Q.   OKAY.  I'D LIKE TO TALK A LITTLE BIT ABOUT ACCOUNT

2     SHUTDOWNS, OR SUSPENSIONS.

3          SO THE -- YAHOO HAS THE ABILITY TO CLOSE AN ACCOUNT; IS

4     THAT CORRECT?

5     A.   IT DOES, YES.

6     Q.   OKAY.  DOES IT -- ARE THERE SORT OF -- IS THERE THE

7     ABILITY THEN TO ALSO FREEZE AN ACCOUNT WITHOUT FULLY CLOSING

8     IT?  ARE THERE SORT OF INTERMEDIARY STEPS BETWEEN FULLY CLOSING

9     AN ACCOUNT AND LEAVING IT COMPLETELY OPEN?

10    A.   NOT FROM OUR PERSPECTIVE.  THERE'S -- WE CAN DEACTIVATE AN

11    ACCOUNT, AND THEN WHETHER OR NOT THE DATA ASSOCIATED WITH THAT

12    ACCOUNT GETS DELETED IS -- THERE ARE VARIOUS INTERNAL PROCESSES

13    THAT WE'LL GO THROUGH AFTER A PERIOD OF TIME AND CLEAN UP THE

14    ACCOUNTS THAT ARE NO LONGER ACTIVE OR HAVE BEEN DELETED FOR A

15    CERTAIN PERIOD OF TIME.

16         FROM OUR PERSPECTIVE, IT'S AN ACCOUNT IS EITHER IN AN

17    ACTIVATED OR DEACTIVATED STATE.

18    Q.   SO WHEN I'M SAYING "CLOSED," "DEACTIVATED" IS THE SAME

19    TERMINOLOGY FROM YOUR END?

20    A.   THAT'S CORRECT, YES.

21    Q.   AND YOU, IN YOUR ROLE, HAVE THE ABILITY TO DEACTIVATE AN

22    ACCOUNT, BUT THEN PRESERVE THE INFORMATION IN IT FOR AN

23    INDEFINITE PERIOD OF TIME; IS THAT CORRECT?

24    A.   I -- NOT AN INDEFINITE PERIOD OF TIME.  WE ACTUALLY USE

25    THE TOOLS, THE LEGAL TOOLS, INTERNAL LEGAL TOOLS THAT RESPOND

1        TO PRESERVATION ORDERS FROM LAW ENFORCEMENT TO ALSO PRESERVE

2        ACCOUNT CONTENTS AS PART OF OUR INTERNAL INVESTIGATIONS.

3            AFTER A PERIOD OF TIME, I BELIEVE 180 DAYS OR SO, THOSE

4        TEND TO AGE OUT AND DISAPPEAR.

5        Q.   OKAY.  WHEN YOU SAY THEY TEND TO AGE OUT, BUT, YOU, IN

6        YOUR ROLE AS A SUPERVISOR OF THE ECIT, WOULD HAVE THE ABILITY

7        TO MAINTAIN THAT DATA; CORRECT?

8        A.   WE COULD, YES.

9        Q.   OKAY.  SO IN TERMS OF ACCOUNT DEACTIVATIONS, WHICH TEAMS

10       HAVE THE ABILITY TO DEACTIVATE ACCOUNTS?  AND IF -- SPEAKING

11       FOR THE TIME PERIOD OF, SAY, 2014, 2015, 2016.

12       A.   INSIDE OF YAHOO, THERE WERE A NUMBER OF TEAMS THAT HAD THE

13       ABILITY TO DEACTIVATE ACCOUNTS FOR A VARIETY OF REASONS.

14       CERTAINLY THE ECIT WAS ONE OF THEM.  THE MODERATION TEAM THAT

15       REPORTED CYBERTIPS WAS ALSO A SECOND TEAM.

16           ADDITIONALLY, THERE WERE TEAMS WITHIN WHAT WE CALLED

17       MEMBERSHIP, OR THE TEAM THAT HANDLES USER ACCOUNTS IN GENERAL,

18       COULD DEACTIVATE ACCOUNTS THAT WERE ENGAGED IN REGISTRATION

19       ABUSE OR MASS REGISTRATION.

20           OUR MAIL TEAM COULD DEACTIVATE ACCOUNTS THAT APPEARED TO

21       BE SENDING SPAM OR ONLINE SCAMS USING THE MAIL SYSTEM.

22           AND I THINK EVEN PROPERTIES, LIKE YAHOO MESSENGER OR OTHER

23       PROPERTIES, COULD DEACTIVATE ACCOUNTS IF THEY APPEARED TO BE

24       ENGAGED IN SOME SORT OF ABUSE OR VIOLATION OF OUR TERMS OF

25       SERVICE.

1    Q.   OKAY.  SO A MEMBER OF THE MODERATION TEAM, FOR INSTANCE,

2    THEY COULD SHUT DOWN AN INDIVIDUAL ACCOUNT IF THEY FOUND

3    SOMETHING THAT THEY THOUGHT WAS IN VIOLATION OF YAHOO'S TERMS?

4    WOULD THAT BE WITHIN THEIR ABILITIES?

5    A.   THEY COULD DO SO, YES.

6    Q.   OKAY.  WOULD THEY NEED TO GO TO A SUPERVISOR TO DO THAT

7    WITHIN THEIR TEAM, OR COULD THEY DO THAT WITHOUT APPROVAL FROM

8    ABOVE, SHALL WE SAY?

9    A.   IF IT WERE PART OF THEIR SORT OF DAY-TO-DAY REPORTING TO

10   NCMEC REVIEW PROCESS, THEN THEY WOULD NOT REQUIRE A

11   SUPERVISION -- OR SUPERVISOR APPROVAL.

12   Q.   OKAY.

13            THE COURT:  CAN I FOLLOW UP?

14       THE FIRST CASE THAT YOU MENTIONED, IS THAT ONE OF THE

15   ONES -- DO I HAVE THE ORDER IN THAT CASE?

16            MS. HARRIS:  DRIVDAHL?  YES, YOUR HONOR.  IT WAS

17   FILED AS GOVERNMENT'S EXHIBIT, I THINK IT'S P.

18            THE COURT:  OKAY.  AND DOES THAT INCLUDE MR. ZADIG'S

19   DECLARATION, OR NOT?

20            MR. ARCHER:  IT DOES --

21            MS. HARRIS:  NO.  THE GOVERNMENT FILED JUST THE CASE,

22   YOUR HONOR.

23            MR. ARCHER:  HIS DECLARATION IS UNDER SEAL IN THAT

24   CASE.

25            THE COURT:  I SEE.

1           MR. ARCHER:  SO THE DEFENSE DOESN'T HAVE A COPY OF

2    IT.

3           THE COURT:  ALL RIGHT.  WHAT ABOUT -- I DIDN'T

4    UNDERSTAND THE DISTINCTION OF THE -- MR. WOLFENBARGER'S NAME IN

5    THE DECEMBER 2014 YAHOO REPORT, THAT HE WAS LISTED BECAUSE HE

6    WAS IN COMMUNICATION WITH PHILIPPINE SELLERS OF CHILD SEX

7    ABUSE -- I DON'T KNOW IF THAT WAS VIDEOS OR LIVE STREAMING OR

8    PHOTOS OR IMAGES -- BUT THERE WAS NO REPORTABLE CONDUCT AT THAT

9    TIME.  I DIDN'T UNDERSTAND THAT.

10          THE WITNESS:  SO TO REPORT TO NCMEC, THERE'S A

11   CERTAIN CRITERIA THAT HAS TO BE MET.  SOME OF IT IS LAID OUT IN

12   FEDERAL LAW.  SOME OF IT IS WHAT THE NCMEC WEBSITE WILL LET US

13   SUBMIT.

14          SO, FOR EXAMPLE, IF AN ACCOUNT HAS, IN ITS CONTENTS,

15   IMAGES OR VIDEO DEPICTING CHILD ABUSE THAT ARE ESSENTIALLY

16   POSSESSED WITHIN THE CONTENT OF THE ACCOUNT, THAT IS SOMETHING

17   THAT WE HAVE TO REPORT TO NCMEC WHEN WE DISCOVER IT.

18          ANOTHER TYPE OF ACTIVITY THAT WE CAN REPORT TO NCMEC IS

19   TEXT, SO CHAT CONVERSATIONS OR OTHER TEXT DESCRIBING CHILD

20   ABUSE.  BUT THERE'S ONLY A CERTAIN SUBSET OF -- WELL, THERE'S

21   CERTAIN CRITERIA THAT HAVE TO BE MET TO MAKE THAT REPORT.  ONE

22   OF THOSE CRITERIA IS THE, LIKE, TRAVEL FOR THE PURPOSE OF CHILD

23   ABUSE.

24          SO WE FREQUENTLY ENCOUNTER CASES WHERE USERS OF THE YAHOO

25   MESSENGER SERVICE MIGHT BE IN COMMUNICATION WITH THE SELLERS IN

1    THE PHILIPPINES AND THEY MIGHT BE ASKING FOR, SAY, 12-YEAR-OLD

2    CHILDREN, OR CHILDREN WHO COULD DO CERTAIN SEX ACTS ON WEBCAM.

3         HOWEVER, THAT IN ITSELF WAS NOT REPORTABLE.  NCMEC WOULD

4    NOT BE ABLE TO ACCEPT THAT INFORMATION FROM US BECAUSE IT

5    DIDN'T MEET THE CRITERIA THAT WAS DESCRIBED, I THINK, IN THE --

6    AT LEAST ON THEIR WEBSITE.

7              THE COURT:  OKAY.  BUT YOU SAID IF A YAHOO USER IS IN

8    CONNECTION WITH A SELLER IN THE PHILIPPINES TO ASK FOR A

9    12-YEAR-OLD CHILD OR CHILDREN WHO WOULD DO CERTAIN SEX ACTS,

10   THAT'S NOT REPORTABLE?  WHY IS THAT?  I GUESS I'M NOT CLEAR.

11             THE WITNESS:  YEAH, AS FAR AS -- SO REPORTING IMAGES

12   OR VIDEO IS VERY EASY.

13             THE COURT:  RIGHT.

14             THE WITNESS:  IT'S PLAINLY CHILD SEXUAL ABUSE

15   MATERIAL AND IT'S A FEDERAL LAW THAT REQUIRES, WHEN WE BECOME

16   AWARE OF IT, WE HAVE TO REPORT IT.

17        JUST SOMEBODY EXPRESSING A DESIRE TO, TO VIEW THIS TYPE OF

18   MATERIAL, SAY, VERY REGULARLY, ALMOST ON A DAILY BASIS,

19   SOMEBODY MIGHT COME TO OUR YAHOO ANSWERS PRODUCT AND SAY, WHERE

20   CAN I BUY CP, OR CHILD PORNOGRAPHY?

21        WE WILL TERMINATE THE ACCOUNT UNDER OUR TERMS OF SERVICE

22   FOR THAT, FOR THAT MESSAGE, OR ISSUE THEM A WARNING PERHAPS,

23   BUT WE WILL NOT REPORT THAT TO NCMEC BECAUSE THAT INQUIRY, THAT

24   DESIRE ON THEIR BEHALF IS NOT SOMETHING THAT, ACCORDING TO

25   NCMEC AND OUR ATTORNEYS, IS REPORTABLE UNDER THE FEDERAL LAW.

1          THE COURT:  OKAY.  AND WHAT WERE THE CHATS THAT YOU

2    SAW FROM MR. WOLFENBARGER'S ACCOUNT AS OF DECEMBER OF 2014?

3          THE WITNESS:  THOSE WERE -- AND I DON'T HAVE

4    PARTICULAR DIRECT RECOLLECTION OF HIS SPECIFIC CHATS -- BUT

5    THOSE WOULD HAVE BEEN CHATS FROM MR. WOLFENBARGER TO NUMEROUS

6    SELLING ACCOUNTS IN THE PHILIPPINES REGARDING THE CHATS

7    INVOLVING CHILDREN OF SOME SORT.

8       SO THOSE SELLER ACCOUNTS WERE OFFERING FOR SALE, YOU KNOW,

9    THE LIVE STREAMED ABUSE AND THE IMAGES OR VIDEO, AND WE SAW

10   MR. WOLFENBARGER'S ACCOUNT IN COMMUNICATION WITH A NUMBER OF

11   THOSE.  AND EVEN THOUGH WE COULD ONLY SEE THE SMALL SNIPPETS IN

12   OUR LIMITED CONTENT REVIEW, LIKE I DISCUSSED LAST TIME, WHAT WE

13   HAD SEEN WAS SUFFICIENT TO LEAD US TO BELIEVE THAT THE PURPOSE

14   OF THOSE COMMUNICATIONS WAS FOR OBTAINING CHILD ABUSE MATERIAL.

15          THE COURT:  BUT THAT WAS NOT REPORTABLE TO NCMEC?

16          THE WITNESS:  THAT'S CORRECT.

17          THE COURT:  BECAUSE IT DIDN'T MEET NCMEC'S CRITERIA?

18          THE WITNESS:  YES.  AND I'M -- I BELIEVE NCMEC'S

19   CRITERIA IS DERIVED FROM 18 U.S.C. 2258, OR ONE OF THE 2256 OR

20   -2, YOU KNOW, STATUTES ON WHAT, WHAT SERVICE PROVIDERS HAVE TO

21   REPORT WHEN THEY ENCOUNTER IT.  AND JUST THE DESIRE FOR

22   MATERIAL IS NOT ONE OF THOSE -- IS NOT ONE OF THOSE CRITERIA,

23   EVEN THOUGH IT DOES VIOLATE OUR TERMS OF SERVICE.

24          THE COURT:  OKAY.  THANK YOU.

25       SORRY FOR THE INTERRUPTION.

1      BY MR. ARCHER:

2      Q.   MR. ZADIG, YOU DID, IN FACT, IDENTIFY THE JRWOLFEN02

3      ACCOUNT IN DECEMBER OF 2014 AS WHAT YOU CONSIDERED A BUYER

4      ACCOUNT; CORRECT?

5      A.   WE BELIEVED IT WAS, YES.

6      Q.   OKAY.  AND THAT WAS BASED ON YOUR REVIEW OF CHAT SNIPPETS,

7      AND DO YOU RECALL ANY OTHER MATERIALS?

8      A.   IT WAS THE LIMITED CONTENT REVIEW.  I BELIEVE IT WAS JUST

9      THE CHAT SNIPPETS.

10          THERE WERE HUNDREDS OF ACCOUNTS THAT WE WERE REVIEWING AT

11     THIS TIME AND, AS I MENTIONED IN OUR LAST TESTIMONY, WE HAD A

12     DESIRE TO GET THIS INFORMATION TO NCMEC AS QUICKLY AS POSSIBLE

13     BECAUSE WE BELIEVED THAT THERE WERE CHILDREN BEING ABUSED, YOU

14     KNOW, SORT OF IN REAL TIME.

15          SO, YEAH, I BELIEVE AT THAT TIME WE ONLY CONDUCTED A

16     LIMITED CONTENT REVIEW OF THE CHAT SNIPPETS, OBSERVED THE

17     COMMUNICATIONS RELATED TO CHILDREN, AND THEN PUT THAT ACCOUNT

18     INTO THE BUCKET OF A BUYER.

19     Q.   OKAY.  AND SO THAT WAS INFORMATION THAT WAS PROVIDED TO

20     NCMEC, THE FBI, AND HOMELAND SECURITY AT THE IN-PERSON MEETING

21     IN DECEMBER; CORRECT?

22     A.   MORE OR LESS.  SO WE MADE OUR SUPPLEMENT VIA E-MAIL TO

23     NCMEC, THE ESP LINE, THE ELECTRONIC SERVICE PROVIDER SECTION OF

24     NCMEC.  ONCE WE CONFIRMED THAT NCMEC HAD RECEIVED THAT

25     INFORMATION AND THAT LAW ENFORCEMENT HAD OBTAINED THAT

1     INFORMATION FROM NCMEC, WE THEN HAD THE IN-PERSON MEETING THAT

2     WE DESCRIBED.

3     Q.    OKAY.  AND YOU PROVIDED ADDITIONAL COPIES OF THE MATERIALS

4     THAT YOU HAD SUBMITTED AT THAT MEETING; CORRECT?

5     A.    YES.  WE BROUGHT HARD COPIES SO THE NCMEC REPRESENTATIVES

6     AND THE LAW ENFORCEMENT REPRESENTATIVES COULD ESSENTIALLY SORT

7     OF PAGE THROUGH IT AND WE COULD POINT TO AREAS OF RELEVANCE IN

8     THE REPORT.

9           WE ALSO BROUGHT A CHART THAT LAID OUT THE CONNECTIONS

10    BETWEEN THE DIFFERENT ACCOUNTS AND DESCRIBED THE RELATIONSHIPS.

11    Q.    OKAY.  SO THE CHART WAS SOMETHING -- WAS THAT SUBMITTED

12    THROUGH NCMEC?

13    A.    IT WAS, YES.

14    Q.    OKAY.  THIS IS DEFENSE EXHIBIT RR, BATES 1693.  THE

15    GOVERNMENT WENT OVER THIS E-MAIL WITH YOU.  FAIR TO SAY THAT

16    THIS IS BASICALLY YOUR E-MAIL SETTING UP THE MEETING IN THE

17    D.C. AREA?

18    A.    THAT'S CORRECT, YES.

19    Q.    OKAY.  SO THAT'S FOR THE DECEMBER 10TH, 2014 MEETING WHEN

20    THE REPORT WAS SUBMITTED THAT HAD THE JRWOLFEN02 ACCOUNT IN IT;

21    CORRECT?

22    A.    THAT'S CORRECT.

23    Q.    OKAY.  AND SO JUST TO BE CLEAR ON THE TIMELINE, YOU'RE

24    REACHING OUT TO SET UP THIS MEETING PRIOR TO SUBMITTING THE

25    REPORT TO NCMEC; CORRECT?

1      A.   I'M NOT CERTAIN, BUT IT'S POSSIBLE, YEAH.

2      Q.   OKAY.  THEN LET'S TAKE A LOOK AT -- THIS IS EXHIBIT RR,

3      BATES 2029.

4           IF YOU CAN TAKE A LOOK AT THAT.

5      A.   OKAY.

6      Q.   AND ACTUALLY, WE'LL -- SO WE'LL FLIP BACK BRIEFLY TO 1693.

7           DO YOU SEE THE DATE ON THAT E-MAIL?

8      A.   I DO, DECEMBER 10TH.

9      Q.   DECEMBER 10TH, OKAY.

10          SO -- AND THE DATE ON THIS E-MAIL?

11     A.   DECEMBER 12TH.

12     Q.   OKAY.  SO HAVING NOW SEEN THIS, DO YOU BELIEVE THAT WHEN

13     YOU SENT THE E-MAIL ON DECEMBER 10TH TO SET UP THE MEETING, AT

14     THAT POINT YOU HAD NOT SUBMITTED THE SUPPLEMENTAL REPORT TO

15     NCMEC?

16     A.   YES, THAT'S CORRECT.

17     Q.   OKAY.  SO YOU MENTIONED THE OFFICIAL DATA DISCLOSURE

18     MECHANISM IS THROUGH NCMEC.  BUT YOUR -- WOULD IT BE FAIR TO

19     SAY THAT YOU WERE PRACTICALLY SENDING THIS TO THE AGENTS THAT

20     YOU SET UP THE MEETING WITH?

21               MS. HARRIS:  OBJECTION.  ARGUMENTATIVE.

22               THE COURT:  OVERRULED.

23          BUT I DON'T UNDERSTAND THE QUESTION.

24               MR. ARCHER:  OKAY.

25               THE COURT:  LET ME ASK, WHEN WE WENT THROUGH THE

ZADIG CROSS BY MR. ARCHER

1       TIMELINE ON JULY 12TH, I UNDERSTOOD THAT THE SUPPLEMENTAL

2       REPORT WAS -- OR MAYBE THEY WERE CYBERTIPLINE.

3            WHAT WAS ON DECEMBER 14?  I'M NOT RECALLING THAT SECOND

4       TRANCHE.  WERE THOSE CYBERTIPLINE REPORTS OR IS THAT THE

5       SUPPLEMENTAL REPORT?  I KNOW THE MEETING WAS ON DECEMBER 16TH,

6       2014.

7            THE WITNESS:  UM --

8            THE COURT:  WHAT WAS SUBMITTED IN DECEMBER 2014?

9       JUST THE SUPPLEMENTAL REPORT OR ADDITIONAL CYBERTIPS?

10           THE WITNESS:  SO OUR PROCESS WAS WE WOULD HAVE THE

11      MODERATION TEAM -- AT THIS TIME, AT LEAST IN 2014, THE

12      MODERATION TEAM WOULD FILE INDIVIDUAL CYBERTIPS ON VARIOUS

13      ACCOUNTS.  THAT PROCESS WOULD TAKE A FEW DAYS, USUALLY BECAUSE

14      THERE WERE A NUMBER OF THEM.

15           ONCE ALL THE CYBERTIPS HAD BEEN SUBMITTED TO NCMEC, WE

16      WOULD -- THE ECIT WOULD THEN SEND A SUPPLEMENTAL REPORT TO

17      NCMEC WHICH REFERENCED ALL THOSE INDIVIDUAL CYBERTIPS.  SO IT

18      WAS A SORT OF TWO-PHASED APPROACH RELATING TO CYBERTIPS AND THE

19      SUPPLEMENT.

20           THE COURT:  SO CYBERTIPS WENT OUT SEPTEMBER 30TH,

21      2014, OCTOBER 4TH, 2014, AND THEN AGAIN DECEMBER OF 2014, OR

22      NOT?

23           THE WITNESS:  SO I BELIEVE THERE WERE -- IN 2014

24      THERE WERE WHAT WE CALL TWO SEPARATE INVESTIGATIONS.  THE FIRST

25      WAS OUR FIRST INVESTIGATION THAT WAS IN -- I THINK THE

1       CYBERTIPS WERE FILED SEPTEMBER 2014 AND WE HAD THE IN-PERSON

2       MEETING IN OCTOBER AFTER WE SENT OUR SUPPLEMENT.

3               THE COURT:  UM-HUM.

4               THE WITNESS:  AND THEN WE WENT BACK AND THOUGHT ABOUT

5       IT A LITTLE BIT AND REALIZED THAT THERE WAS PROBABLY A LOT MORE

6       THAT WE HADN'T UNCOVERED AND WERE CONCERNED THAT OUR PLATFORMS

7       WERE STILL BEING ABUSED FOR THIS TYPE OF HORRIFIC CONTENT.

8               SO WE DID THE SECOND INVESTIGATION WHICH CULMINATED IN

9       BOTH THE -- THE CYBERTIPS GETTING SENT TO NCMEC OF THE

10      INDIVIDUAL ACCOUNTS THAT HAD CHILD PORNOGRAPHY AS THEIR PROFILE

11      PICTURES; AND THEN THE SUPPLEMENT THAT, IN ESSENCE, TIED IT ALL

12      TOGETHER AND RELATED AND INDICATED HOW THEY WERE ALL CONNECTED

13      TO THE BUYER AND THE SELLERS.

14              IF WE HADN'T DONE THE SUPPLEMENT, THE CYBERTIPS WOULD JUST

15      BE INDIVIDUAL REPORTS THAT WOULDN'T HAVE ANY WAY OF TYING THEM

16      TOGETHER AND WOULD ALL HAVE ESSENTIALLY BEEN SENT TO THE

17      PHILIPPINES WHERE THE PHILIPPINE NATIONAL POLICE MAY OR MAY NOT

18      HAVE DONE ANYTHING ABOUT THEM.

19              THE COURT:  SO WHAT YOU'RE CALLING YOUR SECOND

20      INVESTIGATION, THOSE WERE THE CYBERTIPS THAT WERE SENT ON

21      OCTOBER 4TH OF 2014?

22              THE WITNESS:  NO, I DON'T BELIEVE SO.

23      I'M SORRY, IT'S A BIT CONFUSING.

24              SO I BELIEVE IN SEPTEMBER OF 2014, WE SENT THE CYBERTIPS;

25      AND THEN WE HAD A MEETING IN OCTOBER ABOUT THE SUPPLEMENT THAT

1     WAS -- BOTH THOSE IN EVENTS IN SEPTEMBER AND OCTOBER WERE WHAT

2     WE CALL OUR FIRST INVESTIGATION.

3               THE COURT:  OKAY.

4               THE WITNESS:  THE DECEMBER WAS AROUND WHAT WE CALL

5     OUR SECOND INVESTIGATION AND THERE WAS, AGAIN, THE TWO-PHASE

6     APPROACH OF FIRST CYBERTIPS FILED BY THE MODERATION TEAM, AND

7     THEN THE SUPPLEMENT THAT TIES IT ALL TOGETHER.

8          ONCE THAT WAS SENT TO NCMEC, WE HAD THE E-MAIL ON THE

9     SCREEN NOW ABOUT ARRANGING A MEETING TIME IN WASHINGTON, D.C.

10              THE COURT:  SO WHEN WERE THOSE, THE SECOND

11    INVESTIGATION CYBERTIPS, FILED?

12              THE WITNESS:  THEY PROBABLY WOULD HAVE BEEN LIKELY IN

13    LATE NOVEMBER OR EARLY DECEMBER OF 2014.  IT WAS A DIFFERENT

14    TEAM THAT FILED THEM, SO WE HAD TO RELY UPON THE MODERATION

15    TEAM'S BANDWIDTH, OR AVAILABILITY OUTSIDE OF THEIR NORMAL SORT

16    OF DAY-TO-DAY DUTIES TO TAKE ON THIS LARGE REQUEST FROM US.

17              THE COURT:  AND THEN WHEN IS YOUR THIRD

18    INVESTIGATION?

19              THE WITNESS:  OUR THIRD INVESTIGATION BEGINS IN JULY

20    OF 2015.  THAT TAKES -- IT'S A MUCH LARGER INVESTIGATION.  IT

21    TAKES US A NUMBER OF MONTHS.

22         AND WE FILE THE CYBERTIPS BEGINNING IN AROUND NOVEMBER OF

23    2015 AND INTO DECEMBER OF 2015, AND THEN WE HAVE A MEETING --

24    WELL, WE SET UP THE MEETING IN JANUARY 2016 AND ACTUALLY HAD

25    THE MEETING IN FEBRUARY OF 2016.

1          THE COURT:  OKAY.  AND THEN YOUR FOURTH INVESTIGATION

2    IS THE ONE THAT YOU SAID WAS JUST COMPLETED IN 2019?

3          THE WITNESS:  THAT'S CORRECT.

4          THE COURT:  THOSE CYBERTIPS WERE FILED WHEN?

5    FEBRUARY OF 2019 OR SOMETHING LIKE THAT?

6          THE WITNESS:  SOMEWHERE AROUND THEN.  I BELIEVE WE

7    ACTUALLY HAD THE SORT OF MEETING IN APRIL OF 2019.

8          I DIDN'T HAVE DIRECT INVOLVEMENT IN THIS CASE DUE TO MY

9    CHANGE IN POSITION, BUT I BELIEVE IT WAS SOMEWHERE AROUND

10   FEBRUARY OF 2019.

11         THE COURT:  OKAY.  YOU WERE NOT INVOLVED IN THE

12   FOURTH INVESTIGATION?

13         THE WITNESS:  NOT DIRECTLY.  I SUPERVISED THE TEAM

14   THROUGH A COUPLE DIFFERENT LAYERS.  BUT -- I WAS AWARE OF IT,

15   BUT NOT DIRECTLY INVOLVED.

16         THE COURT:  OKAY.

17         THANK YOU FOR LETTING ME CLEAR UP THE TIMELINE,

18   MR. ARCHER.  GO AHEAD, PLEASE.

19         MR. ARCHER:  THANK YOU.

20   Q.   SO MY QUESTION THEN, MR. ZADIG, IS WHEN YOU'RE SENDING

21   THESE MATERIALS OVER, INCLUDING THE SUPPLEMENTAL REPORT, YOUR

22   INTENTION IS THAT THEY REACH AGENT YESENSKY; CORRECT?

23   A.   I WOULD NOT SAY THAT.  I WOULD SAY THAT OUR -- WE'RE

24   REQUIRED TO SEND IT TO NCMEC.

25         HOWEVER, WE ALSO WANT TO ENSURE THAT, BECAUSE OF THE

1      RESILIENCY ASPECTS LIKE I DISCUSSED EARLIER, THAT THESE

2      CYBERTIPS DON'T JUST SORT OF GO INTO THE VOID AND DISAPPEAR,

3      BUT WE WANTED TO ENSURE THAT THEY ACTUALLY WERE SEEN AND HAD --

4      BY SOMEBODY WHO COULD ACTION THEM.

5          SO ONCE WE NOTIFIED NCMEC AND SENT THE DATA TO NCMEC, WE

6      THEN REACHED OUT TO AGENT YESENSKY AND AGENT O'CALLAGHAN AND

7      SAID THAT THE DATA WAS AT NCMEC AND COULD BE RETRIEVED.

8      Q.   SO -- BUT YOU, IN FACT, CONTACTED THEM PRIOR TO SUBMITTING

9      THE CYBERTIPS, OR AT LEAST PRIOR TO SUBMITTING THE SUPPLEMENTAL

10     REPORT IN DECEMBER OF 2014; CORRECT?

11     A.   TO SET UP THE MEETING, CORRECT.

12     Q.   OKAY.  AND SO -- BUT THEN IT WOULD BE CORRECT TO SAY THAT

13     THEY WERE THE INTENDED TARGETS, OR IF NOT AMONG THE INTENDED

14     TARGETS OR RECIPIENTS OF THE INFORMATION YOU WERE SENDING TO

15     NCMEC; CORRECT?

16     A.   CERTAINLY WE KNEW THAT NCMEC WOULD RECEIVE IT AND HAD

17     INTENDED THAT THE FBI AND HOMELAND SECURITY WOULD ALSO BE ABLE

18     TO SEE IT AFTER NCMEC DID, CORRECT.

19     Q.   OKAY.  AND SO -- AND, IN FACT, A NUMBER OF TIMES YOU ASKED

20     THEM TO GO RETRIEVE THE REPORTS ONCE THEY'D BEEN SUBMITTED;

21     CORRECT?

22     A.   YES.  OUR REQUEST TO NCMEC, BECAUSE -- I THINK I MIGHT

23     HAVE MENTIONED IN OUR LAST TESTIMONY -- WAS THAT NCMEC'S

24     PROCESS IS TO GET AN INDIVIDUAL CYBERTIP, DETERMINE WHERE THE

25     USER REFERENCED IN THE CYBERTIP IS LOCATED, WHEREVER IT IS IN

1      THE WORLD, AND THEN SEND IT TO THAT LOCATION.

2      Q.   SO IF I COULD INTERRUPT.  MY QUESTION WAS THAT ON A NUMBER

3      OF OCCASIONS, YOU REACHED OUT DIRECTLY TO THE FBI AND HOMELAND

4      SECURITY INVESTIGATIONS TO ASK THEM TO GET THINGS FROM NCMEC

5      THAT YOU HAD SUBMITTED; CORRECT?

6      A.   YES.  AS I WAS TRYING TO SAY, WE HAD --

7      Q.   THAT'S ALL.  THAT WAS MY QUESTION.

8           MS. HARRIS:  I WOULD ASK THAT THE WITNESS BE ALLOWED

9      TO FINISH THE ANSWER, PLEASE.

10          THE COURT:  GO AHEAD, PLEASE.  YOU CAN ANSWER THE

11     QUESTION.

12          THE WITNESS:  SO WE HAD ASKED NCMEC -- BECAUSE THERE

13     WERE ALL THESE DIFFERENT HUNDREDS OF CYBERTIPS FLOWING INTO

14     NCMEC THAT WOULD THEN BE SENT ALL OVER THE COUNTRY, ALL OVER

15     THE WORLD, WE HAD ASKED NCMEC TO HOLD THOSE CYBERTIPS SO THE

16     INVESTIGATION COULD BE SEEN AS ONE ENTITY INSTEAD OF HUNDREDS

17     OF UNCONNECTED CYBERTIPS.

18          ONCE WE HAD SUBMITTED OUR LAST CYBERTIP AND SUPPLEMENT, IN

19     OUR VIEW, THAT WAS A COMPLETE SORT OF INVESTIGATION THAT WAS

20     THEN READY TO BE SEEN IN ITS FULL CAPACITY BY, IN THIS CASE,

21     THE FBI AND HOMELAND SECURITY.

22     BY MR. ARCHER:

23     Q.   OKAY.  SO IF I COULD DIRECT YOUR ATTENTION, THIS IS AGAIN

24     EXHIBIT RR AND IT'S BATES 1699.

25          YOU RECALL SENDING THIS E-MAIL?

1    A.   I DO, YES.

2    Q.   SO THE GOVERNMENT ASKED YOU A LITTLE BIT ABOUT THIS.

3         THE E-MAIL HERE IS -- TELL ME IF I'M SUMMARIZING THIS

4    CORRECTLY -- DIRECTING BOTH JEFF YESENSKY AND NEIL O'CALLAGHAN

5    TO A TOOL THAT WOULD ALLOW THEM TO REVIEW THE YAHOO AVATARS OF

6    MESSENGER ACCOUNTS WITHOUT HAVING TO LOG IN WITH THEIR OWN

7    ACCOUNT; IS THAT CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   OKAY.  AND THE PURPOSE OF THAT WAS TO AID THEM IN THEIR

10   INVESTIGATION OF THESE ACCOUNTS; CORRECT?

11   A.   YES.  WE WANTED TO MAKE SURE THAT, BECAUSE SOME OF THE

12   SELLER ACCOUNTS HAD PROFILE PICTURES, AS I MENTIONED IN THE

13   SECOND PARAGRAPH HERE, THAT HAD IMAGES OF CHILDREN THAT WERE

14   NOT -- DIDN'T MEET THE FEDERAL -- THE DEFINITION FOR CHILD

15   PORNOGRAPHY, SO WE WERE NOT ABLE TO REPORT THOSE ACCOUNTS, THEY

16   STILL, IN OUR BELIEF, INDICATED CHILDREN WHO WERE LIKELY AT

17   RISK OF BEING ABUSED OR BEING ABUSED IN OTHER CONTEXTS.

18        SO, YES, I WANTED TO MAKE SURE THAT LAW ENFORCEMENT WAS

19   ABLE TO SEE THOSE POTENTIAL VICTIMS, CHILD ABUSE VICTIMS.

20   Q.   OKAY.  BUT, AGAIN, THE PURPOSE OF SENDING THIS E-MAIL WAS

21   TO HELP THEM WITH THEIR INVESTIGATION; CORRECT?

22   A.   THE PURPOSE OF THE E-MAIL WAS TO DIRECT THEM TO AN OPEN

23   SOURCE TOOL THAT WE UTILIZED IN OUR OWN INVESTIGATION AND WHICH

24   THEY MIGHT ALSO FIND USEFUL, CORRECT.

25   Q.   OKAY.  AND IF YOU SEE DOWN, I THINK IT'S ABOUT THREE LINES

1      FROM THE BOTTOM, YOU SAID THAT THEY "MIGHT FIND VALUE IN

2      CHECKING THESE PICTURES WHEN WRITING UP YOUR AFFIDAVITS."

3           ARE YOU REFERRING TO SEARCH WARRANT AFFIDAVITS IN THAT

4      CASE?

5      A.   I WAS, YES.

6      Q.   OKAY.  SO YOU THOUGHT THIS TOOL MIGHT BE HELPFUL FOR THEM

7      IN DEVELOPING PROBABLE CAUSE TO THEN SEEK WARRANTS AGAINST THE

8      IDENTIFIED TARGETS?

9      A.   BASED ON MY UNDERSTANDING OF WHAT LAW ENFORCEMENT DOES

10     WITH THESE REPORTS THAT WE SEND, JUST LIKE HOW WE UTILIZE OPEN

11     SOURCE INVESTIGATIVE METHODS, LIKE FACEBOOK OR LINKEDIN OR

12     OTHER OPEN SOURCE TOOLS, THIS WAS ONE OF THE TOOLS THAT WE

13     UTILIZED, AND WHILE IN THE REPORT WE SAID LINKEDIN PROFILE,

14     FACEBOOK PROFILES OF CERTAIN BUYERS, FOR EXAMPLE, TO HIGHLIGHT

15     PEOPLE WHO MAY HAVE ACTUALLY BEEN TRAVELING OR HAD ACCESS TO

16     CHILDREN, THIS WAS A TOOL WE DIDN'T CALL OUT IN OUR REPORT, SO

17     WE WANTED TO MAKE SURE THAT THEY WERE AWARE OF IT.

18     Q.   OKAY.  YOU HAVE EXPERIENCE AS A FEDERAL LAW ENFORCEMENT

19     OFFICER; IS THAT CORRECT?

20     A.   A LITTLE DATED NOW, BUT YES.

21     Q.   OKAY.  HOW MANY YEARS DID YOU WORK AS AN AGENT?

22     A.   SEVEN YEARS.

23     Q.   OKAY.  AND IN THAT TIME, DID YOU HAVE THE OCCASION TO

24     PREPARE SEARCH WARRANT AFFIDAVITS AND APPLY FOR SEARCH

25     WARRANTS?

1    A.   I DID, YES.

2    Q.   OKAY.  AND SO WHEN YOU'RE SUGGESTING THAT THIS TOOL MIGHT

3    BE HELPFUL TO THEM, "THEM" BEING AGENTS YESENSKY AND

4    O'CALLAGHAN, WERE YOU DRAWING ON YOUR EXPERIENCE IN DEVELOPING

5    SEARCH WARRANT AFFIDAVITS FOR SEARCH WARRANT APPLICATIONS IN

6    YOUR PRIOR CAREER?

7    A.   I WOULD SAY IT'S A BIT OF BOTH, THAT BOTH THAT -- AND IN

8    2014, IT WAS A LITTLE MORE RECENT, MY LAW ENFORCEMENT

9    EXPERIENCE.

10        BUT ALSO TRYING TO SHOW ALL THE TOOLS THAT WE UTILIZED IN

11   OUR INTERNAL INVESTIGATION.

12   Q.   OKAY.  THIS IS BATES 1700 FROM EXHIBIT RR.

13        YOU RECALL SENDING THIS E-MAIL?

14   A.   I DO, YES.

15   Q.   OKAY.  THE GOVERNMENT DISCUSSED THIS WITH YOU A LITTLE

16   BIT, BUT WOULD YOU AGREE THAT THIS IS AN -- A SUGGESTION ABOUT

17   HOW TO CIRCUMVENT THE MLAT PROCESS?

18   A.   I WOULD NOT AGREE WITH THAT CHARACTERIZATION, NO.

19   Q.   OKAY.  SO WHAT YOU'RE SUGGESTING THAT THIS INFORMATION

20   BE -- SO I GUESS -- I'LL STEP BACK A SECOND.

21        WHAT YOU'RE SUGGESTING TO AGENT YESENSKY HERE IS THAT HE

22   GET THE INFORMATION VIA A U.S. SEARCH WARRANT AND THEN SHARE IT

23   DIRECTLY WITH LAW ENFORCEMENT IN EUROPE; CORRECT?

24   A.   YES.  AS A U.S. COMPANY, FRANKLY, IT'S A LOT EASIER FOR US

25   TO HANDLE U.S. SEARCH WARRANTS.

1    Q.   OKAY.  SO -- AND YOU DISCUSS HERE AN MLAT OR A LETTER

2    ROGATORY.

3         YOUR UNDERSTANDING WAS NOT THAT AGENT YESENSKY WOULD SHARE

4    THE INFORMATION THAT HE GOT VIA EITHER OF THOSE TWO METHODS;

5    CORRECT?

6              MS. HARRIS:  OBJECTION.  CALLS FOR SPECULATION.

7         AND THE WITNESS DOESN'T HAVE PERSONAL KNOWLEDGE OF WHAT

8    AGENT YESENSKY WOULD HAVE DONE OR DID DO.

9              MR. ARCHER:  I'M ASKING HIM WHAT HIS -- WHAT HE WAS

10   INTENDING, WHAT HE WAS SUGGESTING.

11             THE COURT:  OVERRULED.

12        YOU MAY ANSWER THE QUESTION.

13             THE WITNESS:  WOULD YOU MIND RESTATING THAT?  I'M

14   SORRY.

15   BY MR. ARCHER:

16   Q.   SURE.  SO MY QUESTION IS, WHEN YOU'RE ASKING AGENT -- OR

17   YOU'RE SUGGESTING THAT AGENT YESENSKY GET THIS INFORMATION BY A

18   U.S. WARRANT, ARE YOU SUGGESTING THAT HE GET IT BY U.S. WARRANT

19   AND THEN TURN IT OVER SUBJECT TO AN MLAT OR A LETTER ROGATORY?

20   A.   BASED ON MY UNDERSTANDING, THAT'S NOT HOW MLATS OR LETTERS

21   ROGATORY WORK.

22   Q.   OKAY.  INDEED, YOU WERE SUGGESTING THAT HE SHARE IT

23   DIRECTLY TO EUROPEAN LAW ENFORCEMENT WITHOUT SEPARATE LEGAL

24   PROCESS; CORRECT?

25   A.   WE'RE NOT -- WE'RE NOT IN A POSITION TO DICTATE WHAT

ZADIG CROSS BY MR. ARCHER                                    318

1        HAPPENS AFTER WE COMPLY WITH LEGAL PROCESS.

2            SO IF OUR COMPANY RECEIVES A U.S. SEARCH WARRANT SIGNED BY

3        A U.S. MAGISTRATE JUDGE, THEN THAT IS -- THAT WILL BE COMPLIED

4        WITH.

5        Q.   OKAY.  I UNDERSTAND REGARDING YOUR COMPLIANCE.

6            BUT IN THIS E-MAIL, ARE YOU SUGGESTING THAT HE SHARE THEM

7        ON AN LE BASIS?  AND THAT'S A LAW ENFORCEMENT BASIS; CORRECT?

8        A.   THAT'S CORRECT.

9        Q.   OKAY.  AND SO FROM YOUR EXPERIENCE AS AN AGENT AND WORKING

10       IN YOUR CURRENT POSITION, A LAW ENFORCEMENT BASIS SHARING WOULD

11       BE A DIRECT SHARING; CORRECT?

12       A.   MY UNDERSTANDING IS THAT IF BOTH AGENCIES IN DIFFERENT

13       COUNTRIES HAVE SORT OF PARALLEL OR JOINT INVESTIGATIONS GOING,

14       THEN THEY HAVE THE ABILITY TO SHARE THAT INFORMATION ON THIS

15       SORT OF LAW ENFORCEMENT TO LAW ENFORCEMENT BASIS.

16       Q.   OKAY.  WHAT DO YOU BASE THAT BELIEF ON?

17       A.   BOTH FROM MY PERSONAL EXPERIENCE IN LAW ENFORCEMENT, AS

18       WELL AS INFORMATION I'VE LEARNED FROM, SAY, CONFERENCES OR,

19       LIKE, CYBER SECURITY CONFERENCES.

20       Q.   SO ARE YOU AWARE OF ANY EXCEPTION IN THE MLAT THAT PERMITS

21       LAW ENFORCEMENT TO SHARE DIRECTLY WITHOUT GETTING AN MLAT?

22       A.   I'M ACTUALLY NOT REALLY AWARE OF HOW MLATS WORK IN TERMS

23       OF DIPLOMATIC, YOU KNOW, INTERNATIONAL RELATIONS.

24       Q.   OKAY.  BUT YOU'RE NOT SUGGESTING THAT AGENT YESENSKY GET A

25       SEPARATE COURT ORDER TO PERMIT HIM TO SHARE IT LAW ENFORCEMENT

1    TO LAW ENFORCEMENT; CORRECT?

2    A.   YEAH.  I SHOULD CLARIFY THAT IN MY LAST QUESTION, OR MY

3    RESPONSE, RATHER.

4         AN MLAT, OR AT LEAST MY UNDERSTANDING OF AN MLAT, IS TWO

5    GOVERNMENTS MAKING A REQUEST TO EACH OTHER.  THE RECIPIENT

6    GOVERNMENT OF THE MLAT THEN COMPLIES WITH THEIR OWN LEGAL

7    PROCESS.  SO, FOR EXAMPLE, IF THE U.K. WERE TO SEND AN MLAT TO

8    IRELAND, AN IRISH LAW ENFORCEMENT OFFICER WOULD GO BEFORE AN

9    IRISH JUDGE AND GET AN IRISH SEARCH WARRANT AND GO TO YAHOO.

10        SO WE DON'T ACTUALLY -- WE NEVER SEE MLATS.  WE JUST SEE

11   THE HOST COUNTRY LEGAL PROCESS, IF THAT MAKES SENSE.

12   Q.   AND YOUR UNDERSTANDING OF THE PURPOSE OF IT, THEN, IS TO

13   RESPECT THE INDIVIDUAL HOST COUNTRY'S SERVICE, OR LEGAL

14   PROCESS?  DOES THAT MAKE SENSE?

15   A.   ESPECIALLY FOR COUNTRIES -- FOR COMPANIES LIKE OURS THAT

16   ARE PRIMARILY U.S. COMPANIES, WE ARE NOT EQUIPPED TO HANDLE

17   REQUESTS FROM COUNTRIES WHERE WE CAN'T -- WE DON'T KNOW WHAT

18   HAPPENS, LIKE RUSSIA, FOR EXAMPLE.

19   Q.   OKAY.  BUT YOU INDICATED A SECOND AGO THAT THE MLAT WOULD

20   THEN REQUIRE PROPER LEGAL PROCESS TO BE SOUGHT IN BOTH THE

21   REQUESTING COUNTRY AND THE, AND THE COUNTRY REQUESTED OF.  IS

22   THAT --

23   A.   CERTAINLY THE RECIPIENT COUNTRY, THEY HAVE TO -- LIKE,

24   IRELAND OR THE UNITED STATES, THEY HAVE TO GET WHATEVER LEGAL

25   PROCESS IS IN THEIR COUNTRY, LIKE HERE IT'S A SEARCH WARRANT,

1       AND SERVE IT ON THE COMPANY.

2           BUT I ACTUALLY DON'T KNOW WHAT THE REQUIREMENT OF THE

3       SENDING COUNTRY WOULD BE.

4       Q.   AND SO IT WOULD BE -- WOULDN'T IT THEN BE ACCURATE TO SAY

5       THAT SHARING SOMETHING DIRECTLY WITHOUT GOING THROUGH THAT

6       PROCESS WOULD CIRCUMVENT THE MLAT PROCESS?

7       A.   I WOULDN'T CHARACTERIZE IT LIKE THAT, AND IT'S BECAUSE I

8       DON'T -- I DON'T KNOW IF THE PURPOSE OF THE MLAT PROCESS IS

9       TO -- YOU KNOW, LIKE, WE'RE CONCERNED WITH USER PRIVACY.  WE

10      WANT TO MAKE SURE OUR USERS' PRIVACY IS PROTECTED, SO WE

11      REQUIRE SEARCH WARRANTS TO RESPECT THE PRIVACY OF OUR USERS.

12          I DON'T KNOW IF AN MLAT, THE SORT OF FRAMEWORK, THE ACTUAL

13      FRAMEWORK OF THAT IS DESIGNED TO, YOU KNOW, HAVE THAT SIMILAR

14      TYPE OF PROTECTION IN PLACE.

15          THERE'S DIPLOMATIC RELATIONS BETWEEN COUNTRIES, BUT THAT'S

16      SORT OF WAY OUTSIDE MY SCOPE OF EXPERTISE.

17      Q.   UNDERSTOOD.  I'M NOT ASKING YOU FOR A LEGAL OPINION.

18          BUT YOU UNDERSTAND CIRCUMVENT IS --

19              MS. HARRIS:  OBJECTION.  THIS IS BECOMING

20      ARGUMENTATIVE, YOUR HONOR, AND IT'S REPETITIVE AND IT'S BEEN

21      ASKED AND ANSWERED.

22              MR. ARCHER:  I'M ASKING WHETHER THE -- WELL, I'M

23      ABOUT TO ASK WHETHER THE WITNESS UNDERSTANDS WHAT I MEAN BY

24      "CIRCUMVENT."

25              MS. HARRIS:  THAT'S ARGUMENTATIVE, YOUR HONOR.

1           THE COURT:  I'LL ALLOW ONE MORE QUESTION, BUT IT HAS

2      BEEN ASKED AND ANSWERED AND I'D LIKE YOU TO MOVE ON.

3           MR. ARCHER:  OKAY.

4           THE COURT:  GO AHEAD, YOU CAN ASK ONE MORE QUESTION

5      ON THIS.  YOU'VE ALREADY ASKED WHETHER HE WAS SUGGESTING HOW TO

6      CIRCUMVENT THE MLAT PROCESS, SO --

7           MR. ARCHER:  OKAY.

8      Q.   WOULD YOUR SUGGESTION PERMIT THE AUTHORITIES IN, IN THIS

9      CASE, THE U.K. TO AVOID HAVING TO GO THROUGH THE MLAT PROCESS?

10          MS. HARRIS:  OBJECTION.  CALLS FOR A LEGAL CONCLUSION

11     AND FOR SPECULATION.

12          MR. ARCHER:  HE'S THE ONE MAKING THE SUGGESTION.

13          MS. HARRIS:  AS TO HOW THE EFFECT OF THE SUGGESTION

14     AND HOW IT WOULD AFFECT GOVERNING BODIES IN OTHER COUNTRIES?

15     THE WITNESS DOESN'T HAVE THE REQUISITE KNOWLEDGE FOR THAT.

16          MR. ARCHER:  IT APPEARS FROM HIS E-MAIL HE DOES

17     BECAUSE THAT'S EXACTLY WHAT HE'S SUGGESTING.

18          THE COURT:  WELL, THERE'S NO NEED TO ARGUE.

19     GO AHEAD.  OVERRULED.

20     YOU CAN ANSWER THIS QUESTION AND THEN I'D LIKE US --

21     ACTUALLY, WE MAY NEED TO TAKE OUR BREAK.

22     BUT GO AHEAD, PLEASE.

23          THE WITNESS:  WOULD YOU MIND RESTATING THAT?

24     BY MR. ARCHER:

25     Q.   SURE.  SO WOULD YOUR SUGGESTION -- IN YOUR UNDERSTANDING

1       OF THIS, WOULD YOUR SUGGESTION TO AGENT YESENSKY TO SHARE THIS

2       ON A LAW ENFORCEMENT BASIS ALLOW THE AUTHORITIES IN THE U.K. TO

3       AVOID HAVING TO GO THROUGH THE MLAT PROCESS?

4       A.   SO OUR -- THE PURPOSE OF THIS STATEMENT WAS, AGAIN, AS I

5       MENTIONED EARLIER, WE WERE CONCERNED WITH THE HANDS-ON ABUSE OF

6       CHILDREN AND THE AMOUNT OF TIME THE MLAT TAKES.

7            SO WE WANTED TO --

8            MR. ARCHER:  YOUR HONOR, I'D MOVE TO STRIKE AS

9       NONRESPONSIVE.

10           THE COURT:  OVERRULED.  PLEASE, ENOUGH ARGUING.

11           GO AHEAD.  ANSWER THE QUESTION.

12           THE WITNESS:  SO WE WANTED TO TRY TO HIGHLIGHT AN

13      OPTION, BASED ON OUR COMPANY'S EXPERIENCE DEALING WITH MLAT --

14      WE ACTUALLY PARTICIPATE IN MLAT REFORM PROJECT.  AS A COMPANY,

15      WE BELIEVED THAT MLATS WERE IMPORTANT.  BUT THE WAY THAT

16      THEY'RE IMPLEMENTED RIGHT NOW IS VERY CUMBERSOME AND DOESN'T

17      RESPECT THE SORT OF REALLY URGENT NEEDS THAT WE HAD FELT THAT

18      WE HAD WITH THE CHILD ABUSE.

19           SO CERTAINLY I WAS DIRECTING THE AGENT TO GET U.S. LEGAL

20      PROCESS WHICH, IN OUR EXPERIENCE, IS MUCH FASTER.

21      BY MR. ARCHER:

22      Q.   OKAY.  YOU ALSO EXPRESSED A CONCERN THAT IF THIS WERE

23      SHARED ON A LAW ENFORCEMENT BASIS, IT MAY NOT BE ABLE TO BE

24      USED AT TRIAL; IS THAT ACCURATE?

25      A.   UM --

ZADIG CROSS BY MR. ARCHER

1    Q.   IF YOU LOOK IN PARAGRAPH 1 THERE.

2    A.   RIGHT.  AND AGAIN, THAT'S SORT OF -- AND I THINK I'M

3    PROBABLY SPEAKING OUTSIDE MY COMFORT ZONE HERE, AND WAS AT THE

4    TIME -- BUT MY UNDERSTANDING, VERY LIMITED UNDERSTANDING, IS

5    THAT FOR A TRIAL, THERE WOULD NEED TO BE SOME SORT OF

6    AUTHENTICATION OF RECORDS, AND INFORMATION SHARED LAW

7    ENFORCEMENT TO LAW ENFORCEMENT WOULDN'T HAVE THAT

8    AUTHENTICATION STATEMENT THAT A COMPANY MIGHT PROVIDE TO

9    CERTIFY THE RECORDS.

10          MR. ARCHER:  OKAY.  WOULD THE COURT LIKE TO TAKE A

11   BREAK OR SHOULD I MOVE ON?

12          THE COURT:  OKAY.  WHY DON'T WE -- IT IS ALREADY

13   12:02.  WE'LL TAKE A ONE HOUR BREAK FOR LUNCH AND BE BACK AT,

14   LET'S SAY 1:05 SINCE IT'S 12:02.

15       ALL RIGHT.  THANK YOU VERY MUCH.

16          MR. ARCHER:  THANK YOU.

17          THE COURT:  WE'LL SEE YOU BACK AT 1:05.

18       (THE LUNCH RECESS WAS TAKEN FROM 12:02 P.M. UNTIL

19   1:07 P.M.)

20

21

22

23

24

25

1        **AFTERNOON SESSION**

2            THE COURT:  GOOD AFTERNOON.  WELCOME BACK.

3        PLEASE GO AHEAD, MR. ARCHER.

4            MR. ARCHER:  THANK YOU, YOUR HONOR.

5   Q.   SO I'M PUTTING UP ON THE SCREEN NOW -- THIS IS FROM

6   DEFENSE EXHIBIT RR.  IT IS BATES 1680.

7        DO YOU RECALL SENDING THIS E-MAIL, MR. ZADIG?

8   A.   I DO, YES.

9   Q.   OKAY.  SO IS IT FAIR TO DESCRIBE THIS AS ANOTHER

10  DISCUSSION WITH AGENT YESENSKY ABOUT A LAW ENFORCEMENT TO LAW

11  ENFORCEMENT SHARING ARRANGEMENT?

12  A.   THAT IS INCLUDED IN THE E-MAIL, AS WELL AS QUESTIONS ABOUT

13  MLAT'S PROCESS, YES.

14  Q.   OKAY.  SO -- BUT THE REASON THE LAW ENFORCEMENT TO LAW

15  ENFORCEMENT WAS DISCUSSED IS BECAUSE IT'S RELATED TO THE MLAT

16  PROCESS; IS THAT CORRECT?

17  A.   YES, THAT'S CORRECT.

18  Q.   OKAY.  THAT'S -- SO THAT'S THE REASON IT'S IN THIS E-MAIL;

19  IS THAT CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   SO YOU'RE DIRECTING AGENT YESENSKY THERE TO FOUR ACCOUNTS

22  THAT HAVE BEEN INQUIRED OF YOU BY THE GERMAN AUTHORITIES; IS

23  THAT CORRECT?

24  A.   THAT'S CORRECT.  THOSE WERE IN THE, ONE OF OUR PRIOR

25  REFERRALS TO NCMEC, YES.

1    Q.   OKAY.  SO WHAT WAS YOUR INTENT IN DIRECTING AGENT YESENSKY

2    TO THOSE, TO THOSE FOUR ACCOUNTS?

3    A.   SIMILAR TO THE LAST E-MAIL WE DISCUSSED BEFORE OUR BREAK,

4    THIS WAS A CASE WHEN THE GERMAN LAW ENFORCEMENT REACHED OUT TO

5    ME AND I NOTIFIED THE FBI ABOUT THAT REACH OUT.

6    Q.   OKAY.  BUT WHAT WAS YOUR INTENT IN DOING SO?

7    A.   I THINK IT WAS SIMILAR TO LAST TIME IN THAT, AS I

8    MENTIONED EARLIER, GERMAN LAW ENFORCEMENT WAS NOT ABLE TO GET

9    ACCOUNT CONTENT WITHOUT AN MLAT TO IRELAND, SO I WAS NOTIFYING

10   THE FBI ABOUT THIS INQUIRY BECAUSE THIS WAS A SET OF USERS THAT

11   WE HAD PROVIDED IN OUR INITIAL REFERRAL -- WELL, ONE OF OUR

12   SUBSEQUENT REFERRALS TO NCMEC.

13   Q.   OKAY.  SO MAYBE I CAN ASK IT A DIFFERENT WAY.  WHAT DID

14   YOU HOPE TO HAPPEN AS A RESULT OF YOU SENDING THIS E-MAIL?

15   A.   SO THIS WAS AN INDIVIDUAL WHO, AS I MENTIONED EARLIER, WAS

16   A -- HE OPERATED AN ORPHANAGE.  HE WAS A GERMAN NATIONAL

17   RESIDING IN THE PHILIPPINES OPERATING AN ORPHANAGE AND, BASED

18   ON THE INFORMATION WE PROVIDED, WAS ABUSING THE CHILDREN IN HIS

19   CARE.

20        THIS WAS VERY CONCERNING TO US AND WE WANTED TO ENSURE

21   THAT SWIFT ACTION WOULD BE TAKEN TO RESCUE THOSE CHILDREN.

22   Q.   OKAY.  WHAT DO YOU MEAN BY "SWIFT ACTION"?

23   A.   WELL, THE MLAT, AS I DESCRIBED EARLIER, IS KIND OF THE

24   OPPOSITE OF SWIFT ACTION.  IT'S A VERY TEDIOUS PROCESS AND

25   TAKES A LONG TIME.

1          AND WE WERE CONCERNED THAT THERE WAS MORE OF AN EXIGENCY

2     IN THIS SITUATION WITH THE SORT OF HANDS-ON ABUSE GOING ON WITH

3     THIS INDIVIDUAL AND THE CHILDREN.

4     Q.   OKAY.  SO WAS IT YOUR HOPE, THEN, THAT BY CONNECTING THESE

5     TWO LAW ENFORCEMENT AGENCIES, IT WOULD AID IN THE FASTER

6     APPREHENSION OF THAT GENTLEMAN?

7     A.   NOT NECESSARILY THE APPREHENSION, BUT HOPEFULLY THE RESCUE

8     OF THE CHILDREN, YES.

9     Q.   OKAY.  IS IT YOUR UNDERSTANDING AS A LAW ENFORCEMENT

10    AGENT, YOUR PRIMARY RESPONSIBILITY IS TO ARREST PEOPLE AND

11    INVESTIGATE CASES?

12    A.   ARE YOU ASKING ME AS A LAW ENFORCEMENT PERSON?

13    Q.   SURE, IN YOUR EXPERIENCE IN LAW ENFORCEMENT.

14    A.   I MEAN, I WORKED AT AN AGENCY THAT WAS A LITTLE BIT

15    DIFFERENT, IT WAS INSPECTOR GENERAL, AND WE WERE CONCERNED WITH

16    THE OPERATION OF THE AGENCY.

17         SO I DON'T HAVE A WHOLE LOT OF DIRECT EXPERIENCE AROUND

18    THAT.

19    Q.   OKAY.  SO -- BUT YOU UNDERSTOOD THAT THE METHOD BY WHICH

20    THEY WOULD DO THIS WOULD BE TO GO AND ARREST THAT PERSON;

21    CORRECT?

22    A.   I MEAN, BASED ON WHAT HAPPENS IN THE UNITED STATES, THAT'S

23    NOT ALWAYS WHAT HAPPENS.  YOU KNOW, INDIVIDUALS -- CHILDREN

24    MIGHT GET RESCUED AND THAT INDIVIDUAL MIGHT BE CHARGED AT SOME

25    LATER DATE.  THERE MIGHT NOT BE AN ARREST THAT OCCURS.

1    Q.   OKAY.  DID YOU EXPECT THAT BY SHARING THIS INFORMATION, IT

2    WOULD AID THEM IN POTENTIALLY ARRESTING THAT PERSON?

3    A.   I WAS SEEKING TO HIGHLIGHT A PREVIOUSLY IDENTIFIED USER IN

4    A PRIOR SUPPLEMENT AND LET THE FBI, WHO WE MADE -- WHO WE

5    TALKED TO ABOUT THIS INITIAL CASE AFTER WE MADE THE NCMEC

6    REFERRAL, THAT THE GERMAN BKA WAS INQUIRING AND, YOU KNOW, IT

7    WOULD BE BETTER IF THE LAW ENFORCEMENT PEOPLE WORKED IT OUT

8    AND, YOU KNOW, WAS CONSISTENT IN THEIR APPROACH TO US.

9    Q.   I'M SHOWING WHAT IS MARKED AS -- I'M SORRY -- WHAT IS

10   BATES 1771 FROM EXHIBIT RR.

11        DO YOU RECALL THIS EXCHANGE WITH AGENT YESENSKY?

12   A.   I DO, YES.

13   Q.   OKAY.  AND SO IS IT YOUR UNDERSTANDING THAT AGENT YESENSKY

14   TOOK SOME ACTION BASED ON YOUR SUGGESTION?

15   A.   HE SAID HE WAS IN TOUCH WITH THEM, YES.

16   Q.   OKAY.  SO THE DECEMBER 2014 REPORT INCLUDED BOTH BUYERS

17   AND SELLERS; CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   OKAY.  AND FOR EACH OF THE BUYERS AND SELLERS, THERE

20   WAS -- IS IT SAFE TO SAY THERE WAS AT LEAST ONE YAHOO ACCOUNT

21   ASSOCIATED WITH EACH IDENTIFIED BUYER OR SELLER?

22   A.   NOT ALWAYS.  WITH THE SELLERS, I WOULD SAY THAT IS THE

23   CASE.

24        WITH THE BUYERS, IN SOME CASES WE SAW WHAT WE BELIEVED TO

25   BE -- SO A BUYER COULD COMMUNICATE WITH A SELLER OVER YAHOO

1    MESSENGER, WHICH IS PART OF THE YAHOO ACCOUNT, OR OVER E-MAIL,

2    WHICH DOESN'T NECESSARILY REQUIRE A YAHOO ACCOUNT.  IN SOME

3    SITUATIONS WE OBSERVED SELLERS SENDING POTENTIAL CHILD

4    PORNOGRAPHY OVER E-MAIL TO NON-YAHOO RECIPIENTS.

5    Q.   OKAY.  GENERALLY, THOUGH, WAS IT -- IS IT FAIR TO SAY THAT

6    THE MAJORITY OF BUYERS AND SELLERS IDENTIFIED POSSESSED YAHOO

7    MESSENGER OR MAIL ACCOUNTS?

8    A.   PROBABLY A MAJORITY, YES.

9    Q.   OKAY.  AND AT THE POINT IN DECEMBER 2014, THOSE PEOPLE

10   WERE INCLUDED IN THAT REPORT BECAUSE YOU HAD DISCOVERED

11   EVIDENCE OF CHILD SEXUAL ABUSE OR ATTEMPTED CHILD SEXUAL ABUSE;

12   IS THAT CORRECT?

13   A.   SO THE SELLERS APPEARED TO BE ADVERTISING, YOU KNOW, THE

14   ABUSE OF CHILDREN OVER THIS LIVE STREAMING WEBCAM, AND THE

15   BUYERS, THE PEOPLE WE CALL BUYERS, WERE -- THEY APPEARED TO BE

16   INQUIRING AND SORT OF REQUESTING THAT TYPE OF INFORMATION, YES.

17   Q.   OKAY.  SO, BUT YOU WERE -- TO QUALIFY AS A BUYER FOR THAT

18   REPORT, YOU WOULD HAVE TO HAVE ENGAGED IN SOMETHING THAT LED

19   YOU AND YOUR TEAM TO BELIEVE THAT THEY WERE ENGAGED IN ILLEGAL

20   ACTIVITY RELATED TO, TO THE SEXUAL EXPLOITATION OF CHILDREN?

21   IS THAT FAIR TO SAY?

22   A.   I DON'T KNOW IF "ILLEGAL" IS THE -- WE'RE NOT LAW

23   ENFORCEMENT OR ATTORNEYS AND SO WE WEREN'T TRYING TO MAKE A

24   DETERMINATION OF LEGALITY.

25        BUT IT WAS, IS THIS PERSON TRYING TO USE OUR SERVICE, OUR

1     PLATFORM, TO ENGAGE IN, YOU KNOW, THE PURCHASE OF CHILD

2     EXPLOITATION MATERIALS OR LIVE STREAM ABUSE?

3     Q.   OKAY.  AND AT THAT POINT, YOU COULD HAVE SHUT DOWN EVERY

4     ONE OF THOSE ACCOUNTS; CORRECT?

5     A.   PROBABLY MOST OF THEM, WE COULD HAVE, YES.

6     Q.   OKAY.  BUT, I MEAN, AS THE HEAD OF -- AS THE HEAD OF THE

7     ECIT, YOU WOULD HAVE HAD THE AUTHORITY TO SHUT DOWN ALL OF

8     THOSE ACCOUNTS; CORRECT?

9     A.   SO WE TRY NOT TO SHUT DOWN ACCOUNTS UNLESS, LIKE, IF AN

10    ACCOUNT CONTAINS CONTRABAND, FOR EXAMPLE.  SO CHILD PORNOGRAPHY

11    IN IT, LIKE ACTUAL IMAGES OR VIDEOS, THAT IS A SITUATION WHERE

12    WE WANT TO SHUT THAT ACCOUNT DOWN BECAUSE WE DON'T WANT THAT

13    MATERIAL TO BE DISSEMINATED BEYOND OUR PLATFORMS WHICH COULD

14    INTRODUCE LEGAL RISK FOR US.

15         FOR ACCOUNTS WHERE THEY ARE JUST IN THE PROCESS OF ASKING,

16    YOU KNOW, "HEY, ARE YOU SELLING CHILDREN," OR "DO YOU HAVE THIS

17    TYPE OF CHILD AVAILABLE," OR WHAT HAVE YOU, IN THOSE SITUATIONS

18    WE TEND TO NOT SHUT DOWN.

19    Q.   OKAY.  BUT YOU HAVE THE -- WHAT I'M ASKING IS, ON YOUR

20    SYSTEM, ASIDE FROM THE DISCRETION THAT YOU EXERCISED AT THAT

21    POINT, YOU HAD THE ABILITY TO SHUT DOWN ALL OF THE ACCOUNTS

22    THAT YOU IDENTIFIED; IS THAT CORRECT?

23    A.   WE WOULD HAVE HAD TO MAKE SURE THAT EACH WAS VIOLATING OUR

24    TERMS OF SERVICE.  BUT IF THAT WAS THE DETERMINATION, WE COULD

25    HAVE, YES.

1    Q.   OKAY.  SO A -- OKAY.

2         BUT A MODERATOR -- SO SOMEONE ON THE MODERATION TEAM CAN

3    DO THAT WITHOUT ANY ADDITIONAL AUTHORITY; CORRECT?

4    A.   I MEAN, THEY USE WHAT'S CALLED AN ABUSE GRID, SO IT'S A --

5    IT'S A LIST OF CONDUCTS IN A TABLE WITH THE VARIOUS TERMS OF

6    SERVICE VIOLATIONS THAT MAY OR MAY NOT BE PRESENT.  IF THEY

7    DETERMINE THAT THE CONDUCT IN QUESTION VIOLATES A PART OF THE

8    ABUSE GRID, THEN THEY CAN TERMINATE THE ACCOUNT, YES.

9    Q.   OKAY.  SO IF SOMEONE IS NEGOTIATING FOR THE SALE OF CHILD

10   SEXUAL EXPLOITATION MATERIAL ON THE PLATFORM, YOU COULD AT THAT

11   POINT SHUT THAT ACCOUNT DOWN; CORRECT?

12   A.   I THINK AT OUR DISCRETION WE COULD, YES.

13   Q.   OKAY.  BUT IN DECEMBER OF 2014, THOSE ACCOUNTS -- THE

14   ACCOUNTS IN THE REPORT WERE NOT SHUT DOWN; IS THAT CORRECT?

15   A.   ANY ACCOUNT WE FILED A CYBERTIP ON WAS PUT IN A

16   DEACTIVATED STATE.

17        BUT OTHERS THAT DID NOT HAVE THE CHILD SEXUAL ABUSE

18   MATERIAL IMAGES OR VIDEO THAT WE WERE ABLE TO READILY VIEW AND

19   PUT EYES ON, WE DID NOT SHUT DOWN.

20   Q.   SO ON THE ONE HAND THERE'S AN URGENCY -- YOU TESTIFIED

21   PREVIOUSLY THAT THERE'S AN URGENCY TO REFERRING THIS

22   INFORMATION TO LAW ENFORCEMENT IN OCTOBER OF 2014 AND

23   DECEMBER OF 2014.

24        DO YOU RECALL TESTIFYING TO THAT?

25   A.   CORRECT, YES.

1    Q.   OKAY.  AND YOU TESTIFIED ALSO THAT THE URGENCY WAS BASED

2    ON THE NEED TO STOP THE POTENTIAL EXPLOITATION OF CHILDREN; IS

3    THAT CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   OKAY.  AND SO FROM THE CHAT LOGS THAT IDENTIFIED ACCOUNTS,

6    OR THE CHAT SNIPPETS THAT IDENTIFIED ACCOUNTS THAT MET YOUR

7    THRESHOLD FOR REFERRING THEM TO THE FBI, OR THROUGH NCMEC, THAT

8    THRESHOLD INCLUDED A DETERMINATION THAT THEY WERE ENGAGED IN

9    SOME SORT OF EXPLOITATIVE BEHAVIOR; IS THAT CORRECT?

10   A.   AT LEAST POTENTIALLY, YES.

11   Q.   OKAY.  BUT THOSE ACCOUNTS WERE NOT SHUT DOWN AT THAT

12   POINT?  IS THAT -- UNLESS THERE WAS THE PRESENCE OF CHILD

13   PORNOGRAPHY, EFFECTIVELY?

14   A.   YES.  IF WE COULD OBSERVE CHILD PORNOGRAPHY, LIKE, FOR

15   EXAMPLE, IN THE USER PROFILE PICTURES, AT THAT TIME WE WOULD

16   SHUT THOSE ACCOUNTS DOWN.

17        HOWEVER, IF THE ACCOUNT DID NOT HAVE, YOU KNOW,

18   ESSENTIALLY READILY DISCERNIBLE CHILD PORNOGRAPHY AND OUR

19   COMPANY WAS NOT ESSENTIALLY ON NOTICE THAT THAT WAS THERE, THEN

20   WE DID NOT SHUT THE ACCOUNT DOWN.

21   Q.   OKAY.  SO IT WAS IN YAHOO'S DISCRETION TO PERMIT THE

22   ACCOUNTS THAT HAD BEEN IDENTIFIED AS ENGAGING IN NEGOTIATIONS

23   BY CHAT ONLY FOR THE SALE AND EXPLOITATION OF CHILDREN, IT WAS

24   IN YAHOO'S DISCRETION TO NOT SHUT THOSE ACCOUNTS DOWN AT THAT

25   POINT?

1    A.   THAT'S CORRECT.

2    Q.   OKAY.  WHAT I'M PUTTING UP NEXT IS AGAIN FROM DEFENSE

3    EXHIBIT RR.  THIS IS BATES 1649.

4         MR. ZADIG, DO YOU RECOGNIZE THAT E-MAIL?

5    A.   I DO, YES.

6    Q.   OKAY.  SO THAT'S AN E-MAIL FROM JULY 23RD OF 2015;

7    CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   OKAY.  AND IN THAT E-MAIL, IS IT ACCURATE TO SAY THAT YOU

10   ARE NOTIFYING AGENT YESENSKY OF WORK ON A NEW PHILIPPINES CASE?

11   A.   THE PURPOSE OF THIS E-MAIL, AS INDICATED BY THE SUBJECT

12   LINE, WAS AROUND THE EUROPOL TRIP.

13        THE PURPOSE WAS NOT TO NOTIFY, AS IN SEND OFFICIAL NOTICE,

14   OF A NEW INVESTIGATION UNDERWAY.

15        HOWEVER, BECAUSE I WAS ALREADY ENGAGED IN A COMMUNICATION

16   WITH HIM ABOUT A DIFFERENT TOPIC, I DID MENTION THAT WE WERE

17   BEGINNING A NEW PHILIPPINES CASE AND INFORMED HIM THAT WE

18   WOULDN'T BE ABLE TO SHARE ANYTHING UNTIL WE FINISHED, THAT'S

19   CORRECT.

20   Q.   OKAY.  SO THE TWO-THIRDS OF YOUR -- IS IT ACCURATE TO SAY

21   THAT TWO-THIRDS OF THIS E-MAIL IS SPENT DISCUSSING THIS NEW

22   INVESTIGATION?

23   A.   IF -- IF WE COUNT EACH PARAGRAPH AS BEING A THIRD, I WOULD

24   SAY ONE-THIRD OF IT IS.

25   Q.   OKAY.  SO THE OVERLAPPING OF THE U.K. BUYERS IS NOT PART

1    OF THE NEW INVESTIGATION?

2    A.   I'M NOT SURE WHAT THAT REFERS TO.  I INITIALLY THOUGHT

3    THAT IT REFERRED TO OUR PRIOR INVESTIGATIONS BECAUSE I WAS

4    ASKING FOR ESSENTIALLY FEEDBACK OR CLOSURE ON SOME OF THE PRIOR

5    REFERRALS.

6    Q.   SO THE NEW PHILIPPINES CASE, YOU INDICATE THERE THAT YOU

7    DISCOVERED IT YESTERDAY, SO WOULD THAT BE, I GUESS, WEDNESDAY,

8    JULY THE 22ND?

9    A.   I IMAGINE SO, YES.

10   Q.   OKAY.  AND JUST SO WE'RE CLEAR, YOU PREVIOUSLY TESTIFIED

11   THAT THERE WAS A PORTION OF THE INVESTIGATION THAT OCCURRED AS

12   A RESULT OF A CONVERSATION WITH THE LAW ENFORCEMENT OFFICER

13   FROM TEXAS; IS THAT CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   OKAY.  SO THAT CONVERSATION REVEALED INFORMATION TO YOU

16   THAT THAT -- THE GENTLEMAN THAT WAS ARRESTED IN TEXAS HAD SPENT

17   SOMEWHERE IN THE NEIGHBORHOOD OF $50,000 ON WEBCAM SHOWS; IS

18   THAT CORRECT?

19   A.   YES, THAT'S CORRECT.

20   Q.   OKAY.  SO THAT'S INFORMATION THAT YOU LEARNED FROM THE LAW

21   ENFORCEMENT OFFICER AFTER THAT GENTLEMAN'S ARREST IN TEXAS?

22   A.   YES.

23   Q.   OKAY.  AND I THINK YOU TESTIFIED BEFORE THAT THE GENESIS

24   OF YOU INVESTIGATING THESE PARTICULAR ACCOUNTS WAS AS A RESULT

25   OF THAT CONVERSATION WITH THE LAW ENFORCEMENT OFFICER IN TEXAS.

1    A.   PRIMARILY, YES, ALTHOUGH I BELIEVE, IN OUR LAST SESSION, I

2    ALSO DID REFERENCE THIS PROACTIVE SCANNING AS WELL.

3    Q.   OKAY.  WHAT DO YOU MEAN BY "PROACTIVE SCANNING," IF I MAY

4    ASK?

5    A.   SO ONE THING WE OBSERVED FROM OUR PRIOR TWO REFERRALS,

6    THAT BEING THE OCTOBER AND DECEMBER REFERRALS, WAS THAT MANY

7    USERS HAD ACTUALLY OPTED TO PUT CHILD PORNOGRAPHY IMAGES AS

8    THEIR PROFILE PICTURES.

9        OBVIOUSLY THAT IS NOT WHAT THE PRODUCT WAS INTENDED TO DO.

10   THAT'S SUPPOSED TO BE LIKE A SORT OF SELFIE OF YOU, NOT OF

11   CHILD PORNOGRAPHY.

12       SO I HAD BEEN WORKING FOR A PERIOD OF SOME MONTHS WITH OUR

13   ENGINEERING TEAM TO ENGAGE IN A PROACTIVE SCAN ACROSS OUR YAHOO

14   MESSENGER PROFILE CORPUS TO IDENTIFY USERS WHO MIGHT HAVE

15   PREVIOUSLY OBSERVED CHILD PORNOGRAPHY AS THEIR PROFILE PICTURE.

16   WE USE AN ALGORITHM CALLED PHOTO DNA, WHICH IS AN INDUSTRY

17   STANDARD THAT TAKES PREVIOUSLY SEEN CHILD PORNOGRAPHY, BUILDS A

18   HASH OF IT, AND THEN WE CAN USE IT TO SCAN THROUGH

19   USER-GENERATED CONTENT TO FIND OTHER INSTANCES OF THAT CHILD

20   PORNOGRAPHY.

21   Q.   OKAY.  I'D LIKE TO CLARIFY ONE THING.  THE JRWOLFEN02

22   ACCOUNT WAS NOT ONE THAT WAS DISCOVERED AS A RESULT OF PHOTO

23   DNA; CORRECT?

24   A.   IT WAS NOT.

25   Q.   OKAY.  SO IT APPEARS THAT IN THE ONE DAY SINCE THAT

1    INVESTIGATION BEGAN, YOU WERE ABLE TO IDENTIFY THAT THERE WAS

2    OVERLAP WITH BUYERS FROM THE PREVIOUS REFERRALS.  IS THAT

3    ACCURATE?

4    A.   UM -- OH, I SEE.  PROBABLY, YES, IN OUR INITIAL, INITIAL

5    INQUIRY INTO IT AFTER THAT DISCOVERY, YES.

6    Q.   OKAY.  AND A DIFFERENT SET OF SELLERS THAN THE FIRST ONE,

7    SO THAT WAS AGAIN DISCOVERED IN THE FIRST DAY; IS THAT CORRECT?

8    A.   CORRECT.

9    Q.   OKAY.  AND LOTS OF TRAVELERS AGAIN?  DO YOU SEE THAT AS

10   WELL?

11   A.   I DO SEE THAT, YES.

12   Q.   OKAY.  AND JUST TO CLARIFY, TRAVELERS WOULD BE PEOPLE THAT

13   YOU HAD IDENTIFIED AS POTENTIALLY TRAVELING FOR THE PURPOSE OF

14   HAVING SEX WITH CHILDREN BASED ON THEIR CHAT AND E-MAIL

15   COMMUNICATIONS?

16   A.   THAT'S CORRECT.

17   Q.   OKAY.  AND SO WHEN YOU'RE TALKING ABOUT THE TRAVELERS

18   HERE, HOW WOULD YOU IDENTIFY THE TRAVELERS, SOMEONE AS A

19   POTENTIAL TRAVELER FOR THE PURPOSES OF WHAT YOU'RE TELLING

20   AGENT YESENSKY?

21   A.   WELL, I DIDN'T TELL AGENT YESENSKY HOW WE HAD MADE THAT

22   DETERMINATION.

23        HOWEVER, I BELIEVE WHAT WE HAD DONE WAS WE HAD FOUND

24   THAT -- WE CONDUCTED THE SCAN, AND ACTUALLY, I'M NOT SURE ON

25   THE DATES AS TO WHEN WE RECEIVED THAT CALL FROM THE AGENT IN

1    TEXAS AS WELL.  IT WAS SOMEWHERE IN THIS, YOU KNOW, THIS TIME

2    PERIOD WHEN THE SCAN WAS FINALLY UNDERWAY.  IT TOOK A FEW

3    MONTHS TO GET STARTED.

4        SO WE HAD AN INITIAL SET OF PHILIPPINE SELLERS AND WE

5    HADN'T, I BELIEVE, AT THIS POINT YET STARTED TO WHAT WE CALL

6    SPIDER OUT, TO LOOK AT CONNECTIONS VIA PHONE NUMBERS OR E-MAIL

7    ADDRESSES OR SORT OF A NETWORK, A SOCIAL GRAPH OF BUYERS AND

8    SELLERS.

9        SO WE HAD AN INITIAL SET OF SELLERS, AND ALREADY IN THAT

10   INITIAL SET WE WERE ABLE TO DETERMINE THAT PEOPLE WERE --

11   APPEARED TO BE DISCUSSING IN-PERSON MEETINGS IN THE PHILIPPINES

12   AND IN-PERSON CHILD ABUSE.

13   Q.   SO NOW HAVING RECALLED THAT, IS IT ACCURATE TO SAY THAT

14   ALL OF THAT HAD HAPPENED IN THE ONE DAY AS INDICATED IN THE

15   E-MAIL?  OR HAD THERE BEEN INVESTIGATION DONE AS TO THESE

16   TARGETS PRIOR TO JULY 22ND, 2015?

17   A.   YOU KNOW, I'M NOT CERTAIN.  I DON'T RECALL THE DATE THAT

18   THE INVESTIGATION BEGAN.  I LIKELY WOULDN'T HAVE SAID YESTERDAY

19   UNLESS THAT WAS ACCURATE, BUT I DON'T HAVE THE EXACT SORT OF

20   INITIATION DATE OF THAT INVESTIGATION.

21   Q.   OKAY.  AND SO FROM JULY, WHEN WAS THE -- FROM JULY ON,

22   WHEN WAS THE FIRST SET OF CYBERTIPS SENT OVER AS A RESULT OF

23   THESE EFFORTS?

24   A.   SO OUR PROCESS, I THINK AS I DESCRIBED A BIT LAST TIME,

25   WAS THAT WE ATTEMPT TO SORT OF SPIDER OUT -- AGAIN IN QUOTES --

1      OF MAKING CONNECTIONS BETWEEN DIFFERENT ACCOUNTS, IDENTIFYING

2      THE SOCIAL GRAPH OF BUYERS AND SELLERS.

3           ONCE WE'VE IDENTIFIED WHAT WE BELIEVE TO BE SORT OF THE

4      UNIVERSE OF ACCOUNTS THAT WOULD BE IN A PARTICULAR REFERRAL, AT

5      THAT TIME, AS WE'VE GONE ON, WE'VE NOTED WE BELIEVE THERE'S

6      CHILD PORNOGRAPHY IN THIS ACCOUNT, WE BELIEVE THIS PERSON MIGHT

7      BE TRAVELING FOR CHILD ABUSE.

8           AND THEN WHEN WE'VE IDENTIFIED ALL THE ACCOUNTS, WE'LL GO

9      BACK AND FILE CYBERTIPS.  ONCE CYBERTIPS ARE FILED, THEN WE CAN

10     BEGIN ASSEMBLING THE FINAL PACKAGE AND GET THAT SUPPLEMENT OUT

11     TO NCMEC.

12     Q.   SO WHEN DID THAT OCCUR?

13     A.   I BELIEVE IT WAS PROBABLY AROUND, LIKE, LATE 2015, SO I

14     BELIEVE NOVEMBER-ISH.  BUT I THINK IT TOOK PROBABLY, YOU KNOW,

15     TWO MONTHS OR SO TO FINISH ALL THE MANUAL REVIEW OF THAT

16     MATERIAL.

17     Q.   OKAY.  THE -- SO -- AND I GUESS I WANT TO CLARIFY ONE

18     THING.

19          THE OVERLAP WITH SOME OF THE BUYERS -- I'LL WITHDRAW THAT.

20          SO AT THIS POINT, JULY 23RD, THE ACCOUNTS THAT YOU'RE

21     INVESTIGATING HERE, ARE THEY ACTIVE ACCOUNTS?

22     A.   THESE WOULD HAVE BEEN ACTIVE ACCOUNTS, YES.

23     Q.   OKAY.  AND DO YOU KNOW WHEN THE FIRST DEACTIVATIONS

24     OCCURRED OF THE ACCOUNTS THAT WERE BEING INVESTIGATED AS A

25     RESULT OF THIS?

1    A.   I DON'T KNOW FOR CERTAIN, BUT THEY WOULD LIKELY HAVE

2    OCCURRED AS WE REPORTED THE CYBERTIPS.  IT ALSO MIGHT HAVE

3    HAPPENED AFTER WE MADE ALL OF THE CYBERTIPS.  IT WAS ONE OF

4    THOSE TWO.

5         BUT GENERALLY WHEN WE -- AS I DESCRIBED IN OUR LAST

6    SESSION, WE WOULD IDENTIFY AN ACCOUNT THAT HAD POTENTIAL CHILD

7    PORNOGRAPHY IN IT; WE WOULD CONSULT OUR LEGAL TEAM TO MAKE SURE

8    THAT THEY AGREED THAT WE SHOULD PULL THAT CONTENT AND REVIEW

9    IT; WE WOULD PULL A VERY LIMITED SNAPSHOT OF THE ACCOUNT

10   CONTENTS JUST SO WE CAN GET BASICALLY THE E-MAIL QUESTIONS OR

11   CHATS IN QUESTION; AND THEN WE WOULD FILE THE CYBERTIP.

12        AFTER THE CYBERTIP WAS FILED, THAT WAS WHEN WE WOULD

13   DEACTIVATE THE ACCOUNT.

14   Q.   OKAY.  SO THE JRWOLFEN02 ACCOUNT CAME UP IN THIS

15   INVESTIGATION AS AN OVERLAPPER; IS THAT CORRECT?

16   A.   THAT IS CORRECT.

17   Q.   OKAY.  AND THE CYBERTIP IN THAT WAS FILED IN NOVEMBER OF

18   2015?

19   A.   YES.

20   Q.   OKAY.  AND THE ACCOUNT WAS DEACTIVATED IN DECEMBER OF

21   2015?

22   A.   I BELIEVE SO.  I'M NOT CERTAIN.

23   Q.   SO THEN IT WAS WITHIN YAHOO'S DISCRETION TO NOT SHUT DOWN

24   THAT ACCOUNT UP UNTIL DECEMBER OF 2015; IS THAT CORRECT?

25   A.   YEAH.  AS I DESCRIBED EARLIER, WE -- ONCE WE BECAME AWARE

1      OF --

2      Q.   I WAS JUST ASKING WHETHER IT WAS WITHIN YAHOO'S DISCRETION

3      OR NOT AT THAT POINT.

4      A.   I THINK ESSENTIALLY EVERYTHING WE DO WITH RESPECT TO THE

5      ACTIVATIONS IS WITHIN OUR DISCRETION, YES.

6      Q.   OKAY.  I'M PUTTING UP WHAT IS BATES 2071 OF EXHIBIT RR.

7           AND IN THE MIDDLE OF THE PAGE THERE, DO YOU RECOGNIZE AN

8      E-MAIL EXCHANGE WITH MEMBERS OF THE FBI?

9      A.   I DO, YES.

10     Q.   OKAY.  AND YOU'RE ANSWERING -- IS IT FAIR TO SAY YOU'RE

11     ANSWERING A QUESTION ABOUT A NOTIFICATION, A USER NOTIFICATION

12     ISSUE THAT CAME UP DURING THE SERVICE OF PROCESS?

13     A.   YEAH.  AS I DESCRIBED UNDER DIRECT WITH THIS E-MAIL, THE

14     AGENT HAD SENT IN A SERIES OF WARRANTS AND RECEIVED AN

15     AUTOMATED RESPONSE REGARDING USER NOTICE AND HAD INQUIRED WHY

16     THAT HAD OCCURRED.

17     Q.   OKAY.  AND --

18          MS. HARRIS:  EXCUSE ME.  I JUST WANT TO CLARIFY ONE

19     THING.  THIS EXHIBIT 2071 IS DEFENSE EXHIBIT SS.

20          MR. ARCHER:  OH, APOLOGIES.  THANK YOU.

21          MS. HARRIS:  SURE.

22     BY MR. ARCHER:

23     Q.   AND SO IN THE LAST PARAGRAPH OF YOUR E-MAIL RESPONSE, YOU

24     ARE, IN FACT, SUGGESTING THE BEST PRACTICE FOR THEM GOING

25     FORWARD TO AVOID TRIGGERING A USER NOTIFICATION; CORRECT?

1    A.   SO WHEN WE CAN, WE ALWAYS ENCOURAGE LEGAL PROCESS, AND

2    GOING BEFORE A JUDGE AND GETTING A LEGAL ORDER IS WHAT WE, AND

3    OUR LEGAL TEAM, ENCOURAGE AS OPPOSED TO RELYING ON OUR

4    DISCRETION AND POLICY.

5    Q.   OKAY.  BUT YOUR RECOMMENDATION TO THEM IS BEST PRACTICE IN

6    ORDER TO AVOID TRIGGERING A YAHOO LEGAL NOTIFICATION OR YAHOO

7    USER NOTIFICATION; CORRECT?

8    A.   YES, I ENCOURAGE THEM TO SEEK LEGAL PROCESS, A

9    NON-DISCLOSURE ORDER.

10   Q.   OKAY.  AND WHAT'S THE PROBLEM WITH A USER NOTIFICATION

11   OCCURRING IN THIS TYPE OF SITUATION?

12   A.   IT -- I MEAN, I THINK PROBABLY A LOT OF THINGS COULD

13   HAPPEN.  CERTAINLY ONE OF THE CONCERNS THAT LAW ENFORCEMENT HAS

14   RAISED -- BECAUSE THIS LEGAL NOTICE ISSUE IS VERY CONTENTIOUS.

15   IT'S NOT JUST OUR COMPANY, IT'S THE INDUSTRY AS A WHOLE HAS

16   BEEN MOVING TOWARDS MORE TRANSPARENCY AND MORE NOTICE TO USERS

17   WHO ARE THE TARGET OF GOVERNMENT REQUESTS.

18        LAW ENFORCEMENT HAS STRESSED TO US THAT IN MANY CASES, FOR

19   EXAMPLE, IN CHILD ABUSE SITUATIONS, THE ABUSERS MIGHT GET

20   TIPPED OFF THAT THERE IS A LAW ENFORCEMENT INVESTIGATION

21   UNDERWAY AND, YOU KNOW, TAKE ACTIONS TO EVADE CAPTURE OR

22   PREVENT THE CHILD FROM BEING RESCUED OR OTHER BAD THINGS FROM

23   HAPPENING.

24   Q.   AND AS AN EXAMPLE OF THAT, FOR INSTANCE, IF YOU WERE TO

25   DEACTIVATE AN ACCOUNT, IT MIGHT PUT THAT PERSON ON NOTICE AFTER

1    THAT AS WELL; IS THAT CORRECT?

2    A.   POTENTIALLY, ALTHOUGH WE DEACTIVATE A LARGE NUMBER OF

3    ACCOUNTS FOR VARIOUS REASONS AND NOT ALL ARE CONNECTED TO LEGAL

4    INQUIRIES.

5    Q.   THIS IS BATES 1752 OF EXHIBIT RR.

6         MR. ZADIG, DO YOU RECALL THIS INTERACTION?

7    A.   I DO, YES.

8    Q.   OKAY.  FAIR TO DESCRIBE IT AS AN INTRODUCTION BETWEEN

9    JEFF JONES AND JEFF YESENSKY?

10   A.   THAT'S CORRECT.

11   Q.   WHAT WAS YOUR INTENT IN INTRODUCING MR. JONES AND

12   AGENT YESENSKY?

13   A.   AS I DISCUSSED EARLIER TODAY BEFORE LUNCH, IN THE CONTEXT

14   OF THIS E-MAIL, I HAD MET JEFF JONES, WHO WAS THE HEAD OF CYBER

15   INVESTIGATIONS AT WESTERN UNION ONLINE.  HE AND I WERE

16   DISCUSSING WHAT WE LOOK AT ON OUR OWN PLATFORMS, LIKE, YOU

17   KNOW, ONLINE FRAUD, ACCOUNT HIJACKING, AS WELL AS CHILD

18   EXPLOITATION.

19        HE HAD MENTIONED TO ME THAT THEY HAD SEEN A SPIKE IN

20   REMITTANCES OR PAYMENTS RELATED TO WHAT THEY BELIEVED TO BE

21   CHILD EXPLOITATION IN ONLINE STREAMING COMING OUT OF THE

22   PHILIPPINES.  BECAUSE THAT WAS SOMETHING THAT THEY WERE LOOKING

23   AT, I SUGGESTED THAT HE MEET THE FBI PERSON WHO'S BEEN THE

24   POINT OF CONTACT FOR US, AND I BELIEVE JEFF JONES HAD REQUESTED

25   AN INTRODUCTION.

1    Q.   OKAY.  AND YOU MENTIONED DOWN HERE THE COMMON GOAL.  I

2    BELIEVE YOU TESTIFIED PREVIOUSLY THAT THE COMMON GOAL WAS

3    TRYING TO RID YOUR PLATFORM OF CHILD EXPLOITATION.

4    A.   I THINK I MEANT NOT OUR, NOT MY PLATFORM, LIKE YAHOO.

5         BUT I THINK JEFF JONES AND I HAVE A COMMON GOAL, AS DO

6    OTHERS OF MY PEERS IN THE INDUSTRY, OF MAKING SURE THAT ONLINE

7    PLATFORMS IN GENERAL ARE NOT USED FOR SEX TRAFFICKING AND CHILD

8    ABUSE.

9    Q.   BUT IT APPEARS, FROM YOUR E-MAIL THOUGH, THAT THE

10   CONVERSATION WAS WITH AGENT YESENSKY AND YOU ABOUT YOUR COMMON

11   GOAL.  ISN'T THAT WHAT IT APPEARS TO BE FROM THIS E-MAIL?

12   A.   I ADDRESS IT TO JEFFS, PLURAL, SO I SUPPOSE IT'S BOTH OF

13   THEM.

14   Q.   OKAY.  BUT AGENT YESENSKY'S COMMON GOAL IS NOT CLEARING

15   THE YAHOO PLATFORM OF --

16        MS. HARRIS:  OBJECTION.  THIS CALLS FOR SPECULATION

17   AND IT'S ARGUMENTATIVE.

18        THE COURT:  SUSTAINED.

19        MR. ARCHER:  OKAY.

20   Q.   YOU'RE NOT AWARE OF THE FBI BEING RESPONSIBLE FOR HELPING

21   MAINTAIN -- HELPING CLEAR YAHOO'S PLATFORM OF CHILD

22   EXPLOITATION; CORRECT?

23   A.   I'M NOT.

24   Q.   OKAY.  THIS IS BATES 1684 OF DEFENSE RR.

25        MR. ZADIG, DO YOU RECOGNIZE THIS E-MAIL?

1      A.   I DO, YES.

2      Q.   OKAY.  AND THIS IS A -- THIS IS AN INTRODUCTORY E-MAIL.

3      IS IT ACCURATE TO SAY IT'S YOU INTRODUCING BILL YUREK FROM --

4      AND WHAT IS THE DCIS?

5      A.   THAT IS THE DEFENSE CRIMINAL INVESTIGATIVE SERVICE, AND

6      THEY ARE AKIN TO THE OIG FOR THE DOD, DEPARTMENT OF DEFENSE.

7      Q.   OKAY.  SO AT THIS POINT WHEN YOU'RE SENDING THIS E-MAIL,

8      BILL YUREK IS AN ACTIVE LAW ENFORCEMENT OFFICER; CORRECT?

9      A.   THAT'S CORRECT.

10     Q.   OKAY.  AND IS IT SAFE TO SAY FROM THIS E-MAIL THAT WE --

11     THAT HE IS ENGAGED IN INVESTIGATING SIMILAR CONDUCT TO WHAT

12     AGENT YESENSKY IS INVESTIGATING?

13     A.   NO.  I MEAN, SO HE APPROACHED ME AND HAD INDICATED THAT HE

14     HAD MOVED INTO THIS NEW ROLE OF MANAGING THE DCIS CYBER

15     INVESTIGATIONS PROGRAM, AND HE HAD WANTED -- HAD BEEN

16     INTERESTED IN GETTING DCIS INTO WORK INVOLVING HUMAN

17     TRAFFICKING INVOLVING DOD SERVICE MEMBERS.

18     Q.   AND YOU HAD PREVIOUSLY IDENTIFIED IN YOUR INVESTIGATION

19     DOD SERVICE MEMBERS FROM -- WHO YOU SUSPECTED TO BE ENGAGING IN

20     CHILD EXPLOITATION; CORRECT?

21     A.   SPECIFICALLY THOSE WHO WERE BUYERS IN THE PHILIPPINES

22     WEBCAM CASE, YES.

23     Q.   OKAY.  AND SO YOU WERE HERE ASKING WHETHER AGENT YESENSKY

24     CAN PROVIDE THOSE ACCOUNTS TO AGENT YUREK?

25     A.   YES.  AS I WAS SAYING, AGENT YUREK HAD ASKED -- HAD

1          APPROACHED ME AND WAS TALKING ABOUT GENERAL CYBER CRIMES

2          INVESTIGATIONS BECAUSE HE WAS IN THIS NEW ROLE.  HE HAD

3          MENTIONED HUMAN TRAFFICKING AND HIS DESIRE TO START WORKING

4          THOSE INVESTIGATIONS.

5               I HAD RECALLED, DURING THAT CONVERSATION, THAT WE HAD

6          IDENTIFIED A NUMBER OF SERVICE MEMBERS, OR CONTRACTORS OR OTHER

7          DOD AFFILIATES, WHO WERE IDENTIFIED IN OUR INVESTIGATION.

8               BECAUSE WE COULDN'T PROVIDE AGENT YUREK WITH THAT

9          INFORMATION, I SUGGESTED HE REACH OUT TO THE FBI POINT OF

10         CONTACT AND MADE THE INTRODUCTION AT HIS REQUEST.

11    Q.   OKAY.  SO YOU WERE -- YOU WERE HOPING THAT THERE COULD BE

12         A LAW ENFORCEMENT TO LAW ENFORCEMENT EXCHANGE OF THAT

13         INFORMATION BETWEEN AGENT YESENSKY AND AGENT YUREK?

14    A.   I MEAN, AGENT YUREK ASKED IF I COULD PUT HIM IN TOUCH

15         BASED ON DCIS WANTING TO MOVE INTO THIS TYPE OF WORK, AND IT

16         SEEMED A NATURAL CONNECTION TO MAKE.

17    Q.   SO I GUESS I HAVE TO SAY, WAS THAT YOUR HOPE, THAT THERE

18         WOULD BE A LAW ENFORCEMENT TO LAW ENFORCEMENT EXCHANGE?

19    A.   I MEAN, I SUPPOSE SO, YES.

20    Q.   AND AGENT YUREK IS NOT INVOLVED IN ANY WAY IN HELPING TO

21         CLEAR YAHOO'S PLATFORM OF CHILD EXPLOITATION MATERIAL; RIGHT?

22    A.   THAT'S CORRECT.

23    Q.   THIS IS BATES 1614 OF EXHIBIT RR, AND IF I COULD JUST

24         DIRECT YOU TO THE BOTTOM E-MAIL THERE.

25               DO YOU RECALL THAT E-MAIL EXCHANGE WITH AGENT YESENSKY?

1      A.   I DO, YES.

2      Q.   OKAY.  AND SO IS IT FAIR TO DESCRIBE THAT AS FOLLOW-UP

3      REGARDING A PREVIOUSLY DISCUSSED JOINT PRESENTATION ON THE

4      OPERATION SWIFT TRAVELER INVESTIGATION?

5      A.   SORT OF.  SO WE HAD -- SO JEFF YESENSKY HAD ACTUALLY ASKED

6      IF I WOULD BE INTERESTED IN GOING TO DALLAS AND PRESENTING WITH

7      HIM AND CEOS -- WHICH IS THE DOJ'S CHILD EXPLOITATION AND

8      OBSCENITIES SECTION -- ABOUT THE ONLINE PHILIPPINE WEBCAM

9      INVESTIGATIONS.  I ACTUALLY DIDN'T END UP DOING THIS.

10          AND WE HAD DISCUSSED INTERNALLY WITHIN OUR LEGAL

11     DEPARTMENT AND DETERMINED THAT IF WE WERE TO DO ANY SORT OF,

12     SORT OF CO-PRESENTATION, WE WOULD NEED TO MAKE SURE WE HAD

13     CLEAR, LIKE, LINES BETWEEN WHERE THE GOVERNMENT PART ENDS AND

14     WHERE THE INDUSTRY PART BEGINS.

15     Q.   SO -- OKAY.  SO AGENT YESENSKY INVITED YOU TO POTENTIALLY

16     GIVE THAT PRESENTATION.

17          THERE WAS ALSO A PRESENTATION, A JOINT PRESENTATION TO THE

18     PHILIPPINE NATIONAL POLICE?

19     A.   NO, NOT EXACTLY.  THE PHILIPPINES PRESENTATION WAS

20     ORCHESTRATED BY ICMEC, THE INTERNATIONAL CENTER FOR MISSING AND

21     EXPLOITED CHILDREN, AND THERE WERE A NUMBER OF NGO'S AND OTHER

22     INDUSTRY PARTICIPANTS AT THIS CONFERENCE, EACH GIVING THEIR OWN

23     PRESENTATIONS.

24          SO WE DIDN'T HAVE A JOINT PRESENTATION BETWEEN YAHOO AND

25     LAW ENFORCEMENT.  THERE WAS A YAHOO SECTION, JUST LIKE THERE

1      WAS A FACEBOOK SECTION AND A XOOM SECTION.

2      Q.   OKAY.  SO FOR SOME REASON I WAS UNDER THE IMPRESSION THAT

3      THERE WAS -- OUTSIDE OF THE CONFERENCE, THERE WAS ALSO A

4      PRESENTATION DIRECTLY TO THE PHILIPPINE NATIONAL POLICE, OR

5      DISCUSSION THAT BOTH YOU AND AGENT YESENSKY ENGAGED IN WHILE

6      YOU WERE OVER THERE FOR THE CONFERENCE.

7      A.   SO I ACTUALLY WENT AND MET WITH THE PHILIPPINE NATIONAL

8      POLICE.  I DON'T BELIEVE AGENT YESENSKY WAS THERE.  I BELIEVE

9      JEFF WU, WHO IS THE TRUST AND SAFETY REPRESENTATIVE FOR THE

10     APAC REGION FOR FACEBOOK WAS THERE, BUT I DON'T RECALL

11     JEFF YESENSKY BEING IN THE MEETINGS WITH THE PHILIPPINE

12     NATIONAL POLICE.

13     Q.   OKAY.  OKAY.  I'M PUTTING UP NOW BATES 1674 OF EXHIBIT RR.

14          DO YOU RECOGNIZE THE TOP OF THIS E-MAIL AS A DRAFT BIO FOR

15     THE ICMEC PRESENTATION THAT WE JUST DISCUSSED?

16     A.   I DO, YES.

17     Q.   SO I HAVE ONE QUESTION ABOUT IT.  YOU CAN SEE TOWARD THE

18     BOTTOM IT SAYS, "HIS CASES RESULTED IN THE ARREST AND

19     PROSECUTION OF SUBJECTS IN ESTONIA, NIGERIA, CHINA, AUSTRALIA,

20     SOUTH AFRICA, AND DOZENS OF INDIVIDUALS IN THE U.S."

21          THAT INCLUDES ARRESTS THAT WERE BOTH A RESULT OF YOUR

22     DIRECT LAW ENFORCEMENT CAREER, AS WELL AS REFERRALS SINCE

23     YOU'VE BEEN IN THE PRIVATE SECTOR; IS THAT CORRECT?

24     A.   YES.  BOTH OF THAT WAS MY DIRECT LAW ENFORCEMENT, BUT MOST

25     LIKELY SOME OF THE INDIVIDUALS IN THE U.S. WERE AS MY PRIVATE

1    SECTOR AS WELL.

2    Q.  I'M PUTTING UP NOW A COPY OF BATES 1738 OF EXHIBIT RR.  I

3    APOLOGIZE.  THERE ARE A COUPLE OF MY PEN MARKS ON THERE.

4         BUT YOU RECOGNIZE THIS AS A COMMUNICATION WITH

5    AGENT YESENSKY REGARDING, I GUESS WE SHOULD TERM IT A

6    "TRAVELER"?

7    A.  I DO RECALL THAT, YES.

8    Q.  OKAY.  AND SO YOU WERE SUGGESTING TO AGENT YESENSKY THAT

9    HE PRIORITIZE THE PERSON LISTED IN THAT PARTICULAR CYBERTIP?

10   A.  THAT WAS NOT EXACTLY MY INTENT.  AS I DESCRIBED EARLIER IN

11   RELATION TO THIS E-MAIL, YOU KNOW, OUR PROCESS WAS TO FILE A

12   CYBERTIP; ONCE THE CYBERTIPS HAD BEEN FILED, THEN FILE OUR

13   SUPPLEMENT AND THEN HAVE AN IN-PERSON MEETING.

14        THIS FELL IN THAT MIDDLE GROUND WHERE WE HAD FILED THE

15   CYBERTIP, SO NCMEC WAS AWARE OF THE CYBERTIP AND WHAT WAS

16   CONTAINED WITHIN IT, WHICH I BELIEVE WERE CHATS DESCRIBING

17   TRAVEL.

18        BECAUSE WE HAD NOT YET SET UP OR HAD THAT MEETING IN

19   FEBRUARY, AND IN ESSENCE CHILD ABUSE WOULD OCCUR IN THAT

20   INTERMEDIATE TIME, I WANTED TO ENSURE THAT THE FBI WAS AWARE OF

21   THIS UPCOMING TRAVEL PURSUANT TO A CYBERTIP.

22   Q.  OKAY.  SO THAT THEY WERE AWARE OF IT AND THAT THEY

23   PRIORITIZED IT BECAUSE OF WHAT YOU BELIEVED TO BE IMMINENT

24   HARM; CORRECT?

25   A.  IT'S ONE OF THOSE THINGS WHERE I DIDN'T WANT THE -- IT TO

1    SORT OF SLIP BETWEEN THE CRACKS BETWEEN WHEN WE -- WHEN I FILED

2    THE CYBERTIP AND WHEN WE HAD THE MEETING.

3    Q.   OKAY.  THIS IS BATES 1737 FROM EXHIBIT RR.

4         DO YOU RECOGNIZE AGAIN YOU DIRECTING AGENT YESENSKY TO A

5    DIFFERENT CYBERTIP?

6    A.   I DO, YES.

7    Q.   OKAY.  AND WAS IT YOUR HOPE IN SENDING THAT THAT LAW

8    ENFORCEMENT WOULD FOCUS ON THAT PARTICULAR INDIVIDUAL?

9    A.   THIS IS A VERY SIMILAR SITUATION TO WHAT WE JUST HAD

10   TALKED ABOUT WHERE -- LOOKING AT THE DATE, THIS IS PRIOR TO OUR

11   MEETING IN JANUARY.

12        I ACTUALLY REMEMBER THIS INDIVIDUAL CASE.  THIS WAS AN

13   INDIVIDUAL WHO WAS PROBABLY THE MOST CONCERNING PERSON WE HAD

14   SEEN IN OUR INVESTIGATIONS.  HE WAS -- HE WAS A GERMAN BANKER

15   RESIDING IN SINGAPORE FOR DEUTSCHE BANK.  BUT THEN HE, ON THE

16   SIDE, OPERATED A SEX TOURISM BUSINESS, AND ONE OF THE SERVICES

17   THAT THIS BUSINESS OFFERED WAS WHAT'S CALLED SNUFF, OR

18   ESSENTIALLY A MURDER, FOR SEXUAL GRATIFICATION, OF CHILDREN.

19        SO WE WERE EXTREMELY CONCERNED ABOUT THE SNUFF

20   CONVERSATIONS AND WANTED TO MAKE SURE THAT THE FBI HAD A CHANCE

21   TO LOOK AT THAT AHEAD OF OUR MEETING.  AGAIN, UNDER THE CONTEXT

22   OF A CYBERTIP.

23   Q.   OKAY.  THIS IS BATES 1645 FROM EXHIBIT RR.

24        AND SO, AGAIN, DO YOU RECOGNIZE THIS AS AN E-MAIL FROM YOU

25   AND JEFF ZINGLER IDENTIFYING SOMEONE FOR THE FBI TO PRIORITIZE

1    PRIOR TO YOUR MEETING?

2    A.   NOT QUITE.  AS I DESCRIBED EARLIER TODAY, THIS E-MAIL WAS

3    NOT CONNECTED TO THE YAHOO PHILIPPINE WEBCAM INVESTIGATION.

4         THIS IS ONE OF OUR INDIVIDUAL CYBERTIP AND SUPPLEMENTS.

5    THIS INDIVIDUAL, AS I DESCRIBED, APPEARED TO WORK AS A BUDDHIST

6    MONK OR A MISSIONARY IN THE PHILIPPINES, OPERATED AN ORPHANAGE,

7    AND APPEARED TO BE USING HIS POSITION TO ABUSE CHILDREN.

8         WE -- EVEN THOUGH THIS WAS NOT CONNECTED TO THE PHILIPPINE

9    WEBCAM INVESTIGATION, I HAD KNOWN FROM PREVIOUS CONVERSATIONS

10   WITH AGENT YESENSKY THAT HE WAS AN EXPERT IN THAILAND, AS WELL

11   AS THE PHILIPPINES, AND SEX TRAFFICKING INVESTIGATIONS.  AND SO

12   I WANTED TO ENSURE THAT HE COULD HELP PRIORITIZE AND GET THIS

13   CYBERTIP TO THE RIGHT PLACE IT NEEDED TO BE.  OTHERWISE IT

14   WOULD JUST KIND OF GO TO THAILAND AND VANISH.

15   Q.   OKAY.  SO THIS IS BATES 1648 OF EXHIBIT RR.

16        DO YOU RECOGNIZE THAT E-MAIL CONVERSATION?

17   A.   I DO, YES.

18   Q.   OKAY.  AND WHAT WAS YOUR INTENT IN SENDING THIS E-MAIL?

19   A.   THIS WAS AN INTRODUCTION TO -- ACTUALLY, NO.

20        SO I THINK -- YEAH.  I THINK I HAD MET THEM INDIVIDUALLY

21   ON A PRIOR TRIP IN D.C.  ACTUALLY, THIS WAS THE TRIP THAT WE

22   HAD REFERRED THE THIRD INVESTIGATION TO NCMEC.

23        WHILE I WAS THERE, I ALSO HAD MET THIS DIRECTOR OF

24   THREAT -- OF CYBER INVESTIGATIONS FOR THE IJM, WHICH IS THE

25   INTERNATIONAL JUSTICE MISSION, IT'S THE NGO THAT WORKS IN THE

1    PHILIPPINES ON SEX TRAFFICKING.  THIS INDIVIDUAL IS ACTUALLY A

2    PRIOR CO-WORKER OF MINE FROM NASA, MELANIE.

3         AND AFTER HAVING THE REFERRAL WHERE WE HIGHLIGHTED THIS

4    INDIVIDUAL THAT'S IN THE CYBERTIP THAT IS BLACKED OUT -- THIS

5    WAS AN INDIVIDUAL THAT WAS AN AMERICAN, HE LIVED IN THE

6    PHILIPPINES AND HE HAD A HOUSE WHERE HE FORCED WOMEN AND

7    CHILDREN TO GO ON WEBCAM IN EXCHANGE FOR MONEY.  HE WAS

8    BASICALLY LIKE OPERATING AS KIND OF LIKE A CYBER PIMP.

9         AND GIVEN THE IJM'S SPECIALTY, AND SPECIFICALLY AFFECTING

10   THE RESCUE OF TRAFFICKED CHILDREN AND THEN THE REHABILITATION

11   OF THOSE CHILDREN AFTERWARDS, I WANTED -- I SUGGESTED THAT IJM

12   MIGHT BE IN A POSITION TO HELP THE FBI.

13   Q.   OKAY.  SO THIS IS BATES 1766 OF EXHIBIT RR.

14        AND IF I COULD JUST DIRECT YOU TO THE BOTTOM THERE, SO

15   THERE'S AN INDICATION OF, I GUESS IT'S A -- THIS IS AN E-MAIL

16   FROM AGENT YESENSKY IDENTIFYING THE ARRESTS OF PEOPLE ARRESTED

17   IN THE PHILIPPINES?  IS THAT WHAT'S IN THAT LINK?

18   A.   I -- BASED ON THE URL, I BELIEVE SO, YES.

19   Q.   OKAY.  AND YOU ASK HIM FOR THE YAHOO I.D.S OF THE SELLERS;

20   IS THAT CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  YOU INDICATE TOO, THOUGH, THAT YOU WANT TO MAKE

23   SURE THAT YOU DON'T STEP ON ANYTHING.  IS THAT BECAUSE YOU'RE

24   CONCERNED ABOUT DOING SOMETHING THAT MIGHT JEOPARDIZE THEIR

25   INVESTIGATION?

1    A.   SO ONE THING THAT I KNOW, BASED ON BOTH THE TRIP -- WHEN

2    IS THE DATE OF THIS?

3         I HAD KNOWN FROM MY CONVERSATIONS WITH THE FBI, WITH

4    HOMELAND SECURITY, WITH OTHER INDUSTRY PARTNERS THAT THE

5    PHILIPPINE NATIONAL POLICE, AFTER AN ARREST LIKE THIS, OFTEN

6    ASSUMES THE IDENTITY OF ONE OF THE SELLERS IN AN ATTEMPT TO

7    IDENTIFY ADDITIONAL CHILD VICTIMS OR OTHER SELLERS.

8         I WANTED TO ENSURE, IF WE KNEW WHAT THE YAHOO I.D.S WERE,

9    THAT WE WOULDN'T INADVERTENTLY EITHER DEACTIVATE THEM, OR THAT

10   WE WOULDN'T INCLUDE THEM IN ANOTHER REFERRAL AND KIND OF

11   INADVERTENTLY, YOU KNOW, BE SORT OF ACTING AS THEIR AGENT OR

12   SOMETHING.  SO WE WANTED TO MAKE SURE WE STAYED FAR AWAY FROM

13   THE ACCOUNTS IN QUESTION.

14   Q.   OKAY.  SO YOUR UNDERSTANDING IS THAT THE PHILIPPINE

15   NATIONAL POLICE, IN THIS CASE, MIGHT BE USING THOSE ACCOUNTS TO

16   CONTINUE TO INTERACT WITH PEOPLE WHO ARE ATTEMPTING TO PURCHASE

17   CHILD EXPLOITATION MATERIAL IN AN EFFORT TO PROSECUTE THEM,

18   EFFECTIVELY; IS THAT CORRECT?

19   A.   WELL, THAT, AND TO AFFECT THE RESCUE OF CHILDREN AS I HAD

20   MENTIONED AS -- IN MY RESPONSE TO THAT E-MAIL ABOUT THE CHILD

21   RESCUES.

22   Q.   RIGHT.  OKAY.  SO THIS IS BATES 1692 OF EXHIBIT RR.

23        YOU RECOGNIZE THAT AS AN E-MAIL EXCHANGE BETWEEN YOU AND

24   JEFF YESENSKY?

25   A.   I DO, YES.

352

1    Q.   OKAY.  AND SO IT APPEARS HERE THAT YOU'RE REACTING TO

2    NOTIFICATION FROM A FACEBOOK INVESTIGATION TEAM THAT A YAHOO

3    ACCOUNT IS INVOLVED IN STREAMING.  IS THAT ACCURATE?

4    A.   I THINK SO.

5    Q.   OKAY.  AND SO IT ALSO APPEARS THAT AS A RESULT OF THAT,

6    YOU WENT AND REVIEWED THAT ACCOUNT AND THAT ACCOUNT HAD CHATS

7    WITH ANOTHER PREVIOUSLY IDENTIFIED TARGET?

8    A.   WITHOUT SEEING THE UNREDACTED I.D.S HERE, BOTH OF THESE

9    MAY HAVE ACTUALLY BEEN IN OUR PRIOR REFERRALS.

10   Q.   OKAY.

11   A.   BUT THAT'S CORRECT, YES.

12   Q.   OKAY.  SO THE -- THE ONE THAT'S BEEN STREAMING ON FACEBOOK

13   MAY HAVE BEEN IN A PRIOR ONE, BUT WE'RE NOT SURE BECAUSE IT'S

14   REDACTED?  IS THAT ACCURATE?

15   A.   YEAH.  IT'S COMMON THAT OTHER COMPANIES MIGHT REFER --

16   JUST LIKE XOOM DID FOR US -- REFER ACCOUNTS THAT ARE ENGAGED IN

17   VIOLATION OF THEIR OWN TOS TO US.

18        SO, YEAH, EXACTLY.

19   Q.   OKAY.  SO YOU SAY AGAIN THAT YOU DON'T WANT TO DISRUPT

20   ANYTHING ONGOING.  IS THAT BECAUSE SHUTTING DOWN AN ACCOUNT

21   MIGHT JEOPARDIZE A PROSECUTION?

22   A.   AS I MENTIONED BEFORE, ESPECIALLY WITH RESPECT TO THE

23   WEBCAM, THE PHILIPPINE WEBCAM INVESTIGATION, OUR FOCUS WAS ON

24   CHILD RESCUES, AND I WOULD PERSONALLY, AS A PERSON, FEEL VERY

25   BAD ABOUT SORT OF INTERRUPTING A RESCUE OPERATION THAT MIGHT

1    HAVE BEEN UNDERWAY.

2    Q.   SO YOU DIDN'T HAVE ANY CONCERN ABOUT DISRUPTING A LAW

3    ENFORCEMENT INVESTIGATION?

4    A.   I MEAN, THE LAW ENFORCEMENT INVESTIGATION WOULD LIKELY

5    HAVE RESULTED IN THE CHILD RESCUE.

6    Q.   SO YOU'RE TESTIFYING THAT IT DID NOT CROSS YOUR MIND THAT

7    IT MIGHT -- THAT YOU MIGHT JEOPARDIZE A PROSECUTION?

8         MS. HARRIS:  OBJECTION, YOUR HONOR.  ASKED AND

9    ANSWERED.

10        THE COURT:  SUSTAINED.

11   BY MR. ARCHER:

12   Q.   OKAY.  THIS IS BATES 1628.

13        DO YOU RECALL RECEIVING THIS E-MAIL?

14        THE COURT:  YOU KNOW WHAT?  ACTUALLY, HIS LAST ANSWER

15   KIND OF TIES THE TWO.  I'M GOING TO OVERRULE THAT OBJECTION.

16        YOU CAN ANSWER THE QUESTION.

17        MR. ARCHER:  THANK YOU.

18   Q.   SO I'LL REASK IT.  WHEN YOU STATED, "I DON'T WANT TO

19   DISRUPT ANYTHING ONGOING," ARE YOU TESTIFYING THEN THAT THAT

20   HAD NOTHING TO DO WITH THE POSSIBILITY OF JEOPARDIZING A

21   PROSECUTION?

22   A.   SO YOU PREVIOUSLY ASKED ABOUT LAW ENFORCEMENT

23   INVESTIGATION, AND AT LEAST IN MY MIND, THE LAW ENFORCEMENT

24   INVESTIGATION LEADS TO THE CHILD RESCUE.

25        PROSECUTION NOTWITHSTANDING, I THINK WE WOULDN'T WANT TO

1    INTERRUPT THE INVESTIGATION THAT WAS GOING TO RESULT IN A

2    RESCUE.

3    Q.   OKAY.  I'M NOT SURE I UNDERSTAND.  BUT YOU UNDERSTAND THAT

4    INVESTIGATIONS LEAD TO BOTH PROSECUTIONS AND CHILD RESCUES;

5    CORRECT?

6    A.   SOMETIMES THEY DO, YES.

7    Q.   OKAY.  AND SO IS IT YOUR TESTIMONY THEN TODAY THAT IT

8    NEVER CROSSED YOUR MIND THAT YOU COULD DISRUPT A, AN

9    INVESTIGATION THAT COULD LEAD TO A PROSECUTION BY DEACTIVATING

10   AN ACCOUNT?

11   A.   AGAIN, I THINK THAT WE WERE NOT FOCUSSED ON THE

12   PROSECUTION.  OUR OBJECTIVE AS A COMPANY IN DOING THESE

13   REFERRALS WAS THE RESCUE OF CHILDREN WHO WERE BEING ABUSED, AND

14   THEN THE STOPPING OF THE ACTIVITY AND INDIVIDUALS WHO WERE

15   USING OUR PLATFORM TO DO THIS BAD THING.

16   Q.   SO IN THIS -- SO IN THIS CASE, YOU HAD THE DISCRETION TO

17   DETERMINE THAT IT WAS BETTER TO LEAVE THE ACCOUNT ACTIVE AND

18   HAVE THE ACTIVITY CONTINUE ON YOUR PLATFORM IN THE HOPES THAT

19   IT WOULD LEAD TO A CHILD RESCUE?

20        MS. HARRIS:  OBJECTION.  THIS IS ARGUMENTATIVE, YOUR

21   HONOR, AND IT'S BEEN ANSWERED ALREADY.

22        THE COURT:  SUSTAINED.

23   HOW MANY MORE DO YOU HAVE, MR. ARCHER?

24        MR. ARCHER:  THIS IS MY LAST ONE.

25        THE COURT:  OKAY.

```
1    BY MR. ARCHER:

2    Q.   SO I'D LIKE TO SHOW YOU A SERIES OF E-MAILS.  THIS IS

3    BATES 1628.

4         DO YOU RECALL THIS INTERCHANGE WITH AN OFFICER FROM THE

5    AUSTRALIAN FEDERAL POLICE?

6    A.   I DO, YES.

7    Q.   OKAY.  AND SO -- LET'S SEE.  I'M GOING TO MOVE ON TO 1703,

8    AND I GUESS JUST TO SUMMARIZE IT, THIS IS A -- THIS IS SOMEONE

9    THAT, TO YOUR UNDERSTANDING, WAS REFERRED TO YOU BY

10   AGENT YESENSKY?

11   A.   YES, I BELIEVE SO.

12   Q.   OKAY.  AND SO HE WAS -- HE INDICATED THAT, THAT YAHOO

13   AUSTRALIA DID PROCESS THEIR LEGAL REQUESTS, BUT HE WAS

14   INTERESTED IN MORE OF A WORKING RELATIONSHIP THAN THAT.

15        IS THAT YOUR UNDERSTANDING OF WHAT HE WAS REQUESTING?

16   A.   THAT WAS HIS REQUEST, YES.

17   Q.   OKAY.  THIS IS BATES 1703.  LET ME FIX THAT A LITTLE BIT.

18        SO IN YOUR EXCHANGE WITH THIS AGENT OF THE AUSTRALIAN

19   FEDERAL POLICE, HE ASKED -- WELL, FIRST, I SUPPOSE I SHOULD

20   SAY, HE HAD A NUMBER OF QUESTIONS FOR YOU; IS THAT CORRECT?

21   A.   THESE ARE -- WELL, THIS IS MY RESPONSE TO HIM, YES.

22        SO I DON'T SEE HIS QUESTIONS HERE.  BUT I THINK I WAS

23   ANSWERING SOME SORT OF QUESTIONS AS I INDICATED IN NUMBER 3.

24   Q.   OKAY.  I'M PERHAPS TAKING IT SLIGHTLY OUT OF ORDER.  LET'S

25   SEE.
```

1          SO YOU PROVIDED HIM -- IN RESPONSE TO HIS QUESTIONS,

2     THOUGH -- HE IDENTIFIED PARTICULAR CASES THAT HAD BEEN -- THAT

3     YOU HAD PREVIOUSLY IDENTIFIED AS PART OF THE SWIFT TRAVELER

4     INVESTIGATION; IS THAT CORRECT?

5     A.   CAN YOU SAY THAT AGAIN, PLEASE?

6     Q.   SURE.  SO PART OF YOUR DISCUSSION WITH HIM WAS ABOUT CASES

7     THAT YOU HAD ALREADY IDENTIFIED AND REFERRED OVER TO THE FBI

8     THROUGH NCMEC; IS THAT CORRECT?

9     A.   YES.  SO WHAT HAD HAPPENED WAS HIS INITIAL E-MAIL WE SAW

10    ON THE SCREEN PREVIOUSLY, HE HAD ESSENTIALLY ASKED FOR A BETTER

11    WORKING RELATIONSHIP.

12         MY RESPONSE TO THAT WAS TO KIND OF GENTLY REBUFF HIM AND

13    SAY -- AND THERE'S A THREAD SOMEWHERE IN THIS CHAIN WHERE I

14    SAID, "WHAT WE WOULD REALLY LIKE WOULD BE FEEDBACK FROM YOU

15    BECAUSE THIS IS WHAT REALLY HELPS OUR FRONT-LINE REVIEWERS AT

16    OUR COMPANY."

17         SO I WAS ABLE TO REDIRECT HIM FROM A WORKING

18    RELATIONSHIP -- WHICH WE DON'T CLAIM TO HAVE A, YOU KNOW,

19    WORKING RELATIONSHIP WITH LAW ENFORCEMENT, THAT'S NOT HOW WE

20    WOULD CHARACTERIZE OUR INTERACTIONS WITH THE GOVERNMENT, OR ANY

21    GOVERNMENT -- BUT I WAS ABLE TO DIRECT HIS SORT OF FOCUS TOWARD

22    FEEDBACK, WHICH WAS SOMETHING THAT WE HAD PARTICULARLY WANTED

23    FOR OUR OWN BUSINESS PURPOSES.

24              MR. ARCHER:  YOUR HONOR, MAY I HAVE A QUICK MOMENT?

25    THERE'S -- I THINK I'M MISSING A COUPLE PAGES OF THIS DOCUMENT.

```
 1              THE COURT:  OKAY.  GO AHEAD, PLEASE.

 2         (PAUSE IN PROCEEDINGS.)

 3              MS. HARRIS:  WHAT'S THE BATES?

 4         (PAUSE IN PROCEEDINGS.)

 5              MR. ARCHER:  I APOLOGIZE, YOUR HONOR.  JUST A MOMENT.

 6              THE COURT:  DO YOU HAVE THE PAGE, MS. HARRIS, THAT

 7    MR. ARCHER IS LOOKING FOR?  MAYBE THAT COULD EXPEDITE IT.

 8              MS. HARRIS:  I BELIEVE I MIGHT.

 9              MS. KEITH:  170 --

10              THE COURT:  WE'RE AT 1703.  DO YOU WANT BEFORE OR

11    AFTER THAT NUMBER?

12              MR. ARCHER:  SO IT KIND OF SKIPS AROUND,

13    UNFORTUNATELY, IN THE PRODUCTION.

14              MS. HARRIS:  SO THIS IS WHAT I HAVE (INDICATING).

15              MR. ARCHER:  BECAUSE THERE'S AROUND --

16              MS. KEITH:  I HAVE 1702.

17              MS. HARRIS:  THERE'S 1702.

18         THAT'S 12.  OR IF YOU NEED THE BIGGER ONE, THIS IS IT

19    (HANDING).

20              MR. ARCHER:  OKAY.

21         (PAUSE IN PROCEEDINGS.)

22    BY MR. ARCHER:

23    Q.   OKAY.  SO YOU TESTIFIED A MOMENT AGO THAT YOUR INTENTION

24    IN RESPONDING TO HIM WAS SORT OF TO GIVE HIM A POLITE REBUFF

25    ABOUT THE POSSIBILITY OF A WORKING RELATIONSHIP; IS THAT
```

1    CORRECT?

2    A.   YEAH.  I WANTED TO SORT OF REDIRECT HIM TOWARDS, TOWARDS

3    PROVIDING FEEDBACK.  WE TYPICALLY HADN'T RECEIVED FEEDBACK FROM

4    AUSTRALIA IN RESPONSE TO OUR CYBERTIPS AND SUPPLEMENTS.  SO --

5    Q.   OKAY.

6    A.   YEAH, THAT WAS THE IDEA.

7    Q.   OKAY.  SO IF WE COULD LOOK AT 1708 NOW, SO "HELLO RAB,

8    WE'D BE DEFINITELY INTERESTED IN DEVELOPING A BETTER WORKING

9    RELATIONSHIP WITH THE AFP, ESPECIALLY WITH RESPECT TO CHILD

10   ABUSE INVESTIGATIONS AND SPECIFICALLY TO SEX TOURISM CASES."

11        DO YOU RECALL SENDING THAT E-MAIL?

12   A.   I DO.  AND SPECIFICALLY THE NEXT PARAGRAPH IS EXACTLY MY

13   POINT THERE.

14   Q.   OKAY.  SO INSTEAD OF -- SO YOUR RESPONSE THEN TO HIM WAS A

15   REQUEST FOR INFORMATION FROM HIM ON FEEDBACK ON PRIOR REFERRALS

16   AND CASES GOING FORWARD?  THAT'S WHAT YOU'RE ASKING OF HIM IN

17   EXCHANGE FOR THIS WORKING RELATIONSHIP; CORRECT?

18   A.   NO.  I WAS NOT MAKING ANY PROMISES OR IN EXCHANGE

19   ARRANGEMENT.

20        I WAS SAYING -- HE'S SAYING, "HEY, CAN WE WORK TOGETHER

21   CLOSELY?"  AND I WAS SAYING, "YES.  CAN WE GET SOME FEEDBACK?"

22        THERE WAS NO PROMISE THAT I WOULD DO ANYTHING ADDITIONAL

23   WITH RESPECT TO THAT FEEDBACK.

24   Q.   OKAY.  SO YOU SAID -- YOU ASKED FOR FEEDBACK, AND YOU

25   SUGGEST THEN THE FORMAT OF THE FEEDBACK, SAYING IT MIGHT BE AS

1    SIMPLE AS "SUBJECT ARRESTED ON JUNE 1, 2016," AND THEN YOU

2    INDICATE THAT THIS RELATIONSHIP WOULD BE PRODUCTIVE FOR BOTH

3    SIDES; CORRECT?

4    A.   YES.  THAT WAS MY ATTEMPT TO KIND OF DIRECT HIM AWAY FROM

5    THE -- FROM WHAT I BELIEVED HE WAS SUGGESTING, WHICH WAS SORT

6    OF MORE OF A, YOU KNOW, HAND-IN-HAND RELATIONSHIP.

7    Q.   SO HE'S COMING TO YOU WITH A SUGGESTION OF A RELATIONSHIP

8    BASED ON COMMUNICATIONS THAT HE RECEIVED FROM AGENT YESENSKY

9    ABOUT YOUR RELATIONSHIP WITH AGENT YESENSKY; CORRECT?

10             MS. HARRIS:  OBJECTION.  CALLS FOR SPECULATION.

11             MR. ARCHER:  WELL, WE CAN GO TO THE -- BACK TO THE

12   FIRST E-MAIL IF WE'D LIKE.

13             THE COURT:  ALL RIGHT.  OVERRULED.

14   BY MR. ARCHER:

15   Q.   SO WHEN HE'S SAYING HE SEEMS -- "IT SEEMS THAT YOU HAVE A

16   REALLY GOOD WORKING RELATIONSHIP WITH THE FBI IN THIS CRIME

17   TYPE, IT SOUNDS LIKE THAT RELATIONSHIP WAS QUITE VALUABLE TO

18   THE SUCCESS OF THEIR INVESTIGATIONS."

19        YOUR UNDERSTANDING IS THAT HE'S ASKING FOR THE SAME TYPE

20   OF RELATIONSHIP WITH HIM THAT AGENT YESENSKY HAS; IS THAT

21   CORRECT?

22   A.   I WOULD NOT WANT TO PUT MYSELF IN HIS MIND.

23        ONE THING THAT WE SEE WITH RESPECT TO FOREIGN LAW

24   ENFORCEMENT IN GENERAL IS THAT THEY OFTEN DON'T HAVE THE SAME

25   LEVEL OF DISTANCE FROM PRIVATE SECTOR LIKE WE DO IN THE

1    UNITED STATES.  THEY MAY NOT HAVE THE EQUIVALENT OF THE FOURTH

2    AMENDMENT OR SIMILAR PROTECTIONS.  AND SO, YOU KNOW, REQUESTS

3    FROM FOREIGN LAW ENFORCEMENT LIKE THIS ARE NOT IRREGULAR.

4         I PROBABLY SHOULD HAVE BEEN A LITTLE MORE FORCEFUL IN MY

5    REBUFFING OF HIM.  BUT I DEFINITELY DID TRY TO STEER HIM AWAY

6    FROM I THINK THE COZY RELATIONSHIP HE WANTED INTO MORE OF ONE

7    THAT WAS SOLICITING FEEDBACK FOR, FOR DISSEMINATION WITHIN

8    YAHOO.

9    Q.   OKAY.  SO WHEN YOU SAY "HAVING THIS RELATIONSHIP WOULD BE

10   PRODUCTIVE FOR BOTH SIDES," YOU CONSIDER THAT A MANNER OF

11   REBUFFING A REQUEST FOR A RELATIONSHIP?

12   A.   UM --

13            MS. HARRIS:  OBJECTION.  ARGUMENTATIVE.

14            THE COURT:  SUSTAINED.  LET'S PUT THAT WHOLE

15   PARAGRAPH ON THE RECORD.  IT STATES, "WOULD YOU BE ABLE TO

16   PROVIDE FEEDBACK ON OUR PRIOR REFERRALS AND ON CASES GOING

17   FORWARD?  THIS FEEDBACK MIGHT BE AS SIMPLE AS 'SUBJECT ARRESTED

18   ON JUNE 1, 2016, AND TWO CHILDREN RESCUED' OR 'CASE CLOSED DUE

19   TO LACK OF EVIDENCE.'  HAVING THIS RELATIONSHIP WOULD BE

20   PRODUCTIVE FOR BOTH SIDES."

21        GO AHEAD, PLEASE.  ANSWER THE QUESTION.

22            THE WITNESS:  I'M SORRY.  WOULD YOU MIND STATING THE

23   QUESTION AGAIN?

24   BY MR. ARCHER:

25   Q.   SURE.  I'LL WITHDRAW THE QUESTION.  THAT'S FINE.

1          THIS IS 1708.  SO YOU IDENTIFY TO OFFICER SEIP THAT THE

2    FEEDBACK THAT YOU'RE LOOKING FOR IS LEARNING OF ARRESTS,

3    CHARGES, AND THE LIKE FROM THE CASE REFERRALS; CORRECT?

4    A.   THAT'S WHAT I SAID, YES.

5    Q.   OKAY.  DO YOU SEE ANYTHING THERE ABOUT CHILD RESCUE?

6    A.   I BELIEVE IN THE -- IF THIS WERE TO CONTINUE LATER IN THAT

7    PARAGRAPH, ASSUMING THIS IS WHAT WE WERE LOOKING AT IN THE

8    PRIOR PAGE, THAT'S --

9          THE COURT:  THE PARAGRAPH THAT I JUST READ WAS 1709,

10   CORRECT, AND IS THE PARAGRAPH THAT FOLLOWS THIS ONE?  IS THAT

11   RIGHT?  CAN SOMEONE PUT UP 1707 AND 1708?  I'M CONFUSED.

12         MR. ARCHER:  THIS IS 1708 AND THE TOP OF 1709, YOUR

13   HONOR.

14         THE COURT:  OKAY.  SO THE NEXT PARAGRAPH DISCUSSES

15   CHILD RESCUE AND CASE CLOSED DUE TO LACK OF EVIDENCE.

16         MR. ARCHER:  OKAY.

17   Q.   SO -- LET'S SEE.  THIS IS 1702.

18         DO YOU RECOGNIZE THESE AS THE QUESTIONS THAT THE AGENT HAD

19   FOR YOU ABOUT THE PREVIOUS INVESTIGATIONS?

20   A.   I BELIEVE SO, YES.

21   Q.   OKAY.  SO IN PARTICULAR, HE'S ASKING ABOUT HOW THEY CAN

22   AVOID -- AND THIS IS PARAGRAPH 3 -- HOW THEY CAN AVOID USER

23   NOTIFICATION TO AVOID TIPPING THEIR HAND.

24         DO YOU SEE THAT?

25   A.   I DO SEE THAT.

1          THE COURT:  WHAT'S THE BATES NUMBER ON THIS ONE?

2          MR. ARCHER:  1702, YOUR HONOR.

3          THE COURT:  OKAY.  THAT'S 1702.  ALL RIGHT.  THANK

4     YOU.

5          MR. ARCHER:  AND I APOLOGIZE.  THEY'RE MOSTLY IN

6     SEQUENCE.  IT'S JUST ONE OF THEM STARTS -- THE ORIGINAL E-MAIL

7     STARTS AT 1628.  THAT'S WHY THEY'RE --

8          THE COURT:  1628.  OKAY.  THANK YOU.

9          MR. ARCHER:  CORRECT.

10         THE COURT:  THANK YOU.

11    BY MR. ARCHER:

12    Q.   AND SO YOU RECALL ANSWERING AND PROVIDING, IN PARAGRAPH 2,

13    SPECIFIC DETAILS ABOUT CASES THAT THE AUSTRALIAN FEDERAL POLICE

14    HAD IDENTIFIED?  THAT WOULD BE THE REDACTED PORTION THERE?

15    A.   I DON'T ACTUALLY RECALL THIS.  CAN WE FLIP BACK TO THE

16    PRIOR PAGE SO I CAN SEE WHAT HE'S ASKING?

17    Q.   SURE.

18    A.   I DON'T UNDERSTAND HOW NUMBER 2 PERTAINS TO PORT NUMBERS.

19    Q.   AND I'M NOT SURE, EITHER.  IT MAY BE -- SO I GUESS I DON'T

20    KNOW WHAT QUESTION THAT'S IN RESPONSE TO.  WE MAY BE MISSING A

21    QUESTION.

22         BUT DO YOU RECALL PROVIDING FEEDBACK, ON CASES THAT HE

23    IDENTIFIED, TO HIM?

24    A.   MAYBE IT'S ON THE NEXT PAGE, BECAUSE THIS WAS A RESPONSE.

25    Q.   OKAY.

1       A.   THE CONTEXT WOULD HELP.

2       Q.   SORRY.  I'LL --

3       A.   FEEDBACK.

4            I'M SORRY.  I DON'T -- I DON'T ACTUALLY RECALL WHAT THIS

5       WAS ABOUT.

6       Q.   OKAY.

7       A.   CERTAINLY THERE'S A LEGAL PROCESS SECTION.

8       Q.   THESE ARE HIS QUESTIONS THEN; CORRECT?

9       A.   YEAH, I THINK SO.

10      Q.   OKAY.

11           THE COURT:  WHAT'S THE PORT NUMBER?  IS THAT A REPORT

12      NUMBER?  OR DO YOU -- DO YOU KNOW WHAT THAT IS?

13           THE WITNESS:  I KNOW WHAT THAT IS.  A PORT NUMBER --

14      SO IF YOU THINK -- SORRY, THIS IS A LITTLE TECHNICAL.

15           WHEN THERE'S A CONNECTION TO A YAHOO SERVER, THAT HAPPENS

16      WITH AN I.P. ADDRESS, AND IT HAPPENS OVER WHAT'S CALLED TCP/IP,

17      OR TRANSMISSION CONTROL PROTOCOL/INTERNET PROTOCOL.

18           THERE'S AN I.P. NUMBER, I.P. ADDRESS, WHICH IS THE

19      DESTINATION COMPUTER, AND THEN THERE'S WHAT'S CALLED A PORT

20      NUMBER, WHICH IS THE, THE SORT OF SOCKET ON THE DESTINATION

21      COMPUTER THAT GETS SENT TO THE -- OR THE REQUESTED COMPUTER

22      THAT GETS SENT TO THE DESTINATION.

23           PORT NUMBERS ARE OFTEN IMPORTANT FOR LAW ENFORCEMENT OR

24      OTHER INQUIRIES LIKE THAT BECAUSE WHEN, LIKE, A REQUEST IS

25      COMING FROM A CELLULAR PROVIDER WHERE THERE MIGHT BE 5,000

1        PEOPLE USING ONE I.P. ADDRESS, THE PORT NUMBER IS REQUIRED TO

2        IDENTIFY THAT SPECIFIC USER BEHIND THAT ONE I.P. ADDRESS.

3            SO PORT NUMBERS ARE ONE THING THAT YAHOO DOES PROVIDE, BUT

4        MOST OTHER PROVIDERS DO NOT.

5                THE COURT:  OKAY.  GO AHEAD, PLEASE.

6                MR. ARCHER:  OKAY.

7        Q.   SO THIS IS BATES 1706.

8            THAT IS A -- DO YOU RECOGNIZE THIS AS A RESPONSE TO AN

9        E-MAIL FROM AGENT SEIP ABOUT -- I MEAN, ACTUALLY, IF YOU CAN

10       JUST READ IT AND TELL US WHAT THIS E-MAIL IS AND THEN PERHAPS

11       WHY YOU SENT IT?

12       A.   SURE.  THIS SHOULD HAVE BEEN A -- I MEAN --

13       Q.   SORRY.  I CAN SHOW YOU THE SECOND PAGE, TOO, BECAUSE

14       THERE'S MORE CONTENT.  THAT MIGHT BE HELPFUL.

15       A.   SURE.

16               MR. ARCHER:  MS. HARRIS, DO YOU MIND IF I DISCONNECT

17       THE STAPLE?

18               MS. HARRIS:  OH, YEAH, GO AHEAD.

19       BY MR. ARCHER:

20       Q.   OKAY.  SO THIS IS 1706, CONTINUING ON TO 1707.

21       A.   OKAY.  SO I BELIEVE THIS WAS LIKELY A LIST OF CYBERTIPS

22       FROM OUR PRIOR SWIFT TRAVELER REFERRALS, SWIFT TRAVELER BEING

23       THE FBI'S NAME FOR THEIR INVESTIGATION.

24           MY UNDERSTANDING WAS THAT THE FBI HAD PROVIDED THE

25       AUSTRALIAN FEDERAL POLICE WITH, IF NOT THE ENTIRE INVESTIGATION

1    WE PROVIDED, AT LEAST THE SUBSET PERTAINING TO AUSTRALIAN

2    USERS.

3    Q.   OKAY.

4    A.   SO I WAS INQUIRING AS TO WHAT THE AUSTRALIAN POLICE HAD

5    DONE.

6    Q.   SO THIS IS FROM -- IS IT SAFE TO SAY THAT THE REDACTED

7    PORTION OF THIS IS A LIST THAT YOU HAD OF YAHOO I.D.S THAT WERE

8    BELIEVED TO BE AUSTRALIAN USERS?  IS THAT --

9    A.   I DON'T KNOW IF THEY'RE YAHOO I.D.S.  THEY'RE CERTAINLY

10   CYBERTIP NUMBERS.  THERE MAY HAVE BEEN YAHOO I.D.S, BUT I DON'T

11   RECALL.

12   Q.   OKAY.  SO -- BUT INFORMATION IDENTIFYING TARGETS OF THE

13   PHILIPPINE WEBCAM INVESTIGATION THAT WERE BELIEVED TO RESIDE IN

14   AUSTRALIA?  IS THAT THE IDEA?

15   A.   CORRECT, AND BASED ON MY UNDERSTANDING, THAT THE FBI HAD

16   ALREADY PROVIDED THIS INFORMATION TO AUSTRALIA AND WAS HOPING

17   TO FOLLOW UP ON THAT.

18   Q.   OKAY.  AND SO YOU WERE -- YOU WANTED TO FIND THE STATUS OF

19   THOSE CASES?  IS THAT --

20   A.   CONSISTENT WITH HOW WE DESCRIBED OUR REQUEST FOR FEEDBACK,

21   YES.

22            MR. ARCHER:  OKAY.

23        MAY I HAVE A MOMENT, YOUR HONOR?

24            THE COURT:  GO AHEAD, PLEASE.

25        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

```
 1          MR. ARCHER:  NOTHING FURTHER, YOUR HONOR.

 2     THANK YOU.

 3          THE COURT:  ALL RIGHT.  IS THERE ANY REDIRECT?

 4          MS. HARRIS:  VERY BRIEFLY, YOUR HONOR.

 5          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

 6          MR. ARCHER:  (HANDING.)

 7          MS. HARRIS:  THANK YOU.

 8                    REDIRECT EXAMINATION

 9     BY MS. HARRIS:

10     Q.   MR. ZADIG, I JUST WANTED TO CLARIFY ONE THING THAT YOU HAD

11     SAID ABOUT THE NCMEC REPORTING THAT YAHOO DOES, OR THAT ECIT

12     DOES AND THE CONTENT MODERATION TEAMS.

13          SO EARLY IN THE CROSS-EXAMINATION, THERE WAS SOME

14     DISCUSSION OF THE STANDARDS OR QUALIFYING EVENTS THAT WOULD

15     TRIGGER -- OR THAT -- FOR WHICH A CYBERTIP CAN BE FILED.

16          CAN YOU EXPLAIN WHAT, WHAT THOSE EVENTS ARE IN TERMS OF

17     WHAT -- WHAT WOULD TRIGGER A FILING OF A CYBERTIP IN YOUR

18     UNDERSTANDING?

19     A.   SO WE FILE CYBERTIPS -- ESSENTIALLY THERE'S A PART OF THE

20     U.S. FEDERAL CODE THAT REQUIRES -- THAT DEFINES THE REPORTING

21     OBLIGATIONS OF ELECTRONIC SERVICE PROVIDERS, AND IT SPELLS OUT

22     WHAT CONDUCT IS REQUIRED TO BE REPORTED WHEN THE COMPANY

23     BECOMES AWARE OF IT, CERTAINLY THE POSSESSION AND DISTRIBUTION

24     OR PRODUCTION OF CHILD PORNOGRAPHY, EXCHANGE OF THAT OVER

25     ONLINE PLATFORMS.
```

1         I BELIEVE THERE'S ALSO, MAYBE IN A SEPARATE STATUTE, A

2    DISCUSSION OF REPORTING OF CHILD -- TRAVEL FOR CHILD ABUSE.  I

3    DON'T KNOW IF THAT'S A MANDATORY REQUIREMENT, BUT CERTAINLY

4    THE -- WHENEVER THE COMPANY BECOMES AWARE OF CHILD PORNOGRAPHY

5    AND SO PUTS EYES ON IT, IT HAS TO REPORT IT TO NCMEC.

6    Q.   I SEE.  SO THE SUPPLEMENTAL REPORTING, IS THAT ALSO

7    REQUIRED UNDER THE STATUTE?

8    A.   IT IS NOT, NO.

9    Q.   IS -- WHY DOES ECIT AND YAHOO DO SUPPLEMENTAL REPORTING

10   BEYOND THAT?

11   A.   WE HAVE A DESIRE TO -- WELL, A COUPLE OF REASONS.

12        ONE, WE DON'T WANT THIS CONDUCT HAPPENING ON OUR PLATFORM,

13   AND THERE ARE MANY CASES WHERE THERE'S IMMINENT HARM TO

14   CHILDREN, PHYSICAL OR SEXUAL HARM THAT WE FEEL WE HAVE AN

15   OBLIGATION TO REPORT.

16        THERE'S ALSO A BUSINESS REASON, THAT MAKING THESE REPORTS

17   RESULTS IN A CLEANER PLATFORM.  IT -- LAW ENFORCEMENT ACTION

18   MIGHT REMOVE THAT INDIVIDUAL FROM OUR PLATFORMS.

19        AND THERE HAVE BEEN MANY CASES WHERE OUR AGGRESSIVE ACTION

20   WITH RESPECT TO CHILD PORNOGRAPHY HAS RESULTED IN BUSINESS

21   BENEFITS, LIKE I THINK I DESCRIBED LAST TIME THE TUMBLR APP

22   REMOVAL WHERE THE FACT THAT WE CONDUCT THIS -- ECIT CONDUCTS

23   THESE TYPES OF INVESTIGATIONS IS ONE OF THE FACTORS THAT

24   ACTUALLY ALLOWED APPLE TO LET US RELIST THE TUMBLR APP ON THE

25   APP STORE.

1    Q.   SO IS IT FAIR TO SAY THAT YAHOO DOESN'T HAVE TO REPORT

2    THINGS LIKE SOMEONE SOLICITING CHILD PORNOGRAPHY AND OFFERING

3    TO PAY FOR IT, BUT IT CHOOSES TO DO SO?

4    A.   THAT'S RIGHT, YES.

5    Q.   FOR THE REASONS YOU JUST SPECIFIED?

6    A.   CORRECT.

7    Q.   AND THOSE REPORTS MAY EXCEED THE STATUTORY MINIMUM

8    OBLIGATION OF THE COMPANY?

9    A.   THEY DO, YES.

10   Q.   AND YOU CHOOSE TO DO THAT FOR THE REASONS THAT YOU

11   SPECIFIED PREVIOUSLY?

12   A.   THAT'S CORRECT.

13   Q.   AND, AGAIN, I JUST WANTED TO CLARIFY AGAIN THE LINE OF

14   SORT OF REPORTING FOR YAHOO.

15       YOU SAID THAT YOUR CONTENT MODERATION TEAM FILES

16   CYBERTIPS, BUT THEN ECIT BECOMES INVOLVED IF THERE'S

17   AGGRAVATING FACTORS.

18   A.   THAT'S CORRECT.  THE MODERATION TEAM, THEY'RE ALSO

19   REFERRED TO AS THE TRUST AND SAFETY TEAM.  THEY'VE HAD A

20   REBRANDING.

21       THEY ARE RESPONSIBLE FOR THE DAY IN AND DAY OUT OF

22   ESSENTIALLY CONTENT MODERATION ON OUR PLATFORMS.  THAT

23   INCLUDES, LIKE I MENTIONED EARLIER, HATE SPEECH, IT INCLUDES

24   TERRORISM, IT INCLUDES A LOT OF OBJECTIONABLE CONTENT, AS WELL

25   AS CHILD SEXUAL ABUSE.

1          THAT TEAM, WHEN THEY BECOME AWARE AND VIEW CHILD SEXUAL

2     ABUSE THAT MAY HAVE BEEN DETECTED, EITHER PROACTIVELY THROUGH

3     SCANNING OR REACTIVELY FROM ABUSE REPORTS FROM USERS, THEY

4     REPORT THAT CONTENT TO NCMEC.

5          AND THEN THE ECIT TEAM, ON A DAILY BASIS, REVIEWS ALL OF

6     THE REPORTS THAT HAVE BEEN SENT THE PRIOR DAY AND LOOKS FOR

7     THOSE AGGRAVATING FACTORS.

8     Q.   OKAY.  AND ONE OF THE THINGS THAT ECIT DOES, AS PART OF

9     ITS ROLE, IS TO FILE SUPPLEMENTAL REPORTS THAT EXPLAIN WHY

10    THERE'S AGGRAVATING FACTORS?

11    A.   YES.  AND THIS HAPPENS ON A DAILY BASIS WITH, YOU KNOW,

12    PROBABLY RIGHT NOW ABOUT 20 A WEEK OR SO.

13    Q.   I SEE.

14         OKAY.  THAT'S IT, YOUR HONOR.

15              THE COURT:  ALL RIGHT.

16         ANY RECROSS?

17              MR. ARCHER:  YES, YOUR HONOR.

18              THE COURT:  GO AHEAD, PLEASE.

19                        **RECROSS-EXAMINATION**

20    BY MR. ARCHER:

21    Q.   SO YOU MENTIONED JUST NOW THE LOSS OF THE YAHOO APP FROM,

22    WAS IT GOOGLE AND APPLE STORES BECAUSE OF TUMBLR?

23    A.   IT WAS THE TUMBLR APP BEING REMOVED FROM THE APPLE ITUNES

24    STORE, YES.

25    Q.   OKAY.  GOT IT.  SO THAT OCCURRED IN ABOUT 2018 SOMETIME?

1    A.    AT THE END OF 2018, YES.

2    Q.    THE END OF 2018.  AND THAT WAS REMEDIED BY DEACTIVATING

3    THE ACCOUNT IN QUESTION?

4    A.    IT WAS NOT.  THE COMPANY HAD TO MAKE A VERY ROBUST

5    REPRESENTATION TO APPLE ABOUT THEIR -- SO THE APP WAS REMOVED

6    BECAUSE THERE WAS ONE BLOG THAT APPLE DETECTED OUT OF THE 300

7    MILLION BLOGS ON THE PLATFORM THAT HAD CHILD PORNOGRAPHY.

8         AND AS PART OF OUR PROCESS TO GET BACK INTO THE APP STORE,

9    WE HAD TO MAKE REPRESENTATIONS AND EXPLAIN OUR PROCESS FOR

10   HANDLING CHILD SEXUAL ABUSE MATERIALS, NOT JUST THAT ONE BLOG

11   IN QUESTION, BUT WHAT OUR ENTIRE PROCESS WAS, WHICH INCLUDED

12   THE ECIT INVESTIGATION SUPPLEMENTAL INVESTIGATIONS.

13        THIS ACTUALLY WENT ALL THE WAY UP TO THE VERIZON BOARD OF

14   DIRECTORS, WHO WAS RECENTLY BRIEFED ON VERIZON'S POLICY NOW FOR

15   CHILD SEXUAL ABUSE MATERIAL.

16        MR. ARCHER:  OKAY.  NOTHING FURTHER.

17   THANK YOU.

18        THE COURT:  OKAY.  ANYTHING ELSE?

19        MS. HARRIS:  NO, YOUR HONOR.

20        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

21   SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

22        MS. HARRIS:  I DON'T BELIEVE THAT THE GOVERNMENT HAS

23   ANYTHING FURTHER.

24        I DO NOTE THAT MR. ZADIG IS LOCAL, SO IF THERE ARE ANY

25   FURTHER QUESTIONS FOR HIM LATER ON, WE WILL -- WE ARE HAPPY TO

```
 1        SUBMIT ANOTHER SUBPOENA FOR HIM.

 2                  THE COURT:  I DON'T THINK THAT'S NECESSARY.

 3                  MS. HARRIS:  OKAY.

 4                  MR. ARCHER:  NOT SUBJECT TO RECALL.

 5                  THE COURT:  OKAY.

 6                  MS. HARRIS:  THAT'S FINE.

 7                  THE COURT:  OKAY.  THEN YOU'RE EXCUSED AND YOU'VE

 8        COMPLETED YOUR TESTIMONY FOR THIS HEARING.

 9            I AM NOT GOING TO HAVE A FRANKS HEARING.

10                  MS. HARRIS:  OKAY.

11                  THE COURT:  SO WHO'S YOUR NEXT WITNESS?

12                  MS. HARRIS:  IT WOULD BE -- LET ME CHECK AND SEE IF

13        AGENT SCHELBLE IS HERE.

14                  THE COURT:  OKAY.

15                  MS. HARRIS:  AND I BELIEVE AGENT MARCEAU IS OUTSIDE.

16                  THE COURT:  OKAY.

17                  MS. HARRIS:  SO LET ME CHECK.

18                  THE COURT:  ALL RIGHT.  BUT THESE ARE GOING TO BE

19        SHORT; CORRECT?

20                  MS. HARRIS:  YES, YOUR HONOR, VERY SHORT.

21                  THE COURT:  OKAY.

22            (PAUSE IN PROCEEDINGS.)

23                  MS. HARRIS:  THE GOVERNMENT CALLS SPECIAL AGENT

24        SCOTT SCHELBLE.

25                  THE COURT:  ALL RIGHT.  IF YOU WOULD PLEASE COME
```

1    FORWARD TO BE SWORN IN.

2              THE WITNESS:  ABSOLUTELY.

3              THE CLERK:  GOOD AFTERNOON, SIR.

4              THE WITNESS:  HI.  HOW ARE YOU?

5              THE CLERK:  FINE.

6        PLEASE RAISE YOUR RIGHT HAND.

7        **(GOVERNMENT'S WITNESS, SCOTT SCHELBLE, WAS SWORN.)**

8              THE WITNESS:  I DO.

9              THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

10       PLEASE STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

11             THE WITNESS:  ABSOLUTELY.  IS THIS OKAY FOR YOU?

12       OKAY.  MY NAME IS SCOTT SCHELBLE.  THE LAST NAME IS

13   SPELLED S-C-H-E-L-B, AS IN BOY, L-E.

14                        **DIRECT EXAMINATION**

15   BY MS. HARRIS:

16   Q.   AGENT SCHELBLE, ARE YOU EMPLOYED?

17   A.   YES, I AM.

18   Q.   WHERE?

19   A.   WITH THE FEDERAL BUREAU OF INVESTIGATION.

20   Q.   AND WHAT IS YOUR POSITION WITH THE FBI?

21   A.   CURRENTLY I'M THE ASSISTANT SPECIAL AGENT IN CHARGE OF THE

22   SAN FRANCISCO CRIMINAL BRANCH.

23   Q.   OKAY.  HOW LONG HAVE YOU BEEN EMPLOYED WITH THE FBI?

24   A.   SINCE FEBRUARY OF 2005.

25   Q.   AND HAVE YOU HELD ANY OTHER POSITIONS WITH THE FBI?

1     A.   YES.  MY ENTRY LEVEL POSITION WAS AS A SPECIAL AGENT, AND

2     THEN IN 2012, I WAS PROMOTED TO THE POSITION OF SUPERVISORY

3     SPECIAL AGENT.

4     Q.   OKAY.  CAN YOU BRIEFLY EXPLAIN YOUR EDUCATIONAL

5     BACKGROUND, TRAINING, AND EXPERIENCE?

6     A.   YEAH.  EDUCATION, I HAVE A BACHELOR'S DEGREE IN GOVERNMENT

7     WITH A MINOR IN ECONOMICS.

8          I HAVE A MASTER'S DEGREE IN PUBLIC ADMINISTRATION WITH A

9     FOCUS ON CRIMINAL JUSTICE.

10         AFTER COMPLETING MY EDUCATION, I WAS A POLICE OFFICER IN

11    COLORADO FOR JUST OVER SIX YEARS BEFORE I JOINED THE FBI IN

12    2005.

13    Q.   AT SOME POINT, WERE YOU THE FBI'S LIAISON TO NCMEC?

14    A.   YES.  I WAS THE FBI'S LIAISON TO NCMEC FROM APPROXIMATELY

15    FEBRUARY OF 2013 TO APRIL OF 2015.

16    Q.   AND WHAT IS NCMEC IN YOUR UNDERSTANDING?

17    A.   NCMEC STANDS FOR THE NATIONAL CENTER FOR MISSING AND

18    EXPLOITED CHILDREN.  IT'S A NON-GOVERNMENTAL ORGANIZATION

19    HEADQUARTERED IN ALEXANDRIA, VIRGINIA WITH GENERALLY A FOCUS TO

20    PREVENT -- ASSIST IN CRIMES INVOLVING MISSING AND SEXUALLY

21    EXPLOITED CHILDREN.

22    Q.   DID YOU PREVIOUSLY FILE A DECLARATION IN THIS MATTER?

23    A.   YES, I DID.

24    Q.   SO I'M SHOWING YOU --

25         EXCUSE ME, I'LL APPROACH, YOUR HONOR (HANDING).

1          -- WHAT'S BEEN FILED IN THIS LITIGATION AS GOVERNMENT'S

2     EXHIBIT M.  IS THAT THE DECLARATION THAT YOU FILED?

3     A.   YES, IT IS.

4     Q.   M, AS IN MARY.

5          WHO WROTE THE DECLARATION?

6     A.   I DID.

7     Q.   ARE THE STATEMENTS IN THE DECLARATION TRUE BASED ON YOUR

8     OWN EXPERIENCES AND OBSERVATIONS WITHIN THE SCOPE OF YOUR

9     ASSIGNMENT TO NCMEC AND EMPLOYMENT WITH THE FBI?

10    A.   YES, IT IS.

11    Q.   ARE THE STATEMENTS IN THE DECLARATION ALSO BASED ON THE

12    EXPERIENCES AND OBSERVATIONS OF OTHER AGENTS THAT YOU WORKED

13    WITH?

14    A.   YES.

15    Q.   ARE THE STATEMENTS YOU MADE IN THE DECLARATION TRUE AND

16    ACCURATE TO THE BEST OF YOUR KNOWLEDGE?

17    A.   YES.

18    Q.   HAVE ANY FACTS OR CIRCUMSTANCES RELATED TO THE CONTENTS OF

19    YOUR DECLARATION CHANGED SINCE YOU SIGNED IT IN DECEMBER OF

20    2018 SUCH THAT THE DECLARATION IS NO LONGER TRUE AND ACCURATE?

21    A.   NO.  THE ONLY MODIFICATION I WOULD POINT OUT IS MY

22    POSITION WAS DIFFERENT AT THE TIME THAT I SIGNED THIS.

23    Q.   SO YOU WERE PROMOTED SINCE THE TIME?

24    A.   YES, I WAS -- YES, THAT'S CORRECT.

25    Q.   NOW, IN PARAGRAPH 3 -- I'M GOING TO DIRECT YOU TO

1    PARAGRAPH 3 OF YOUR DECLARATION.

2    A.   OKAY.

3    Q.   YOU STATED THAT NCMEC RECEIVED AN AVERAGE OF 1.5 MILLION

4    CYBERTIPLINE REPORTS EACH MONTH WHILE YOU WERE THERE?

5    A.   YES.  THAT WAS A -- THAT IS A GENERALIZED NUMBER.  DURING

6    MY TIME AT NCMEC, THE AMOUNT OF CYBERTIPLINE REPORTS THAT THE

7    CENTER RECEIVED WAS SORT OF AT A CONSTANT RATE OF GROWTH, WHICH

8    WAS, YOU KNOW, TYPICALLY EXPLAINED BY THE CREATION OF NEW

9    PLATFORMS, NEW ISP'S, NEW ESP'S THAT FELL UNDER THAT MANDATORY

10   REPORTING.  SO AS MORE COMPANIES CAME, THE NUMBER WOULD

11   INCREASE.  BUT THAT'S A GENERAL AVERAGE TOWARDS THE ENDS OF MY

12   TENURE THERE.

13   Q.   AND IN PARAGRAPH 2, YOU DISCUSSED YOUR ROLE AS A

14   SUPERVISORY SPECIAL AGENT ASSIGNED AS THE LIAISON TO NCMEC; IS

15   THAT RIGHT?

16   A.   YES.

17   Q.   WHAT DOES THAT ROLE ENTAIL IN TERMS OF THE PROCESSING OF

18   THOSE -- YOU KNOW, ASSISTANCE WITH THE CYBERTIPS THAT COME IN?

19   A.   SO IT HAD A COUPLE OF DIFFERENT ASPECTS TO IT.  FIRST, I

20   WAS THE -- I SUPERVISED A SMALL STAFF OF FBI EMPLOYEES WHO WERE

21   ASSIGNED, ASSIGNED TO NCMEC.

22       IN TERMS OF OUR FUNCTION, IT WAS KIND OF THREE-PRONGED.

23   FIRST, THERE IS WHAT IS CALLED THE CHILD VICTIM IDENTIFICATION

24   PROGRAM, OR CVIP, AND THAT IS THE PROGRAM THAT WAS HOUSED AT

25   NCMEC IN WHICH ANALYSTS AT NCMEC WOULD LOOK AT IMAGES OF CHILD

1     PORNOGRAPHY AND -- IN ORDER TO MAKE FEDERAL PROSECUTIONS, YOU

2     KNOW, AN ACTUAL CHILD HAD TO BE IDENTIFIED.

3          SO NCMEC EFFECTIVELY HAD THE, THE LIST OF DATABASES THAT

4     WOULD SAY "THIS IMAGE HERE OF THIS EIGHT-YEAR-OLD GIRL IS

5     ACTUALLY THIS PERSON," AND THAT WOULD ALSO LINK UP THE

6     INVESTIGATOR WHO ORIGINALLY WORKED THAT CASE SO THAT

7     INVESTIGATOR COULD THEN BE BROUGHT IN, UTILIZED AS A WITNESS TO

8     TESTIFY, "I INVESTIGATED THIS CASE, I KNOW THIS CHILD WAS

9     SEXUALLY ABUSED, SHE WAS EIGHT YEARS OLD AT THE TIME, SHE WAS A

10    MINOR AND WAS A REAL PERSON."  THAT WAS ONE OF THE FUNCTIONS.

11         THE SECOND FUNCTION AS IT PERTAINED TO THE CYBERTIPLINE

12    REPORTS WAS THE FBI WOULD LOOK AT CERTAIN CYBERTIPLINE REPORTS

13    THAT NCMEC RECEIVED.

14         IF NCMEC ANALYSTS WERE NOT ABLE TO IDENTIFY A VENUE OR A

15    JURISDICTION FOR THAT SPECIFIC CYBERTIPLINE REPORT, IT WOULD GO

16    INTO WHAT WAS KIND OF REFERRED TO AS THE FEDERAL QUEUE.  AND

17    WITHIN THE FEDERAL QUEUE, THE VARIOUS AGENCIES WHO HAD A

18    DETAILED PRESENCE AT NCMEC WOULD THEN LOOK AT THOSE

19    CYBERTIPLINE REPORTS AND SEE IF THERE WERE ACTIONS THAT COULD

20    BE TAKEN THAT WOULD IDENTIFY A VENUE OR JURISDICTION, AT WHICH

21    POINT WE WOULD THEN, ASSUMING A CYBERTIPLINE REPORT WAS

22    SOMETHING WE WERE INTERESTED IN INVESTIGATING, WE WOULD THEN

23    FORWARD THAT CYBERTIPLINE REPORT TO AN APPROPRIATE FIELD OFFICE

24    TO INITIATE THE INVESTIGATION.

25    Q.   WHAT WERE THE PRIORITIES IN TERMS OF PROCESSING THESE

1    REPORTS?

2    A.   SO GENERALLY SPEAKING, OUR PRIORITIES WERE BASED ON THE

3    NOTION OF WHAT CAUSED THE GREATEST HARM TO A CHILD.

4         AND IF I COULD SORT OF DIFFERENTIATE SORT OF TWO EXAMPLES.

5    ONE EXAMPLE MIGHT BE A REPORT WHERE THE USER OF A PLATFORM WAS

6    TRADING IMAGES OF CHILD PORNOGRAPHY.  THAT WOULD CERTAINLY BE A

7    CYBERTIPLINE REPORT THAT WOULD BE OF INTEREST TO THE FBI OR

8    OTHER AGENCIES.

9         AND NOT TO MINIMIZE IT WAS CHILD PORNOGRAPHY, BECAUSE THEY

10   ARE IMAGES OF THE SEXUAL ABUSE OF CHILDREN.

11        BUT IF YOU WERE TO COMPARE AN OLD SERIES TO A CYBERTIPLINE

12   REPORT OF NEW IMAGES THAT HAD NEVER BEFORE BEEN SEEN THAT WERE

13   PERHAPS INDICATIVE OF A NEW CHILD BEING ABUSED OR REAL TIME

14   ABUSE HAPPENING, THAT WAS GOING TO BE THE PRIORITY BECAUSE THE

15   DETERMINATION WAS THOSE NEW IMAGES REPRESENTED THE GREATEST

16   DANGER TO A CHILD.  SO THAT WOULD HAVE BEEN THE PRIORITY.

17   Q.   AND WHY DOES THE FBI HAVE A LIAISON SITTING AT NCMEC?

18   A.   FOR A COUPLE OF REASONS.

19        SO, FIRST, WE TALKED ABOUT THE CHILD VICTIM IDENTIFICATION

20   PROGRAM.  THAT REQUIRES CHILD PORNOGRAPHY TO BE STORED AT THE

21   NATIONAL CENTER.  SO IT WAS IMPORTANT TO HAVE LAW ENFORCEMENT

22   OFFICERS PRESENT AS THEY WERE -- THEY BASICALLY HAD A LEGAL

23   EXEMPTION TO BASICALLY BE IN CONTROL OF THOSE FILES.

24        SECOND, FROM A DECONFLICTION STANDPOINT -- IT WAS VERY

25   IMPORTANT TO UNDERSTAND WHAT MY COUNTERPARTS AT HSI WERE DOING,

1    WHAT MY COUNTERPARTS AT UNITED STATES POSTAL INSPECTOR SERVICE

2    OR THE U.S. MARSHALS, TO HAVE AN UNDERSTANDING OF WHO WAS

3    WORKING WHAT.

4        FROM A DECONFLICTION STANDPOINT, WE WANT TO MAKE SURE THAT

5    WE DON'T HAVE A LAW ENFORCEMENT AGENCY PERHAPS TARGETING

6    ANOTHER LAW ENFORCEMENT AGENCY, OR AN ISSUE WHERE WE MIGHT HAVE

7    A CONFLICT OF RESOURCES.

8        SOME OF THE WORST CASE SCENARIOS WOULD BE WHAT WE WOULD

9    REFER TO AS SORT OF -- THE INDUSTRY TERM IS BLUE ON BLUE, WHICH

10   WOULD MEAN YOU WOULD HAVE TWO AGENCIES GOING AFTER -- YOU KNOW,

11   PERHAPS EXECUTING A SEARCH WARRANT ON THE SAME TARGET WITHOUT

12   KNOWING ABOUT EACH OTHER.  THAT OBVIOUSLY REPRESENTS A SAFETY

13   PROBLEM.

14       SO FROM A SAFETY PERSPECTIVE, DECONFLICTION WAS IMPORTANT.

15       FROM A LIAISON PERSPECTIVE AND MANAGING RESOURCES, IT WAS

16   HELPFUL TO UNDERSTAND WHO WAS DOING WHAT, WHAT TYPICAL ASPECTS,

17   WHAT SPACE WITHIN THIS VIOLATION WERE DIFFERENT AGENCIES

18   FOCUSSED ON.

19   Q.   AND WERE ALL OF YOUR INTERACTIONS WITH ONLY LAW

20   ENFORCEMENT AGENCIES?

21   A.   NO.  PRIMARILY WITH LAW ENFORCEMENT AGENCIES, BUT I ALSO

22   HAD INTERACTIONS WITH STAFF AT THE NATIONAL CENTER, WHETHER IT

23   WAS FACILITATING THE STATUS OF A CVIP REPORT THAT WE WERE

24   WAITING FOR ON A CASE PROSECUTION, PERHAPS IT WAS TO UNDERSTAND

25   BETTER CLARIFICATION OF A CYBERTIPLINE REPORT IN TERMS OF WHAT

1    WAS DONE.

2         THERE WOULD ALSO BE INSTANCES WHERE I HAD LIAISON CONTACTS

3    WITH REPRESENTATIVES OF COMPANIES WHO PROVIDED CYBERTIPLINE

4    REPORTS TO NCMEC.

5    Q.   AND WHAT TYPES OF COMMUNICATIONS DID YOU HAVE WITH THE

6    COMPANIES THAT FILED CYBERTIPLINE REPORTS?

7    A.   GENERALLY SPEAKING, IT WAS TWO-FOLD.  ONE WAS TO

8    UNDERSTAND -- TO BETTER UNDERSTAND THEIR INTERNAL PROCESSES FOR

9    HOW THAT COMPANY OR HOW THAT PLATFORM PROCESSED THEIR

10   CYBERTIPLINE REPORTS.

11        IT BECAME, YOU KNOW, OF IMPORTANCE TO UNDERSTAND, DID THIS

12   COMPANY USE TECHNOLOGY, SUCH AS PHOTO DNA OR A HASH VALUE TO

13   IDENTIFYING AN IMAGE?  OR DID THE COMPANY ACTUALLY HAVE

14   EMPLOYEES WHO ACTUALLY PHYSICALLY LOOKED AT AN IMAGE?  YOU

15   KNOW, WHAT WAS THEIR PROCESS FOR IDENTIFYING AN IMAGE OF

16   SUSPECTED CHILD PORNOGRAPHY?

17        IN ADDITION, THERE WAS ALSO -- I WANTED TO UNDERSTAND WHAT

18   THEIR CURRENT POLICIES AND PROCEDURES WERE.  SOME COMPANIES, IF

19   THEY RECEIVED A SUBPOENA FROM THE FBI FOR A USER, SOME

20   COMPANIES HAD A POLICY OF NOTIFYING THAT USER THAT THEY WERE IN

21   RECEIPT OF A SUBPOENA.  OTHER COMPANIES WOULD NOT.

22        IT WAS IMPORTANT IN OUR INVESTIGATIONS THAT IF A COMPANY'S

23   POLICY WAS TO PROVIDE A SUBPOENA -- WAS TO NOTIFY THEIR CLIENT,

24   THEN WE WOULD SEEK AN APPLICATION WITH THE COURT FOR A COURT

25   ORDER TO PREVENT THE COMPANY FROM MAKING THAT KIND OF A

1    DISCLOSURE BECAUSE THAT COULD COMPROMISE THE INVESTIGATION.

2    Q.   I SEE.  SO IN PARAGRAPH 10 -- WELL, FIRST OF ALL, LET ME

3    JUST BACK UP.

4         DID THESE COMMUNICATIONS THAT YOU HAD WITH THE ISP'S AND

5    OTHER COMPANIES THAT WERE REPORTING TO NCMEC, THE CYBERTIP

6    REPORTS, WERE THEY INVESTIGATIVE CONTACTS?

7    A.   NO.  I WOULD DESCRIBE THEM AS SORT OF LIAISON CONTACTS.

8    THEY WERE TYPICALLY SOMEBODY WHO WAS WITHIN THEIR LEGAL PROCESS

9    UNIT OR A TRUST AND SAFETY UNIT.  EACH COMPANY WAS ORGANIZED A

10   LITTLE BIT DIFFERENTLY.  BUT IT WAS TYPICALLY SOMEBODY WHO

11   MIGHT JUST BE LISTED WITHIN THE COMPANY'S PROFILE AS A POINT OF

12   CONTACT FOR QUESTIONS RELATED TO SUBPOENAS OR SEARCH WARRANTS.

13   Q.   WOULD THERE EVER BE AN EXCHANGE OF INVESTIGATIVE

14   INFORMATION ABOUT THE TARGET OF THE CYBERTIP FROM THE FBI TO

15   THE ISP REPORTER?

16   A.   NO.  NO, THERE WOULD NOT.  AT MOST, IT PERHAPS WOULD BE

17   CLARIFICATION OF A USER NAME OR A HANDLE, YOU KNOW.  FOR

18   EXAMPLE, ON A FACSIMILE, A 1 COULD LOOK SIMILAR TO A LOWER CASE

19   L.  SO THERE MIGHT BE SOME TYPE OF CLARIFICATION OF WHAT THE

20   HANDLE WAS.  BUT NOTHING IN THE SENSE OF WHAT THE FACTS OF THE

21   CASE WERE.

22        THE CLOSEST THAT WOULD EVER COME IS IF THERE WAS AN

23   APPLICATION FOR AN EMERGENCY DISCLOSURE WHERE THERE WAS A RISK

24   OF IMMINENT DEATH OR SERIOUS PHYSICAL INJURY TO A CHILD, AND IN

25   THOSE TYPES OF APPLICATIONS, YOU KNOW, SOME FACTUAL BASIS THAT

1    JUSTIFIED THE EMERGENCY DISCLOSURE WOULD BE PROVIDED.

2    Q.   SO I'M GOING TO DIRECT YOU TO PARAGRAPH 4 OF YOUR

3    DECLARATION.

4    A.   YES.

5    Q.   SO YOU STATE THAT IT'S NOT UNUSUAL FOR AN ELECTRONIC

6    SERVICE PROVIDER TO CONTACT NCMEC OR THE FBI TO BRING ATTENTION

7    TO REPORTS THAT APPEAR TO PRESENT A SITUATION OF IMMINENT HARM

8    TO CHILDREN.  IS THAT CORRECT?

9    A.   CORRECT, YES.

10   Q.   OKAY.  AND WHAT DO YOU CLASSIFY AS "IMMINENT HARM TO

11   CHILDREN"?

12   A.   I WOULD CLASSIFY IMMINENT HARM AS ANYTHING THAT WOULD

13   POSSIBLY RISK THE LIFE OR SERIOUS PHYSICAL INJURY OF A CHILD,

14   SO CHILD ABDUCTION, A KIDNAPPING, INSTANCES WHERE WE'RE LOOKING

15   AT A PREPUBESCENT CHILD WHO WAS BEING PHYSICALLY ASSAULTED,

16   TORTURED, SADISTIC TYPE ACTS --

17   Q.   AND --

18   A.   -- THAT WOULD RESULT IN PERMANENT SCARS, INJURIES.  SO

19   INJURIOUS PHYSICAL INJURY.

20   Q.   AND DURING YOUR TIME THERE, HOW OFTEN WOULD YOU SAY THAT

21   YOU SAW THAT TYPE OF REPORT?

22   A.   HARD TO QUANTIFY, BUT IT WOULD HAPPEN.  I'M NOT -- IT'S

23   NOT A DAILY BASIS OR A WEEKLY BASIS.

24        BUT IF, IF A -- IF AN ISP OR A COMPANY OR PLATFORM CAME

25   ACROSS CONTENT THAT WAS PARTICULARLY DISTURBING, YEAH, THEY

1       WOULD -- THEY WOULD PERHAPS MAKE A PHONE CALL OR REACH OUT.

2            AND MOST COMPANIES KNEW OR HAD AN IDEA IN TERMS OF THE

3       TYPE OF VOLUME OF CYBERTIPLINE REPORTS THAT WOULD COME IN, SO

4       SOMETIMES THEY JUST WANTED TO MAKE SURE THAT IF SOMETHING

5       APPEARED PARTICULARLY EGREGIOUS, THAT THEY WOULD AT LEAST

6       PROVIDE, "HEY, WOULD YOU MIND LOOKING AT THIS CYBERTIPLINE

7       REPORT NUMBER BECAUSE IT SEEMS LIKE IT'S UNUSUALLY HORRIFIC."

8       Q.   SO IN PARAGRAPH 6 OF YOUR DECLARATION, YOU DESCRIBE A

9       MEETING THAT YOU ATTENDED ON OCTOBER 6TH, 2014; IS THAT

10      CORRECT?

11      A.   YES, THAT'S CORRECT.

12      Q.   AND CAN YOU DESCRIBE THE CIRCUMSTANCES PROMPTING THAT

13      MEETING?

14      A.   YEAH.  PRIOR TO THIS MEETING, I HAD RECEIVED -- I WAS

15      CONTACTED BY SEAN ZADIG OF YAHOO -- I BELIEVE THE INITIAL

16      CONTACT WAS OVER E-MAIL -- JUST ASKING TO MEET ABOUT SOMETHING

17      THAT THEY HAD FOUND WITHIN THEIR PLATFORM.

18      Q.   OKAY.  AND WHEN WAS THAT MEETING HELD?

19      A.   THE MEETING WAS ON OCTOBER 6TH OF 2014.

20      Q.   AND WHY WAS THE MEETING HELD?

21      A.   SEAN AND HIS TEAM OVER AT YAHOO WANTED TO EFFECTIVELY

22      PRESENT SOMETHING THEY HAD FOUND WITHIN THEIR PLATFORM

23      INVOLVING PAYMENTS OVER XOOM AND THE USE OF WEBCAMS THAT WERE

24      BASICALLY, YOU KNOW, SHOWING ACTUAL, ACTUAL ABUSE OF

25      CHILDREN --

SCHELBLE DIRECT BY MS. HARRIS                                    383

1      Q.    DID --

2      A.    -- THAT WAS OCCURRING, THEY THOUGHT, IN THE PHILIPPINES.

3      Q.    OKAY.  WAS IT YOUR UNDERSTANDING THAT THAT MATERIAL HAD

4      BEEN PROVIDED TO NCMEC IN SOME WAY?

5      A.    YEAH, YEAH.  HE HAD INDICATED THAT, THAT THERE WERE

6      NUMEROUS CYBERTIPLINE REPORTS THAT WERE SENT.  I THINK, FROM

7      YAHOO'S PERSPECTIVE, THEY THOUGHT THEY WERE RELATED.

8      Q.    NOW, AT THE MEETING -- SO WERE YOU PRESENT AT THE MEETING?

9      A.    YES.

10     Q.    AND WHO ELSE WAS THERE?

11     A.    A COLLEAGUE OF MINE FROM THE DEPARTMENT OF HOMELAND

12     SECURITY, HSI, NEIL O'CALLAGHAN, AND I BELIEVE I HAD ONE OF MY

13     ANALYSTS ATTEND AS WELL.

14          AND IF I RECALL CORRECTLY, I THINK SEAN HAD SOMEBODY THERE

15     AS WELL.  THERE WERE AT LEAST PROBABLY TWO MEETINGS, AND I'M

16     NOT SURE IF HIS COLLEAGUE CAME TO THE FIRST ONE OR THE SECOND

17     ONE.

18     Q.    OKAY.  AND WHAT WAS DISCUSSED AT THE MEETING?

19     A.    IN FAIRLY GENERAL TERMS, SEAN HAD SORT OF TALKED ABOUT

20     WHAT THEY, WHAT THEY WERE SEEING ON THEIR PLATFORM IN TERMS OF

21     WEBCAM ABUSE OF CHILDREN, THE CHILDREN THEY THOUGHT WERE IN THE

22     PHILIPPINES; PAYMENT WAS BEING TRANSFERRED OVER, OVER XOOM; AND

23     I THINK THEY WERE CURIOUS IF THIS WAS SOMETHING THAT WAS --

24     THAT WOULD BE OF INTEREST TO THE FEDERAL PARTNERS BECAUSE,

25     AGAIN, IN THIS CASE THERE WERE, YOU KNOW, DIFFERENT POSSIBLE

SCHELBLE DIRECT BY MS. HARRIS

1    VENUES FOR INVESTIGATION.

2    Q.   I SEE.  NOW, DID THE FBI OR DHS -- BASED ON YOUR PRESENCE

3    AT THE MEETING, DID THE FBI OR DHS REQUEST THAT YAHOO CONDUCT

4    ANY FOLLOW-UP INVESTIGATIONS BASED ON THE INFORMATION THAT IT

5    HAD SHARED IN THE CYBERTIPS?

6    A.   NO.

7    Q.   DID YAHOO OFFER TO DO ANY FOLLOW-UP INVESTIGATION ON THE

8    USERS THAT IT REPORTED IN THE CYBERTIPS?

9    A.   NO.  I THINK THEY -- AT ONE MEETING THEY HAD INDICATED

10   THAT THEY WOULD BE -- THAT WHAT WAS GOING TO BE FILED WAS A

11   SUPPLEMENTAL REPORT, AND SOMETIMES AN ISP WOULD FILE A

12   CYBERTIPLINE REPORT AND THEN THEY WOULD LATER FOLLOW UP WITH A

13   SUPPLEMENTAL REPORT WHICH JUST INCLUDED ADDITIONAL INFORMATION

14   THAT THEY HAD DONE.

15        BUT GENERALLY SPEAKING, IF YAHOO WAS GOING TO -- YAHOO WAS

16   GOING TO DO WHATEVER THEIR OWN INTERNAL POLICIES HAD THEM DO.

17   Q.   UM-HUM.  DID YOU COLLECT ANY EVIDENCE AT THAT MEETING THAT

18   WAS NOT ALREADY PROVIDED TO NCMEC?

19   A.   NO.  THIS WAS A, SORT OF A LIAISON MEETING TO TALK ABOUT

20   SOMETHING THEY WERE SEEING, TO MAKE US AWARE OF A POTENTIAL

21   CRIME THEY WERE SEEING WITHIN THEIR PLATFORMS.

22   Q.   DID YOU OR AGENT O'CALLAGHAN EVER ASK FOR OR RECEIVE ANY

23   NON-PUBLIC INFORMATION FROM YAHOO WITHOUT FIRST PROVIDING LEGAL

24   PROCESS?

25   A.   NO.

1    Q.   WHAT DID YOU AND AGENT O'CALLAGHAN DO IN RESPONSE TO THE

2    INFORMATION RECEIVED AT THIS MEETING?

3    A.   WE SORT OF -- WE TALKED IT OVER, TRIED TO COME UP WITH A

4    GAME PLAN IN TERMS OF WHO WOULD BE IN THE BEST POSITION TO

5    HANDLE A CASE OF THIS SORT OF POTENTIAL MAGNITUDE WHERE WE

6    HAD -- IT WOULD HAVE REQUIRED LIAISONS AND A PRESENCE IN THE

7    PHILIPPINES, AS WELL AS A FAIRLY RESOURCE INTENSIVE OPERATION.

8         YOU KNOW, I THINK WE HAD COME TO THE CONCLUSION THAT WE

9    SHOULD -- WE WOULD BRIEF IT UP OUR RESPECTIVE CHAINS OF

10   COMMANDS, NEIL AT HSI, AND I WOULD GO TO MY CHAIN OF COMMAND TO

11   GET AN IDEA OF WHAT THEY WANTED.

12        BUT WE THOUGHT THERE WAS POTENTIALLY A GOOD CASE AND IT

13   WOULD BE WORTHY OF THE AGENCY'S RESOURCES.

14   Q.   OKAY.

15             THE COURT:  I'M SORRY.  IT'S 2:40 NOW.  LET'S GO

16   AHEAD AND TAKE A TEN MINUTE BREAK.  WE'LL TAKE ANOTHER BREAK AT

17   3:30 --

18             MS. HARRIS:  SURE.

19             THE COURT:  -- WHICH WILL ALSO LAST TEN MINUTES.

20   YOU MAY STEP DOWN DURING THE BREAK.

21             THE WITNESS:  THANK YOU, YOUR HONOR.

22             THE COURT:  OKAY.

23        (RECESS FROM 2:41 P.M. UNTIL 2:52 P.M.)

24             THE COURT:  OKAY.  WOULD YOU PLEASE RETAKE THE STAND?

25             THE WITNESS:  YES, YOUR HONOR.

1          THE COURT:  GO AHEAD, PLEASE.

2          MS. HARRIS:  THANK YOU.

3     Q.   SO BEFORE THE BREAK, WE WERE DISCUSSING AN OCTOBER 6TH,

4     2014 MEETING --

5     A.   YES.

6     Q.   -- BETWEEN YOURSELF AND MR. ZADIG OF YAHOO AND OTHER

7     AGENTS AND ANALYSTS AT FBI.

8     A.   UM-HUM.

9     Q.   OKAY.  SO WAS THIS MEETING DOCUMENTED IN A 302 REPORT?

10    A.   NO.

11    Q.   AND WHY NOT?

12    A.   WELL, ONE, IT WASN'T TESTIMONY THAT WAS TAKEN.  NO

13    EVIDENCE WAS TAKEN.  THIS WAS A, SORT OF A LIAISON MEETING.

14    YAHOO WANTED TO TALK WITH HSI AND THE FBI.  THAT WAS THE EXTENT

15    OF IT.

16    Q.   NOW, IN PARAGRAPH 9 OF YOUR DECLARATION, YOU DESCRIBED

17    SOME COMMUNICATIONS THAT YOU FOUND WITH MR. ZADIG; IS THAT

18    CORRECT?

19    A.   YES.

20    Q.   AND HOW WAS IT THAT YOU CAME ABOUT THOSE COMMUNICATIONS?

21    A.   I RECEIVED A REQUEST TO SEARCH FOR ANY E-MAILS INVOLVING

22    THIS INVESTIGATION, AND SO I DID A SEARCH OF MY E-MAIL ACCOUNT

23    AND FOUND THE E-MAILS AND PROVIDED THEM.

24    Q.   OKAY.  WAS THAT REQUEST FROM ME?

25    A.   I DON'T KNOW IF IT WAS DIRECTLY FROM YOU, BUT IT WAS

1     CERTAINLY -- YEAH, THROUGH YOU.  I CAN'T RECALL IF IT CAME FROM

2     YOU DIRECTLY OR FROM ONE OF THE AGENTS.

3     Q.   THANKS.

4          MAY I APPROACH, YOUR HONOR?

5              THE COURT:  GO AHEAD, PLEASE.

6     BY MS. HARRIS:

7     Q.   THIS IS DEFENSE EXHIBIT YY THAT'S BEEN FILED IN THIS

8     LITIGATION (HANDING).

9     A.   OKAY.

10    Q.   CAN YOU JUST TAKE A QUICK FLIP THROUGH THAT?

11    A.   SURE.

12         (PAUSE IN PROCEEDINGS.)

13             THE WITNESS:  OKAY.

14    BY MS. HARRIS:

15    Q.   SO, AGAIN, IN PARAGRAPH 9, YOU SAID THAT YOU LOCATED SOME

16    E-MAIL STRINGS IN RESPONSE TO A DISCOVERY REQUEST?

17    A.   YES.

18    Q.   ARE THOSE THE E-MAIL STRINGS THAT YOU LOCATED AND

19    PROVIDED?

20    A.   YES.  I DON'T BELIEVE I'M ON ALL OF THESE, BUT YES.

21    Q.   OKAY.  AND DID YOU DESCRIBE THE SUBSTANCE OF THOSE E-MAILS

22    THAT YOU LOCATED IN PARAGRAPH 9 OF YOUR DECLARATION?

23    A.   YEAH.  YES, I DID.

24    Q.   OKAY.  I'M NOT GOING TO GO THROUGH THEM AGAIN.

25         NOW, AT ANY TIME DID YOU OFFER ANY PAYMENTS TO MR. ZADIG

1    IN EXCHANGE FOR ECIT'S OR YAHOO'S REFERRALS TO NCMEC?

2    A.   PAYMENT?  ABSOLUTELY NOT.

3    Q.   DID YOU OFFER ANY REWARDS TO MR. ZADIG OR YAHOO IN

4    EXCHANGE FOR ECIT'S REFERRALS TO NCMEC?

5    A.   NO, I DID NOT.

6    Q.   DID YOU OFFER ANY SPECIAL PRIVILEGES OR ACCESS TO

7    MR. ZADIG OR ANYONE AT YAHOO FOR ECIT'S REFERRALS TO NCMEC?

8    A.   NO, I DID NOT.

9    Q.   IN PARAGRAPH 10 IN YOUR DECLARATION, YOU DISCUSSED

10   NEGATIVE IMPACTS TO A CASE IF A COURT WERE TO FIND THAT NCMEC

11   OR AN ISP WERE ACTING AS A GOVERNMENT AGENT; IS THAT CORRECT?

12   A.   YES.

13   Q.   WHAT -- CAN YOU EXPLAIN WHAT PROMPTED -- WHAT NEGATIVE

14   IMPACTS ARE YOU REFERRING TO?

15   A.   WELL --

16        MR. ARCHER:  OBJECTION, RELEVANCE.

17        THE COURT:  OVERRULED.

18   GO AHEAD.  YOU MAY ANSWER.

19        THE WITNESS:  THANK YOU.

20        SO BASICALLY ABOUT A YEAR BEFORE -- THE PREVIOUS YEAR,

21   DURING MY TIME AT NCMEC, THERE WAS A CASE ROLLING OUT OF THE

22   DISTRICT OF MASSACHUSETTS WHICH WAS REFERRED TO AS THE KEITH

23   DECISION.  THAT CASE PERTAINED TO A DISTRIBUTION OF CHILD

24   PORNOGRAPHY INVESTIGATION IN WHICH I BELIEVE IT WAS AOL HAD

25   SUBMITTED A REPORT TO THE CYBERTIPLINE, TO NCMEC, AND

1    EFFECTIVELY, IN A MOTIONS HEARING, THE COURT FOUND THAT NCMEC

2    AND AOL HAD EFFECTIVELY ACTED AS AGENTS OF THE GOVERNMENT,

3    RESULTING ULTIMATELY IN THE SUPPRESSION OF EVERYTHING THAT

4    DERIVED FROM THAT, WHICH WAS A SEARCH OF MR. KEITH'S RESIDENCE

5    AND THE -- YOU KNOW, THE DISCOVERY OF CHILD PORNOGRAPHY.

6          SO IT COMPROMISED THE CASE.  SO THAT WAS OBVIOUSLY, YOU

7    KNOW, A SIGNIFICANT RESULT.  IT CHANGED THE WAY NCMEC CONDUCTED

8    THEIR INTERNAL PROCESSES.

9          AND IT WAS CERTAINLY SOMETHING THAT WE WERE -- THAT WE

10   MADE SURE, WITHIN THE FBI, THAT WE WERE NOT GOING TO -- WE WERE

11   NOT GOING TO CREATE AN ENVIRONMENT OR A SITUATION WHICH COULD

12   BE CONSTRUED AS A THIRD PARTY WAS ACTING AS AN AGENT OF THE

13   GOVERNMENT.

14   BY MS. HARRIS:

15   Q.   WHAT --

16          THE COURT:  HAVE YOU ALL PROVIDED THAT CASE?

17          MS. HARRIS:  THE GOVERNMENT DIDN'T CITE IT IN ITS

18   RULINGS, YOUR HONOR -- IN ITS PLEADINGS, YOUR HONOR.

19          MR. ARCHER:  KEITH HAS PREVIOUSLY BEEN CITED, BUT I

20   CAN -- I CAN FIND -- KEITH HAS BEEN CITED IN A NUMBER OF THE

21   DEFENSE BRIEFS.

22          THE COURT:  OKAY.

23   BY MS. HARRIS:

24   Q.   AND WHAT ACTIONS DID THE FBI TAKE IN RESPONSE TO THE

25   RULING?

1        A.   WELL, ONE OF THE PRIMARY ACTIONS THAT THE FBI TOOK -- AND

2    I THINK I SPOKE OF IT EARLIER -- WAS UNDERSTANDING THE

3    PROCESSES THAT WERE CONDUCTED BY A PLATFORM.

4        FOR EXAMPLE, SOME COMPANIES WILL USE TECHNOLOGY, WHETHER

5    IT'S PHOTO DNA OR AN ALGORITHM THAT WE WOULD REFER TO AS A

6    HASH, TO EFFECTIVELY DIGITALLY SCRUB THEIR PLATFORM FOR CONTENT

7    THAT WOULD BE CHILD PORNOGRAPHY.  BASICALLY IT'S SORT OF LIKE A

8    DNA OF A DIGITAL FILE.

9        ONE OF THE ELEMENTS THAT CAME FROM THE KEITH RULING WAS

10   THAT, YOU KNOW, A PHOTO DNA TECHNOLOGY THAT INDICATED THE

11   PRESENCE OF CHILD -- OF SUSPECTED CHILD PORNOGRAPHY WAS

12   ULTIMATELY DEEMED TO BE SORT OF INSUFFICIENT COMPARED TO AN

13   ACTUAL PERSON OPENING A FILE AND LOOKING AT THAT PHOTOGRAPH AND

14   VISUALLY SEEING WHAT THE PHOTOGRAPH WAS VERSUS JUST A HASH

15   MATCH.

16       SO ONE OF THE THINGS WE WANTED TO ENSURE FROM THE FBI'S

17   PERSPECTIVE WAS WHAT EXACTLY DID A COMPANY DO?

18       SO IF IT WAS UNCLEAR BASED ON THE INFORMATION PROVIDED IN

19   THAT CYBERTIPLINE REPORT, THEN THERE WOULD BE TIMES THAT WE

20   WOULD REACH OUT TO THE COMPANY AND ASK, "WHAT EXACTLY WAS YOUR

21   POLICY?  WHEN YOU CITE THESE THREE IMAGES ON THE CYBERTIPLINE

22   REPORT AS BEING SUSPECTED CHILD PORNOGRAPHY, IS THIS BASED ON A

23   HASH MATCH OR DID AN EMPLOYEE WITH THE COMPANY SPECIFICALLY

24   OPEN UP THESE FILES AND LOOK AT THEM TO SEE WHAT THEY ACTUALLY

25   CONTAINED?"

1    Q.   AND WHY DID YOU ASK FOR THAT INFORMATION?

2    A.   AGAIN, EFFECTIVELY JUST TO UNDERSTAND WHAT EXACTLY DID

3    THIS PRIVATE PARTY DO?

4         BECAUSE WE WANTED TO ENSURE THAT, AS THE GOVERNMENT, WE

5    WERE NOT GOING TO FURTHER A SEARCH BEYOND WHAT WAS ALREADY DONE

6    BY THAT PRIVATE PARTY TO RISK ANY SORT OF VIOLATION OF FOURTH

7    AMENDMENT RIGHTS.

8    Q.   SO IS IT FAIR TO SAY THAT THAT CHANGE, THAT POLICY CHANGE,

9    WAS DONE TO COMPLY WITH THE RULING?

10   A.   YEAH.  WE WANTED TO MAKE -- THE FBI WANTED TO ENSURE THAT

11   OUR PROCESSES WERE IN TACT.  I THINK THE FBI WAS ALWAYS OF THE,

12   YOU KNOW, THE PROCEDURE THAT WE WERE NOT GOING TO VIOLATE,

13   INTENTIONALLY VIOLATE THE FOURTH AMENDMENT RIGHTS.

14        BUT THE RULING CERTAINLY AFFECTED NCMEC'S INTERNAL

15   POLICIES AND PRACTICES.

16   Q.   UM-HUM.

17   A.   BUT HAVING BEEN THERE AT THE TIME THAT THIS RULING CAME

18   DOWN, IT WAS -- YOU KNOW, IT WAS -- IT WAS EVIDENT THAT THERE

19   WAS A REAL SORT OF PROACTIVE EFFORT TO ENSURE THAT WHAT WAS

20   BEING DONE WOULD NOT RESULT IN ADVERSE RULINGS SUCH AS WHAT

21   HAPPENED IN THE KEITH DECISION.

22   Q.   TO COMPLY WITH THE COURT'S INTERPRETATION OF THE FOURTH

23   AMENDMENT?

24   A.   CORRECT.

25   Q.   DID YOU EVER INSTRUCT AN ISP TO FILE A REPORT IF THERE WAS

1    NO INDICATION THAT IMAGES SUBMITTED WITH THE REPORT HAD BEEN

2    VIEWED BY COMPANY EMPLOYEES?

3    A.   NO.

4    Q.   DID YOU EVER REQUEST ADDITIONAL INFORMATION OR

5    INVESTIGATION IF IT WASN'T CLEAR WHETHER THE IMAGES HAD BEEN

6    VIEWED BY THE COMPANY?

7    A.   NO.  MY ONLY CONTACTS WOULD BE JUST CLARIFICATION ON WHAT

8    WAS ALREADY DONE.

9    Q.   OKAY.  FINALLY, MY QUESTIONS TODAY, HAVE THEY COVERED

10   EVERY DETAIL THAT YOU KNOW ABOUT THIS CASE AND THE

11   INVESTIGATION?

12   A.   NO.

13   Q.   HAVE YOU MERELY ANSWERED THE QUESTIONS THAT I'VE ASKED

14   YOU?

15   A.   YES.

16   Q.   WHEN YOU TESTIFIED ABOUT CONVERSATIONS YOU HAD WITH OTHERS

17   OR DOCUMENTS YOU REVIEWED, DID YOU TESTIFY TO THE EXACT WORDS

18   USED, OR JUST TO THE SUBSTANCE OF THE CONVERSATIONS AND

19   DOCUMENTS?

20   A.   JUST TO THE SUBSTANCE OF THE CONVERSATION AND DOCUMENTS.

21        MS. HARRIS:  DOES THE COURT HAVE ANY FURTHER

22   QUESTIONS FOR AGENT SCHELBLE?

23        THE COURT:  NO.

24        MS. HARRIS:  THANK YOU.  THAT'S IT.

25        THE COURT:  AND THE NAME IS SCHELBLE,

1        S-C-H-E-L-B-L-E, BUT THE LAST L IS SILENT?

2                THE WITNESS:  THAT'S CORRECT.

3                THE COURT:  ALL RIGHT.

4            GO AHEAD, PLEASE, WITH ANY CROSS.

5                MR. ARCHER:  THANK YOU, YOUR HONOR.

6                         **CROSS-EXAMINATION**

7        BY MR. ARCHER:

8        Q.   AGENT SCHELBLE, IF I COULD ASK, WHEN YOU WERE EMBEDDED

9        WITH NCMEC, HOW MANY OTHER AGENCIES ALSO HAD AGENTS EMBEDDED

10       WITH NCMEC?

11       A.   LET'S SEE.  THE UNITED STATES MARSHAL'S SERVICE; DHS; HSI;

12       THE UNITED STATES SECRET SERVICE; THE UNITED STATES POSTAL

13       INSPECTOR SERVICE; AND THEN AT TIMES, ALTHOUGH THERE WERE

14       PERIODS WHERE THERE WAS NOT A PRESENCE FROM THAT ENTITY, THERE

15       WAS A LIAISON FROM ONE OF THE INVESTIGATORY AGENCIES OF THE

16       DEPARTMENT OF DEFENSE.  SOMETIMES IT WAS DCIS, OTHER TIMES IT

17       WAS NCIS.

18            BUT, YEAH, THAT SHOULD BE THE EXTENT.

19       Q.   OKAY.  AND IN YOUR ESTIMATE, ON AVERAGE, HOW MANY LAW

20       ENFORCEMENT OFFICERS WERE STATIONED AT NCMEC WHILE YOU WERE

21       THERE ON ANY GIVEN DAY?

22       A.   SWORN?

23       Q.   OR I GUESS I COULD EXPAND IT -- THAT'S A GOOD QUESTION.

24            SO DID YOU -- WHEN YOU WERE THERE, DID YOU HAVE -- YOU

25       MENTIONED AN ANALYST BEFORE.  HOW MANY PEOPLE WERE ON THE FBI

1       TEAM LOCATED AT NCMEC WHEN YOU WERE THERE?

2       A.   WITHIN THE FBI TEAM, THERE WERE TWO AGENTS; AND IN TERMS

3       OF PROFESSIONAL SUPPORT TEAM, OR ANALYSTS, WITH A SLIGHT

4       FLUCTUATION, FOUR.  SO A TOTAL FOOTPRINT OF SIX --

5       Q.   OKAY.

6       A.   -- WOULD HAVE BEEN THE TYPICAL AVERAGE.

7       Q.   FOR THE FBI.  AND WAS IT SIMILAR FOR THE OTHER AGENCIES OR

8       WAS IT --

9       A.   NO.  THE FBI'S PRESENCE WAS PROBABLY THE LARGEST, AND I

10      THINK THAT'S JUST PROBABLY BASED ON THE AMOUNT OF CASE LOAD.

11           DHS, HSI, FOR THE MOST PART, HAD ONE, SOMETIMES THERE MAY

12      HAVE BEEN TWO; PERHAPS TWO WITH UNITED STATES POSTAL INSPECTOR

13      SERVICE; AND THEN ONE WITH THE U.S. MARSHAL'S SERVICE; ONE WITH

14      THE UNITED STATES SECRET SERVICE.

15      Q.   OKAY.

16      A.   AND THEN ONE OF THE DOD REPS.

17      Q.   OKAY.  AND YOU MENTIONED YOU WERE THERE WHEN THE KEITH

18      DECISION CAME DOWN?

19      A.   YES.

20      Q.   SO IT SOUNDS LIKE THAT WAS A TOPIC OF HOT DISCUSSION AT

21      THE TIME.

22      A.   YEAH.  IT -- IT ABSOLUTELY -- AT LEAST WITHIN THE CONTEXT

23      OF THE CYBERTIPLINE FUNCTION OF THE NATIONAL CENTER, YEAH.

24      Q.   SO ULTIMATELY THERE WAS A CHANGE TO THE, THE TIP LINE

25      FORMAT?

1    A.   YES.  YES, THAT'S CORRECT.

2    Q.   ALL RIGHT.  SO THAT WAS THE FILE REVIEW BOX WAS ADDED AT

3    THAT POINT?

4    A.   YEAH.  THE FILE REVIEW BOX WAS ADDED.

5         I BELIEVE INTERNALLY THE NATIONAL CENTER CHANGED THEIR

6    PROCESSES.  I WAS NOT PART OF THE DISCUSSIONS THE NATIONAL

7    CENTER HAD INTERNALLY, BUT I WAS LATER BRIEFED UPON IN TERMS OF

8    HOW THE CYBERTIPLINE WAS NOW DIFFERENT AND WHAT IT WOULD LOOK

9    LIKE TO ISP'S AND WHAT KIND OF INFORMATION WE WOULD NOW SEE ON

10   OUR END.

11   Q.   AND YOU UNDERSTOOD FROM THOSE CONVERSATIONS THAT THE

12   REASON FOR THE CHANGE WAS BECAUSE OF THE KEITH DECISION; IS

13   THAT CORRECT?

14   A.   THAT IS CORRECT.

15   Q.   OKAY.  SO YOU MENTIONED THAT THERE WAS NO 302 OF THE

16   OCTOBER 2014 MEETING.  DID YAHOO PRESENT DOCUMENTS AT THAT

17   MEETING?  FOR INSTANCE, AN ORGANIZATIONAL CHART OF THE TARGETS

18   IN THEIR INVESTIGATION?

19   A.   YEAH, I BELIEVE THEY HAD -- THEY HAD COME UP WITH A, LIKE

20   A LINK CHART TO SORT OF SHOW -- TO SORT OF DEMONSTRATE WHY THEY

21   THOUGHT THINGS WERE RELATED.

22   Q.   OKAY.  AND SO DID THEY DISCUSS -- I MEAN --

23            THE COURT:  CAN I ASK YOU, CAN YOU CLARIFY WHETHER

24   THAT'S THE FALL OF 2014 MEETING?  THE DECEMBER 2016 -- 2014

25   MEETING?

```
 1              MR. ARCHER:  YOUR HONOR, I THINK MY -- MY QUESTION

 2    WAS AS TO THE OCTOBER --

 3              THE COURT:  OCTOBER 2014 MEETING?

 4              MR. ARCHER:  YES.

 5              THE COURT:  SO I JUST WANTED TO CLARIFICATION AS TO

 6    WHICH MEETING AT THE END OF 2014 WE'RE TALKING ABOUT.

 7              THE WITNESS:  YEAH, THAT'S A GOOD QUESTION.

 8    BY MR. ARCHER:

 9    Q.   DID YOU -- I GUESS --

10    A.   I'M NOT SURE I CAN RECALL IF IT WAS THE OCTOBER MEETING OR

11    THE DECEMBER MEETING.

12         BUT I DO RECALL IN AT LEAST ONE OF THOSE MEETINGS WHERE

13    THEY HAD PRINTED UP SORT OF A CHART TO SORT OF SHOW HOW THE

14    WHOLE -- HOW WHAT THEY SAW WAS SORT OF LINKED TOGETHER BETWEEN

15    A USER, A WEBCAM, AND XOOM TO SORT OF SHOW WHAT THEY BELIEVED

16    THEY WERE SEEING --

17    Q.   OKAY.

18    A.   -- AND HOW IT RELATED.

19    Q.   AND SO THEY -- THEY FLEW ACROSS COUNTRY, AND PRESUMABLY

20    THE FOLKS AT YAHOO HAD AN OPPORTUNITY TO EXPLAIN THE CONTENTS

21    OF THE CHART AND HOW THEY RELATED IT TO THEIR INVESTIGATION.

22         DO YOU RECALL THAT OCCURRING AT THE MEETING?

23    A.   YEAH.  WHETHER THEY CAME FROM CALIFORNIA HERE OR WHETHER

24    THEY WERE ALREADY ON THE EAST COAST, I DON'T KNOW.  BUT YES.

25    Q.   OKAY.  BUT THEY CAME IN PERSON AND EXPLAINED --
```

1    A.   YES, THAT'S CORRECT.

2    Q.   GOT IT.  SO THEY WEREN'T READING -- WERE THEY READING

3    VERBATIM OFF OF THE CHART, OR WERE THEY EXPLAINING IT AND SORT

4    OF GIVING YOU THEIR PERSPECTIVE ON HOW THESE FIT INTO THE

5    INVESTIGATION?

6    A.   I WOULD SAY THE LATTER, THEY WERE GIVING THEIR PERSPECTIVE

7    ON WHAT THEY BELIEVED THEY SAW.

8    Q.   OKAY.  AND WAS IT YOUR UNDERSTANDING THAT SOME OF THE

9    PEOPLE ON THE CHART, OR SOME OF THE ACCOUNTS ON THE CHART AT

10   THAT POINT IN, LET'S JUST SAY, DECEMBER OF 2014, THAT SOME OF

11   THOSE HAD CYBERTIPS SUBMITTED AND SOME OF THEM DID NOT?

12   A.   YEAH.  I BELIEVE SEAN HAD -- HE HAD PROVIDED ME A LIST, OR

13   HE SENT ME A LIST OF APPROXIMATELY 65 CYBERTIPS.  THEY WOULD

14   HAVE HAD A NUMBER, LIKE A SEVEN DIGIT NUMBER, OF CYBERTIPLINE

15   REPORTS THAT HE FELT WERE RELATED TO WHAT THEY WERE SEEING.

16   Q.   OKAY.  BUT THE -- SO ABOUT 65 CYBERTIPS?

17   A.   THAT SOUNDS ABOUT RIGHT.

18   Q.   OKAY.  AND THEN THE OVERALL NUMBERS PRESENTED IN DECEMBER

19   OF 2014 WERE IN THE HUNDREDS FOR EACH OF THE SELLER AND BUYER

20   CATEGORIES?  DO YOU RECALL?

21   A.   THAT I DON'T RECALL.  I RECALL THE INITIAL -- THE INITIAL

22   65.

23   Q.   UM-HUM.

24   A.   AND THAT WAS PRIMARILY BECAUSE I HAD A FUNCTION AT THAT

25   POINT, ALONG WITH HSI, TO SORT OF ASCERTAIN WHERE THOSE 65

1    WERE, BECAUSE IF IT WAS GOING TO BE SORT OF A JOINT

2    COLLABORATION, WE WANTED TO MAKE SURE THAT ONE OF THOSE HADN'T

3    ALREADY BEEN SENT OUT TO A STATE ICAC OR PERHAPS PUT ON THE VPN

4    TO INTERNATIONAL PARTNERS.  WE WANTED TO MAKE SURE, FROM A

5    DECONFLICTION PERSPECTIVE, THAT WE HAD THOSE 65 ACCOUNTED FOR.

6    Q.   OKAY.  BUT THE -- THE REPORT IN DECEMBER, THE SUPPLEMENTAL

7    REPORT THAT WAS SUBMITTED IN DECEMBER, DID YOU HAVE AN

8    OPPORTUNITY TO REVIEW THAT PRIOR TO THE MEETING?  OR DID YOU

9    JUST GO OVER IT AT THE MEETING?

10   A.   IT JUST WOULD HAVE BEEN PROBABLY AT THE MEETING, BECAUSE

11   AT THAT LATER -- AT THAT LATER -- AT THAT SUBSEQUENT MEETING,

12   BY THAT POINT WE WOULD HAVE DETERMINED THAT, AT LEAST ON THE

13   FBI SIDE, WHO WOULD HAVE BEEN THE INVESTIGATIVE COMPONENT.  SO

14   I BELIEVE AT THAT POINT WE HAD BROUGHT IN THE ACTUAL --

15   SOMEBODY FROM THAT TEAM.

16   Q.   WAS THAT JEFF YESENSKY?

17   A.   YES.

18   Q.   OKAY.  GOT IT.  AND SO JUST TO CLARIFY FOR THE RECORD,

19   WHEN YOU'RE SAYING THE LATER SUBSEQUENT MEETING, ARE WE TALKING

20   ABOUT DECEMBER 2014?

21   A.   YES, I BELIEVE SO.

22   Q.   OKAY.  SO THE FIRST MEETING -- DID YOU ATTEND BOTH THE

23   OCTOBER 2014 AND THE DECEMBER 2014 MEETINGS?

24   A.   YES.

25   Q.   OKAY.

1      A.   AND THERE WAS A THIRD MEETING THAT I WAS NOT AT.

2      Q.   OKAY.  AND THERE ARE -- I GUESS WHAT I'M GETTING AT IS THE

3      DOCUMENTS THAT THEY PRESENTED, THAT YAHOO PRESENTED TO YOU THAT

4      INDICATED THAT THEY HAD IDENTIFIED -- DO YOU RECALL A

5      DISTINCTION BETWEEN BUYER ACCOUNTS AND SELLER ACCOUNTS IN TERMS

6      OF THE WEBCAM?

7      A.   I RECALL THEM, YEAH, TALKING ABOUT BUYER ACCOUNTS AND

8      SELLER ACCOUNTS.

9      Q.   OKAY.  AND THE NUMBERS FOR THE BUYER ACCOUNTS WERE -- AND

10     I'M NOT -- I'M CERTAINLY NOT ASKING YOU TODAY TO REMEMBER THE

11     EXACT NUMBERS, BUT SOMEWHERE SIGNIFICANTLY NORTH OF 65?  THE

12     300 RANGE-ISH?

13     A.   YEAH, I DON'T RECALL.

14     Q.   OKAY.

15     A.   THAT DOESN'T SOUND LIKE THAT WOULD BE OUTSIDE THE LINES,

16     BUT I DON'T RECALL SPECIFICALLY.

17     Q.   OKAY.  I GUESS THEN -- BUT DO YOU RECALL THAT THERE WERE

18     SOME ACCOUNTS THAT WERE PRESENTED IN THE MATERIALS FOR WHICH

19     THERE HAD NOT YET BEEN CYBERTIPS SUBMITTED?

20     A.   I MEAN, I COULDN'T SAY.  I COULDN'T SAY FOR CERTAIN.

21     Q.   OKAY.

22     A.   AT THIS POINT -- I MEAN, I DID NOT KNOW EVERY USER NAME

23     AND HANDLE WITHIN THE 65.  I WANTED TO MAKE SURE THAT THE 65

24     CYBERTIPLINE REPORTS WEREN'T SENT SOMEWHERE ELSE.  I DID NOT

25     PERSONALLY LOOK AT ALL 65 ACCOUNTS, SO I COULDN'T SAY IN TERMS

```
 1        OF DID THEY DEPICT A USER NAME OR HANDLE THAT WAS DIFFERENT

 2        FROM WHAT WAS BEING DISCUSSED IN THE MEETING.

 3                   MR. ARCHER:  OKAY.  NO FURTHER QUESTIONS.

 4              THANK YOU.

 5                   THE COURT:  ALL RIGHT.

 6              ANY REDIRECT?

 7                   MS. HARRIS:  NO, YOUR HONOR.

 8                   THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

 9        SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

10                   MS. HARRIS:  I DON'T HAVE ANY FURTHER QUESTIONS FOR

11        THE WITNESS, YOUR HONOR.

12                   MR. ARCHER:  YES, YOUR HONOR, NOT SUBJECT TO RECALL.

13                   THE COURT:  OKAY.  THEN YOU'VE COMPLETED YOUR

14        TESTIMONY AND YOU'RE FREE TO LEAVE.

15              ARE YOU GOING TO CALL ANOTHER WITNESS?

16                   MS. HARRIS:  JUST ONE MORE, AGENT MARCEAU.

17                   THE COURT:  ALL RIGHT.

18                   MS. HARRIS:  THE UNITED STATES CALLS SPECIAL AGENT

19        CHRIS MARCEAU.

20                   THE COURT:  ALL RIGHT.

21                   THE CLERK:  GOOD AFTERNOON, SIR.

22                   THE WITNESS:  GOOD AFTERNOON.

23              (GOVERNMENT'S WITNESS, CHRIS MARCEAU, WAS SWORN.)

24                   THE WITNESS:  I DO.

25                   THE CLERK:  THANK YOU.
```

1          PLEASE HAVE A SEAT AND STATE AND SPELL YOUR FULL NAME.

2              THE WITNESS:  SPECIAL AGENT CHRIS MARCEAU, LAST NAME

3     M-A-R-C-E-A-U.

4                         **DIRECT EXAMINATION**

5     BY MS. HARRIS:

6     Q.   SPECIAL AGENT MARCEAU, ARE YOU EMPLOYED?

7     A.   YES.

8     Q.   WHERE?

9     A.   THE FBI.

10    Q.   IN WHAT CAPACITY?

11    A.   I'M A SUPERVISORY SPECIAL AGENT AT CYBER VISION.

12             THE COURT:  CAN YOU ADJUST THE MICROPHONE, PLEASE.

13    THANK YOU.

14             THE WITNESS:  IS THAT -- HOW'S THAT?

15    BY MS. HARRIS:

16    Q.   HOW LONG HAVE YOU HELD THAT POSITION AS A SUPERVISORY

17    SPECIAL AGENT?

18    A.   FOR A YEAR AND A HALF.

19    Q.   HAVE YOU HAD ANY OTHER POSITIONS WITH THE FBI?

20    A.   I'VE BEEN A SPECIAL AGENT FOR THE FBI SINCE 2008.

21    Q.   AND IS THAT WHEN YOU STARTED WORKING FOR THE FBI?

22    A.   YES.

23    Q.   CAN YOU BRIEFLY EXPLAIN YOUR EDUCATIONAL BACKGROUND,

24    TRAINING, AND EXPERIENCE?

25    A.   I WAS IN THE U.S. ARMY UNTIL 2008, BACHELOR'S DEGREE IN

1    MECHANICAL ENGINEERING, AND A MASTER'S DEGREE IN BUSINESS

2    ADMINISTRATION.

3    Q.   AT SOME POINT WERE YOU ASSIGNED TO A UNIT INVESTIGATING

4    VIOLENT CRIMES AGAINST CHILDREN?

5    A.   YES.

6    Q.   WHICH UNIT WAS THAT?

7    A.   THAT WAS C15 OUT OF THE SAN JOSE.  IT'S A SQUAD IN THE

8    SAN JOSE RESIDENT AGENCY OF THE SAN FRANCISCO FIELD OFFICE.

9    Q.   DID YOU RECEIVE ANY SPECIALIZED TRAINING RELATING TO YOUR

10   WORK ON CRIMES AGAINST CHILDREN?

11   A.   DOZENS.

12   Q.   OKAY.  WHAT'S THAT?

13   A.   INVESTIGATIVE MEANS, INTERVIEWING TECHNIQUES FOR BOTH

14   ADOLESCENTS AND ADULTS, INTERROGATION TECHNIQUES, FORENSICS,

15   HUMAN TRAFFICKING, CHILD EXPLOITATION, RECOVERY OF VICTIMS, HOW

16   TO PROCESS RAPE CASES, ET CETERA.

17   Q.   APPROXIMATELY HOW MANY CASES HAVE YOU INVESTIGATED

18   INVOLVING CRIMES AGAINST CHILDREN?

19   A.   HUNDREDS.

20   Q.   ARE YOU FAMILIAR WITH THE INDICTMENT FILED AGAINST

21   JOHNNY RAY WOLFENBARGER?

22   A.   YES.

23   Q.   IS YOUR TESTIMONY TODAY BASED OFF OF YOUR INVESTIGATION

24   INTO THIS MATTER AND THAT OF OTHER AGENTS OR LAW ENFORCEMENT

25   PERSONNEL WHO INVESTIGATED THAT MATTER?

1    A.    YES.

2    Q.    IS YOUR TESTIMONY ALSO BASED ON DOCUMENTS AND OTHER ITEMS

3    THAT YOU REVIEWED?

4    A.    YES.

5    Q.    HOW DID MR. WOLFENBARGER COME TO THE FBI'S ATTENTION?

6    A.    THERE WAS A CYBERTIP FILED WITH THE NATIONAL CENTER FOR

7    MISSING AND EXPLOITED CHILDREN.

8    Q.    OKAY.  WAS YAHOO ABLE TO IDENTIFY THE ACCOUNT ASSOCIATED

9    WITH THE CYBERTIP?

10   A.    THEY WERE.

11   Q.    HOW SO?

12   A.    IT WAS JRWOLFEN02@YAHOO.COM.  YAHOO HAD CONDUCTED A SEARCH

13   OF THEIR INTERNAL SYSTEMS AND THEY HAD FOUND JRWOLFEN02 WAS

14   VIOLATING THEIR TERMS OF SERVICE AND IT CONTAINED CHILD

15   EXPLOITATION.

16        MR. ARCHER:  OBJECTION.  LACKS PERSONAL KNOWLEDGE.

17        AND, FRANKLY, COULD WE HAVE AN OFFER OF PROOF AS TO WHAT

18   HIS TESTIMONY IS GOING TO BE TODAY?  I'M NOT 100 PERCENT SURE.

19   BECAUSE MY UNDERSTANDING IS HE WAS ON THE CASE AFTER THE SEARCH

20   AND EXECUTION, OR THE APPLICATION FOR THE SEARCH WARRANT.

21        MS. HARRIS:  I'M ACTUALLY -- I HAVE A VERY LIMITED

22   SET OF QUESTIONS, YOUR HONOR, DEALING WITH -- HE WAS THE PERSON

23   WHO CONDUCTED THE SEARCH WARRANT EXECUTION AND REVIEWED THE

24   ACCOUNT, AND ALSO IN REFERENCE TO AN INTERVIEW THAT HE HAD WITH

25   MR. WOLFENBARGER AS A RESULT.

1          MR. ARCHER:  SO I DON'T KNOW HOW THAT WOULD BE

2     RELEVANT TO WHAT THE DEFENSE HAS RAISED IN TERMS OF THE

3     CHALLENGES.  BUT, I MEAN, IF --

4          THE COURT:  I'LL ALLOW IT.

5        BUT WHY DON'T YOU LAY THE FOUNDATION FOR HOW HE KNOWS WHAT

6     YAHOO DID?

7          MS. HARRIS:  SURE.

8     Q.  IF YOU KNOW, GO AHEAD.

9     A.  THIS IS WHAT HAPPENS WHEN THERE'S A CYBERTIP FILED WITH

10    THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN.  THERE

11    IS NOT A NARRATIVE, BUT A SHORT RENDITION OF WHY THE REPORT IS

12    BEING FILED, AND IN THAT, IT WAS THAT THERE WAS CHILD

13    EXPLOITATION MATERIAL ACTIVE ON THE ACCOUNT.

14    Q.  I SEE.

15         THE COURT:  LET ME ASK MS. SHORTRIDGE, CAN YOU HEAR

16    HIM?

17         THE REPORTER:  NOT VERY WELL.

18         THE COURT:  OKAY.  CAN YOU PLEASE ADJUST THE

19    MICROPHONE?  AND YOU CAN ALSO CHANGE IT SO IT'S NOT AT AN

20    ANGLE.

21        THANK YOU.

22    BY MS. HARRIS:

23    Q.  BASED ON THE INFORMATION RECEIVED IN THE CYBERTIP, DID THE

24    FBI PURSUE A SEARCH WARRANT?

25    A.  YES.

1    Q.  WERE YOU THE AFFIANT ON THE SEARCH WARRANT?

2    A.  NO.

3    Q.  WHO WAS THE AFFIANT?

4    A.  AGENT TROMBETTA.

5    Q.  WAS THE SEARCH WARRANT LATER GRANTED?

6    A.  YES.

7    Q.  AND WAS THE SEARCH WARRANT EXECUTED?

8    A.  YES.

9    Q.  AND WHO WAS IT WHO EXECUTED THE SEARCH WARRANT?

10   A.  AGENT TROMBETTA ACTUALLY SERVED IT ON YAHOO, AND I WAS THE

11   ONE WHO ACTUALLY PROCESSED THE RETURN.

12   Q.  AND WHAT WAS THE RESULT OF THE PROCESS, YOUR PROCESSING OF

13   THE RETURN?

14   A.  THERE WERE CHILD EXPLOITATION IMAGES, VIDEOS, AND STILL

15   PICTURES, AS WELL AS NUMEROUS CHATS IDENTIFYING THE RAPE OF

16   CHILDREN, THE EXPLOITATION OF MINORS, AND NUMEROUS INSTANCES

17   REQUESTING MORE OF THE SAME.

18   Q.  SO AT SOME POINT IN YOUR INVESTIGATION, DID YOU SPEAK

19   DIRECTLY WITH MR. WOLFENBARGER?

20   A.  TWICE.

21   Q.  HOW MANY -- OKAY.  WHAT WERE -- THOSE TWO TIMES, WHEN WAS

22   THAT?

23   A.  I SPOKE TO MR. WOLFENBARGER ON AUGUST 2ND WHEN HE FLEW

24   INTO SAN FRANCISCO INTERNATIONAL AIRPORT, AND I SPOKE --

25           THE COURT:  WHAT'S THE YEAR?

1          THE WITNESS:  2016.

2          THE COURT:  OKAY.  THANK YOU.

3       GO AHEAD, PLEASE.

4    BY MS. HARRIS:

5    Q.  GO AHEAD.

6    A.  AND I SPOKE TO HIM AGAIN ON AUGUST 31ST, 2016, IN HIS HOME

7    OF RECORD IN MORGAN HILL, CALIFORNIA.

8    Q.  OKAY.  AND WERE THOSE MEETINGS RECORDED?

9    A.  YES.

10          MS. HARRIS:  AND FOR THE RECORD, RECORDINGS OF THOSE

11   INTERVIEWS WERE MANUALLY FILED PREVIOUSLY ON A DISK.

12          THE COURT:  YES, WE'VE LISTENED TO THEM.

13          MS. HARRIS:  CORRECT.  OKAY.

14   Q.  SO I WANT TO DISCUSS YOUR SECOND MEETING WITH

15   MR. WOLFENBARGER ON AUGUST 31ST, 2016.

16       YOU SAID THAT OCCURRED IN MORGAN HILL?

17   A.  YES.

18   Q.  WHERE, APPROXIMATELY?

19   A.   IT WAS OUTSIDE OF A PEET'S.  I DON'T REMEMBER THE EXACT

20   ADDRESS, BUT IT WAS A PEET'S COFFEE SHOP, WHICH IS IN A STRIP

21   MALL, AND WE SPOKE IN A PARKING LOT NEXT TO AN ADJACENT EMPTY

22   FIELD.

23   Q.  HOW WAS THAT MEETING ARRANGED?

24   A.   MR. WOLFENBARGER AND I EXCHANGED A PHONE CALL AND A TEXT

25   MESSAGE.

1    Q.   OKAY.  HOW DID MR. WOLFENBARGER ARRIVE TO THE MEETING?

2    A.   HE WAS DRIVING A WHITE MINIVAN IF I RECALL.

3    Q.   WAS HE ACCOMPANIED BY ANYONE?

4    A.   NO.

5    Q.   SO HE CAME ALONE IN A CAR?

6    A.   YES.

7    Q.   DID YOU COME WITH ANYONE ELSE?

8    A.   NO.

9    Q.   WAS HE HANDCUFFED AT ALL DURING THIS MEETING?

10   A.   NO.

11   Q.   WAS HE ENCLOSED IN ANY WAY?

12   A.   NO.

13   Q.   DID HE SEEM SCARED OR FEARFUL TO YOU AT THE TIME?

14   A.   NOT AT ALL.

15   Q.   SO AT THAT TIME, DID MR. WOLFENBARGER DO ANYTHING TO

16   ASSIST YOUR INVESTIGATION?

17   A.   MR. WOLFENBARGER WAS HELPING US IDENTIFY HIS VICTIMS SO

18   THAT WE CAN RECOVER THOSE VICTIMS FROM BEING EXPLOITED BY OTHER

19   SUBJECTS.

20   Q.   HOW DID HE DO THAT?

21   A.   HE PROVIDED US ONLINE CONSENT TO ASSUME HIS ONLINE

22   IDENTITY, AND WE DO THAT WITH AN FD 1086.  AN FD 1086, IT'S AN

23   ASSUMED ONLINE IDENTITY FORM THAT WE USE AT THE FBI.

24        SO WHEN A SUBJECT WANTS TO COOPERATE WITH US, WE ASK IF

25   THEY'LL SIGN THAT FORM, WHICH GIVES US CONSENT TO THEIR ENTIRE

```
 1      ACCOUNT.  WE THEN CHANGE THE ACTUAL PASSWORD AND THE FBI

 2      ASSUMES THE ACCOUNT.

 3              MS. HARRIS:  SO MAY I APPROACH, YOUR HONOR?

 4              THE COURT:  YES.

 5      BY MS. HARRIS:

 6      Q.   SHOWING YOU WHAT'S BEEN PREVIOUSLY FILED IN A SEPARATE

 7      SUPPRESSION LITIGATION AS GOVERNMENT'S EXHIBIT 1F, WHAT IS THAT

 8      DOCUMENT (HANDING)?

 9      A.   THIS IS AN FD 1086, AN FBI FORM CONSENT TO ASSUME ONLINE

10      IDENTITY AUTHORIZATION FORM.

11      Q.   WAS THAT FILED WITH A DECLARATION THAT YOU PREVIOUSLY

12      FILED IN RESPONSE TO A MOTION TO SUPPRESS STATEMENTS DURING

13      THAT INTERVIEW?

14      A.   YES.

15      Q.   I'LL PUT IT UP HERE.

16          OKAY.  NOW, CAN YOU PLEASE TAKE US THROUGH THIS FORM?

17      WHAT IS IT?  THERE'S A SIGNATURE THAT APPEARS HERE ON THE

18      BOTTOM THIRD OF THE FORM; IS THAT CORRECT?

19      A.   YES.

20      Q.   WHOSE SIGNATURE IS IT?

21      A.   THAT'S MR. WOLFENBARGER'S SIGNATURE.

22      Q.   OKAY.  AND THERE IS A SIGNATURE OF A WITNESS; IS THAT

23      CORRECT?

24      A.   YES.

25      Q.   WHOSE SIGNATURE IS THAT?
```

1   A.   THAT IS MINE.

2   Q.   AND THE DATE THIS FORM WAS SIGNED?

3   A.   AUGUST 31ST, 2016.

4   Q.   OKAY.   THERE ARE ACCOUNTS THAT ARE IDENTIFIED IN THE --

5   UNDER ACCOUNT NAME.   WHAT ARE THOSE ACCOUNTS?

6   A.   IT'S JRWOLFEN02, AND JRWOLFEN2000@AOL.COM.

7   Q.   AND IT LOOKS LIKE THERE'S A PASSWORD PROVIDED AS WELL.

8   A.   THAT'S CORRECT.

9   Q.   WHO PROVIDED THE PASSWORD?

10  A.   MR. WOLFENBARGER.

11  Q.   WHO PROVIDED THE ACCOUNTS TO IDENTIFY THEM?

12  A.   MR. WOLFENBARGER.

13  Q.   AND WHAT AUTHORIZATION DID HE GIVE YOU AT THAT TIME

14  REGARDING THOSE ACCOUNTS?

15  A.   HE GAVE THE FBI CONSENT TO ASSUME THE IDENTITY OF THE

16  ACCOUNTS, AS WELL AS SEARCH THE ACCOUNTS.

17  Q.   DID HE PROVIDE A PASSWORD FOR THE JRWOLFEN02 ACCOUNT?

18  A.   HE PROVIDED MULTIPLE PASSWORDS TO THE DIFFERENT ACCOUNTS.

19  Q.   SO I'M FLIPPING TO PAGE 2 OF THE DOCUMENT.

20       WHAT IS THIS?

21  A.   THESE ARE MY NOTES FROM THE INTERVIEW.

22  Q.   AND WHAT DO THESE NOTES SAY?

23  A.   SO IN THE TOP RIGHT-HAND CORNER, WE HAVE A COUPLE

24  DIFFERENT PASSWORDS THAT MR. WOLFENBARGER WANTED US TO TRY FOR

25  HIS ACCOUNT.

1    Q.   OKAY.  AND DID YOU TRY THEM DURING YOUR INTERVIEW WITH HIM

2    ON THE 31ST OF AUGUST, 2016?

3    A.   WE DID.

4    Q.   ALL OF THEM?

5    A.   YEAH.  WE TRIED MULTIPLE PASSWORDS, EVERY ONE THAT

6    MR. WOLFENBARGER COULD REMEMBER, BUT WE COULD NOT OBTAIN ACCESS

7    TO HIS ACCOUNT.

8    Q.   AND TO BE CLEAR, AS A RESULT OF THIS WAIVER, HE WAS GIVING

9    YOU AUTHORIZATION TO MONITOR INCOMING AND OUTGOING

10   COMMUNICATIONS IN THAT -- IN THESE ACCOUNTS LISTED?

11   A.   YES.

12   Q.   AND USING OR DISCLOSING ACCESS INFORMATION?

13   A.   YES.

14   Q.   SEARCHING STORED CONTENT IN THE ACCOUNT?

15   A.   YES.

16   Q.   SENDING AND RECEIVING COMMUNICATIONS WITH INDIVIDUALS OR

17   GROUPS UTILIZING THE ABOVE-NAMED ACCOUNTS?

18   A.   YES.

19   Q.   AND HE ALSO STATES THAT HE UNDERSTOOD THAT THE FBI WILL

20   CHANGE THE PASSWORD SO THAT HE WOULDN'T HAVE ACCESS?

21   A.   YES.

22        THE COURT:  LET ME ASK A QUESTION.  WE LISTENED TO

23   THOSE RECORDINGS AT THE END OF MARCH AND IN EARLY APRIL OF 2018

24   BECAUSE THAT MOTION TO SUPPRESS WAS WITHDRAWN THE AFTERNOON

25   BEFORE THE MORNING HEARING, SO I WAS PRETTY MUCH READY TO GO ON

1    THAT MOTION.

2             MS. HARRIS:  UM-HUM.

3             THE COURT:  I DON'T KNOW IF WE STILL HAVE THOSE

4    RECORDINGS.  THEY WERE ON A DVD, IF I RECALL.

5             MS. HARRIS:  YES, YOUR HONOR.

6             THE COURT:  BECAUSE THAT MOTION WAS WITHDRAWN,

7    EVERYTHING HAS BEEN RECYCLED, ANY CHAMBERS COPIES.  I DON'T

8    KNOW -- I ASSUME THE CLERK'S OFFICE STILL HAS AN ORIGINAL, BUT

9    I'M NOT CERTAIN.

10        I'D LIKE THE DVD FOR THAT AUGUST 31, 2016 CALL TO BE

11   REPROVIDED.

12            MS. HARRIS:  YES, YOUR HONOR.  WE CAN DO THAT.

13            THE COURT:  THE SAME COPY OF WHAT YOU PREVIOUSLY

14   FILED WITH YOUR OPPOSITION.

15            MS. HARRIS:  YES, YOUR HONOR.  WE CAN DO THAT.

16            THE COURT:  OKAY.  THANK YOU.

17   BY MS. HARRIS:

18   Q.   SO APPROXIMATELY HOW LONG DID THAT INTERVIEW LAST?

19   A.   APPROXIMATELY 90 MINUTES.

20   Q.   AND WHAT HAPPENED AFTER THE INTERVIEW CONCLUDED?

21   A.   MR. WOLFENBARGER DEPARTED THE AREA.

22   Q.   DID YOU ARREST HIM AFTER THE INTERVIEW WAS DONE?

23   A.   NO.

24   Q.   DID YOU EVER THREATEN TO ARREST HIM IF HE DIDN'T SHOW UP?

25   A.   NO.

1    Q.   DID YOU EVER HAVE ANY COMMUNICATIONS WITH SEAN ZADIG OR

2    ANYONE ELSE AT YAHOO RELATED TO YOUR INVESTIGATION OF

3    MR. WOLFENBARGER?

4    A.   NO.

5    Q.   HOW DID YOU COME TO THAT DETERMINATION?

6    A.   WE SEARCHED ALL OUR RECORDS, WE SCRUBBED OUR PHONES, WE

7    SCRUBBED ALL THE E-MAIL ACCOUNTS WE HAVE AT FBI, BUT I HAD NO

8    CONTACT WITH MR. ZADIG.

9    Q.   YOUR PERSONAL -- YOU PERSONALLY HAD NO CONTACT?

10   A.   CORRECT.

11   Q.   ALL RIGHT.  MY QUESTIONS HAVE NOT COVERED EVERY DETAIL

12   THAT YOU KNOW ABOUT THIS CASE AND THE INVESTIGATION; IS THAT

13   CORRECT?

14   A.   YES.

15   Q.   HAVE YOU MERELY ANSWERED THE QUESTIONS THAT I HAVE ASKED

16   YOU?

17   A.   YES.

18   Q.   WHEN YOU TESTIFIED ABOUT CONVERSATIONS YOU HAD WITH OTHERS

19   OR DOCUMENTS YOU REVIEWED, EXCEPT THE ONES THAT WE DISCUSSED

20   TODAY, DID YOU TESTIFY TO THE EXACT WORDS USED, OR JUST TO THE

21   SUBSTANCE OF THE CONVERSATIONS AND DOCUMENTS?

22   A.   TO THE SUBSTANCE.

23        MS. HARRIS:  DOES THE COURT HAVE ANY FURTHER

24   QUESTIONS FOR SPECIAL AGENT MARCEAU?

25        THE COURT:  NO.

```
 1              I DON'T THINK IT'S RELEVANT FOR PURPOSES OF THESE TWO

 2     MOTIONS, BUT WHY DON'T YOU GO AHEAD AND GIVE US COURTESY COPIES

 3     OF THE AUGUST 2ND, 2016 INTERVIEW THAT WAS DONE AT THE

 4     SAN FRANCISCO INTERNATIONAL AIRPORT?

 5              MS. HARRIS:  YES, YOUR HONOR.

 6              THE COURT:  I DON'T THINK IT'S RELEVANT FOR THESE

 7     PURPOSE, BUT JUST FOR COMPLETION OF THE RECORD, I'D LIKE TO

 8     HAVE IT AGAIN.

 9              MS. HARRIS:  THANK YOU.

10              THE COURT:  I DISPOSED OF THE ONES FROM LAST YEAR.

11       OKAY.  GO AHEAD, PLEASE, WITH ANY CROSS.

12              MR. ARCHER:  NO QUESTIONS, YOUR HONOR.  THANK YOU.

13              THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED

14     SUBJECT TO RECALL?

15              MS. HARRIS:  YES, YOUR HONOR.

16              MR. ARCHER:  YES, YOUR HONOR, NOT SUBJECT TO RECALL.

17              THE COURT:  ALL RIGHT.  THEN YOU HAVE COMPLETED YOUR

18     TESTIMONY.

19       DO YOU HAVE ANY MORE WITNESSES?

20              MS. HARRIS:  NOTHING FURTHER FROM THE GOVERNMENT,

21     YOUR HONOR.

22              THE COURT:  OKAY.

23       AND, MR. ARCHER, YOU PREVIOUSLY REPRESENTED THAT YOU WOULD

24     NOT HAVE ANY WITNESSES.  IS THAT CORRECT?

25              MR. ARCHER:  THAT IS CORRECT, YOUR HONOR.
```

414

1              THE COURT:  OKAY.  SO HAVE WE CONCLUDED THEN THE

2     EVIDENTIARY HEARING FOR THE TWO PENDING MOTIONS?

3              MR. ARCHER:  YES, YOUR HONOR.

4              MS. HARRIS:  YES, YOUR HONOR.

5              THE COURT:  OKAY.  THEN THANK YOU ALL VERY MUCH.

6              THE CLERK:  COURT ADJOURNED.

7              THE COURT:  THE TIME IS NOW 3:24.

8         (THE PROCEEDINGS WERE CONCLUDED AT 3:24 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18         DATED:  AUGUST 7, 2018

19

20

21

22

23

24

25